## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE,<br>430 S. Capitol St. SE,<br>Washington, DC 20003; | CIV. NO. 25-587 |
| DSCC,<br>120 Maryland Ave. NE,<br>Washington, DC 20002; | COMPLAINT FOR<br>DECLARATORY AND<br>INJUNCTIVE RELIEF |
| *and* | |
| DCCC,<br>430 S. Capitol St. SE,<br>Washington, DC 20003; | (Rule 57 Speedy Hearing Request) |
| Plaintiffs,<br>*v.* | |
| DONALD J. TRUMP, in his official capacity as President of the United States,<br>1600 Pennsylvania Ave. NW,<br>Washington, DC 20500; | |
| PAMELA BONDI, in her official capacity as U.S. Attorney General,<br>950 Pennsylvania Ave. NW,<br>Washington, DC 20530; | |
| FEDERAL ELECTION COMMISSION,<br>1050 First St. NE,<br>Washington, DC 20463; | |
| *and* | |
| JAMES E. "TREY" TRAINOR III, SHANA M. BROUSSARD, ALLEN DICKERSON, and DARA LINDENBAUM, in their official capacities as Commissioners of the Federal Election Commission,<br>1050 First St. NE,<br>Washington, DC 20463; | |
| Defendants. | |

**INTRODUCTION**

1.      In 1972, checks payable to President Nixon's reelection campaign were used to finance the burglary and wiretapping of the Democratic National Committee's headquarters. The ensuing scandal resulted in a bipartisan recognition that federal campaign finance rules must be clear and fair, enforced neutrally without fear or favor. Those goals, Congress recognized, could best be achieved by conditioning the interpretation and enforcement of those rules on the consensus reached by members of an impartial oversight board.

2.      That board—the Federal Election Commission ("FEC" or "Commission")—was created by 1974 amendments to the Federal Election Campaign Act ("FECA" or the "Act"). Upon signing the amendments into law, President Ford emphasized that "[b]oth the Republican National Committee and the Democratic National Committee have expressed their pleasure with this bill, noting that it allows them to compete fairly."[1]

3.      The fairness was by design. The FEC is led by six Commissioners, appointed by the President and confirmed by the U.S. Senate, who are tasked with administering federal campaign finance laws. The Commission's authoritative interpretation of those laws requires the support of at least four Commissioners, none of whom may hold elected office, and no more than three of whom may be affiliated with the same political party. This "inherently bipartisan structure" ensures that when political campaigns and party committees request rulemakings, seek advisory opinions on ambiguous statutory provisions, or defend against formal complaints—invariably on "issues charged with the dynamics of party politics"—they can be certain that the

---

[1] Press Release, The White House, Statement by the President (Oct. 15, 1974), available at https://www.fordlibrarymuseum.gov/sites/default/files/pdf_documents/library/document/0019/4520542.pdf.

outcome will not reflect the raw pursuit of electoral advantage by political opponents. *FEC v. DSCC*, 454 U.S. 27, 37 (1981).

4.     For over fifty years, that certainty held. But on February 18, 2025, President Trump issued Executive Order 14215, Section 7 of which provides that "the President and the Attorney General's opinions on questions of law are controlling on all employees in the conduct of their official duties" and prohibits any executive branch employee from "advanc[ing] an interpretation of law as the position of the United States that contravenes the President or the Attorney General's opinion on a matter of law." Exec. Order No. 14215 ("E.O. 14215") § 7, 90 Fed. Reg. 10447, 10448 (Feb. 18, 2025).

5.     As applied to the Commission, Executive Order 14215 would eliminate FECA's requirement that the executive branch's legal interpretations of FECA's provisions reflect the bipartisan consensus of an expert multimember board and replace that bipartisan consensus with the judgment of a single partisan political figure—the President of the United States.

6.     This abrupt departure from the statutory scheme threatens significant harm to the Democratic Party's three national political committees, Plaintiffs Democratic National Committee ("DNC"), DSCC, and DCCC.

7.     DSCC, for example, is currently defending itself before the Commission against a meritless complaint alleging that DSCC improperly classified four advertisements disseminated during the 2024 election cycle in violation of FECA's contribution and coordinated party spending limits. According to FECA's plain terms, the FEC can find that DSCC violated the Act only if at least one non-Republican Commissioner agrees with that finding. Under Executive Order 14215's terms, however, President Trump—the head of the Republican Party—could dictate to the

Commission a legal interpretation of FECA's provisions that would be dispositive to the complaint against DSCC.

8.      DNC, DSCC, and DCCC also all rely on impartial guidance from the FEC for virtually everything they do—soliciting contributions, making expenditures and other disbursements, coordinating campaign activity, and reporting to the Commission. Their ability to solicit rulemakings and advisory opinions and to file or defend against complaints will be severely impaired if those requests are to be resolved under the binding legal interpretations of a political opponent instead of a bipartisan commission of experts.

9.      Executive Order 14215 grounds its unprecedented assertion of presidential power in Article II of the U.S. Constitution. But the constitutionality of FECA's vesting of authority in the FEC is beyond question. The FEC is "patterned on the classic independent regulatory agency." *FEC v. NRA Political Victory Fund*, 6 F.3d 821, 826 (D.C. Cir. 1993). As the Supreme Court has held for 90 years, it "cannot well be doubted" that Congress possesses the authority to insulate from presidential micromanagement agencies that are led by a multimember, bipartisan board that performs quasi-judicial and quasi-legislative functions—that is, agencies like the FEC. *Humphrey's Ex'r v. United States*, 295 U.S. 602, 629 (1935). Congress's authority is especially true in this context, where the credibility of the entire regulatory enterprise would be fatally undermined if the party controlling the White House can unilaterally structure campaign rules and adjudicate disputes to disadvantage its electoral competitors.

10.     The Court should therefore certify the question of FECA's constitutionality to the *en banc* D.C. Circuit under 52 U.S.C. § 30110, and then declare that FECA's provisions shielding FEC decision-making from presidential coercion or control are constitutionally valid and enjoin

the application of Section 7 of Executive Order 14215 to the Commission as inconsistent with those provisions.

**JURISDICTION & VENUE**

11.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 52 U.S.C. § 30110.

12.    Venue is proper under 28 U.S.C. § 1391 and 52 U.S.C. § 30110.

**PARTIES**

13.    Plaintiff DNC is the Democratic Party's national committee as defined by 52 U.S.C. § 30101(14) and is dedicated to electing Democratic candidates at the national, state, and local levels. In support of this mission, DNC solicits contributions and makes expenditures. In the 2024 election cycle, for example, DNC reported to the Commission that it raised and spent over $650 million dollars. DNC intends to raise and spend money to support Democratic candidates in 2025 and 2026.

14.    Plaintiff DSCC, also known as the Democratic Senatorial Campaign Committee, is the Democratic Party's national senatorial committee, as defined by 52 U.S.C. § 30101(14). Its mission is to elect candidates of the Democratic Party across the country to the U.S. Senate. As part of this mission, DSCC solicits contributions and makes expenditures. In the 2024 election cycle, for example, DSCC reported to the Commission that it raised and spent over $250 million. DSCC intends to raise and spend similar amounts of money during the 2026 election cycle, including through joint fundraising committees it has formed and will form with Democratic senatorial candidates.

15.    Plaintiff DCCC, also known as the Democratic Congressional Campaign Committee, is the Democratic Party's national congressional committee as defined by 52 U.S.C. § 30101(14). Its mission is to elect candidates of the Democratic Party from across the country to

5

the U.S. House of Representatives. As part of this mission, DCCC solicits contributions and makes expenditures. In the 2024 election cycle, for example, DCCC reported to the Commission that it raised and spent over $300 million. DCCC intends to raise and spend similar amounts of money during the 2026 election cycle, including through joint fundraising committees it has formed and will form with Democratic congressional candidates.

16.     Together, DNC, DSCC, and DCCC constitute the National Democratic Party for purposes of federal campaign finance law. Virtually every aspect of their activity, including how they raise and spend money and interact with candidates and other political actors, is regulated by FECA. Among other things, the Act limits the permissible sources of contributions, caps contribution amounts, defines the scope of legitimate expenditures, strictly regulates how they may permissibly support their candidates, and imposes strict reporting requirements. Thus, to pursue their missions, DNC, DSCC, and DCCC regularly request and otherwise rely on the FEC's interpretation of FECA, as conveyed through informal guidance, policy documents, rulemakings, advisory opinions, and adjudication of alleged violations through the enforcement process. Plaintiffs' ability to conform their conduct to FECA—and to make strategic decisions about whether, when, and how to request the Commission's interpretation of ambiguous statutory or regulatory provisions—require certainty that the Commission will not be controlled by the head of the opposing political party, with an incentive to construe legal provisions to disadvantage Democratic candidates and campaigns.

17.     Defendant Donald J. Trump is the President of the United States and is sued in his official capacity. On February 18, 2025, President Trump issued Executive Order 14215, which purports to divest the FEC's Commissioners of authority to issue independent interpretations of FECA.

18.    Defendant Pamela Bondi is the United States Attorney General and is sued in her official capacity. Executive Order 14215 purports to authorize Attorney General Bondi to commandeer the Commissioners' statutory authority to issue independent interpretations of FECA, subject to the President's supervision and control.

19.    Defendant FEC is an independent commission with "exclusive jurisdiction" to administer, interpret, and civilly enforce FECA. 52 U.S.C. §§ 30106, 30107.

20.    Defendants James E. "Trey" Trainor III, Shana M. Broussard, Allen Dickerson, and Dara Lindenbaum are Commissioners of the FEC tasked with administering the FEC's functions according to their independent legal judgment. They are sued in their official capacities.

### FACTS

**A.    Congress vested "exclusive jurisdiction" in the Commissioners to administer, interpret, and civilly enforce FECA.**

21.    Following serious financial abuses in the 1972 presidential campaign, the Senate Select Committee on Presidential Campaign Activities initiated a formal investigation and reported its findings and recommendations. "Surely one of the most penetrating lessons of Watergate," the Committee concluded, "is that campaign practices must be effectively supervised . . . if our free institutions are to survive." *Final Report of the Senate Select Comm. on Presidential Campaign Activities*, S. Rep. No. 981, 93d Cong., 2d Sess. 581 (1974).[2]

22.    In response, Congress enacted a series of substantive reforms, including by amending FECA to establish the FEC. The FEC is an independent agency vested with "exclusive jurisdiction" to administer, interpret, and civilly enforce FECA. *See generally* 52 U.S.C. §§ 30106, 30107. Congress authorized the Commission to "formulate policy" with respect to FECA, *id.*

---

[2] Available at https://www.senate.gov/about/resources/pdf/watergate-final-report-1974.pdf.

§ 30106(b)(1); "to make, amend, and repeal such rules . . . as are necessary to carry out the provisions of [FECA]," *id.* §§ 30107(a)(8), 30111(a)(8); and to investigate possible violations of the Act, *id.* § 30109(a)(1)-(2).

23.    As the House Report accompanying the 1974 FECA amendments explained, it is "essential in this sensitive area [of campaign regulation] that the system of administration and enforcement enacted into law does not provide room for partisan misuse." H.R. Rep. No. 94-917, at 3 (1976). To prevent that misuse, Congress provided that the FEC would be multimember and bipartisan. By law today, the Commission is composed of six members appointed by the President, by and with the advice and consent of the Senate, and no more than three members of the Commission may be affiliated with the same political party. 52 U.S.C. § 30106(a)(1); *see also NRA Political Victory Fund*, 6 F.3d at 827 (holding that the inclusion of legislative officers as *ex officio* members of the commission is unconstitutional).

24.    To mitigate the risk that the FEC's powers could be wielded to provide an electoral advantage to a favored campaign, Congress required that the Commissioners be chosen "on the basis of their experience, integrity, impartiality, and good judgment" and that they not be "elected or appointed officers or employees in the executive, legislative, or judicial branch of the Federal Government," and prohibited them from engaging "in any other business, vocation, or employment." 52 U.S.C. § 30106(a)(3).

25.    The Commissioners serve staggered six-year terms, and they choose from among their members a chairman and vice chairman who are not affiliated with the same political party. *Id.* § 30106(a)(2), (5). The FEC requires affirmative votes from at least four Commissioners— which, given the bipartisan membership requirement, means Commissioners from at least two political parties—to (1) make, amend, or repeal rules, (2) approve enforcement actions, (3) initiate

or defend the Commission in certain court actions, (4) issue advisory opinions, (5) develop forms, (6) conduct hearings and investigations, and (7) refer cases of apparent criminal conduct to law enforcement. *Id.* §§ 30106(c), 30107(6)–(9), 30109(a).

26.    The independence of Commissioners' legal determinations is required by law and apparent from the FEC's regular operations.

27.    As FECA provides: "A member of the Commission *may not delegate to any person* his or her vote or any decisionmaking authority or duty vested in the Commission by the provisions of this Act." 52 U.S.C. § 30106(c) (emphasis added).

28.    The Commission appoints its own Staff Director and General Counsel, and it "is authorized to appear in and defend against any action instituted under [the] Act" by employing or appointing its own counsel. 52 U.S.C. § 30106(f).

29.    Congress even authorized the Commission to "appeal from, and to petition the Supreme Court for certiorari"—independent of the Department of Justice's Office of the Solicitor General—to review judgments in actions to enforce the presidential election fund laws. 26 U.S.C. §§ 9010(d), 9040(d). The Supreme Court recognized that the Commission's independent litigating authority in this context is "quite understandable" because "Presidential influence through the Solicitor General might be thought more likely in cases involving Presidential election fund controversies." *FEC v. NRA Pol. Victory Fund*, 513 U.S. 88, 94 (1994).

30.    Commissioners are also required to consider the views of the FEC's General Counsel before voting on whether there is probable cause to believe a person has violated FECA. 52 U.S.C. § 30109(a)(3). Commissioners cannot meaningfully consider the General Counsel's recommendation if they are obligated to vote consistently with diktats from the President.

31.     The FEC's internal operating procedures further anticipate and require that each Commissioner exercise independent legal judgment. For example, the Commission holds open meetings to consider new regulations, advisory opinions, and other public matters, and it holds closed executive sessions to discuss pending enforcement actions and litigation. *See* 11 C.F.R. §§ 2.3, 2.4. Discussions at these meetings—including preliminary "[s]tatements of views or expressions of opinions," 11 C.F.R. § 2.3—would be mere theater if Commissioners were not entitled to develop individual views and to cast votes reflecting their individual opinions.

32.     The Commission also sharply regulates ex parte communications with "any person outside the agency"—which necessarily includes the President and Attorney General—regarding any pending enforcement action, audit, litigation matter, rulemaking, advisory opinion request, or other matters. *See* 11 C.F.R. §§ 7.2, 7.8, 201.2, 201.3, 201.4.

33.     The Commissioners' independent efforts to interpret the law are also apparent from the FEC's regular practice of issuing "statements of reasons" explaining individual Commissioners' votes for or against proposals under consideration, even where the views depart from the Commission's General Counsel's analysis,[3] and even where the views are not shared by other Commissioners.[4]

---

[3] *See, e.g.*, FEC, MURs 7931/8059 & MURs 7968/7969, Statement of Reasons of Vice Chairman Sean J. Cooksey and Comm'rs Allen J. Dickerson and James E. "Trey" Trainor, III (Oct. 6, 2023), available at https://www.fec.gov/files/legal/murs/7968/7968_13.pdf.

[4] *See, e.g.*, FEC, MURs 7968 & 7969, Statement of Reasons of Comm'r Ellen L. Weintraub (Nov. 9, 2023), available at https://www.fec.gov/files/legal/murs/7968/7968_14.pdf.

34.    Individual Commissioners also regularly propose legal directives for the Commission to consider adopting;[5] they occasionally revise their proposals;[6] and other Commissioners may offer competing proposals.[7] When proposed legal interpretations come to a vote, Commissioners regularly disagree with each other about the appropriate outcome.[8]

35.    Commissioners' exercise of independent judgment is therefore an established feature of the FEC's activity, reflecting Congress's decision to pattern the Commission "on the classic independent regulatory agency" sanctioned by Supreme Court precedent. *NRA Pol. Victory Fund*, 6 F.3d at 826. "Congress' decision to create the FEC as an independent agency and to charge it with the civil enforcement of the FECA was undoubtedly influenced by Congress' belief that the Justice Department, headed by a Presidential appointee, might choose to ignore infractions committed by members of the President's own political party." *NRA Pol. Victory Fund*, 513 U.S. at 95–96.

**B.    Executive Order 14215 purports to monopolize authority to interpret FECA in the President and Attorney General alone.**

36.    On February 18, 2025, President Trump issued Executive Order 14215, titled: "Ensuring Accountability for All Agencies."

---

[5] *See, e.g.*, Memorandum from Comm'r Allen J. Dickerson to the Federal Election Commission (Aug. 9, 2023), available at https://www.fec.gov/resources/cms-content/documents/mtgdoc-23-21-A.pdf.

[6] *See, e.g.*, Memorandum from Comm'r Allen J. Dickerson to the Federal Election Commission (Oct. 12, 2023), available at https://www.fec.gov/resources/cms-content/documents/mtgdoc-23-21-A1.pdf.

[7] *See, e.g.*, Memorandum from Comm'r Shana M. Broussard & Chair Dara Lindenbaum to the Federal Election Commission (Oct. 26, 2023), available at https://www.fec.gov/resources/cms-content/documents/mtgdoc-23-21-B.pdf.

[8] *See, e.g.*, Certification, Agenda Document No. 21-21-A, Federal Election Commission (May 5, 2021), available at https://www.fec.gov/resources/cms-content/documents/Vote-Draft-Statement-of-Policy-Initial-Stage-in-the-Enforcement-Process-4-22-21.pdf.

37.    Asserting that "[t]he Constitution vests all executive power in the President," the Executive Order criticizes "'independent regulatory agencies'" that "currently exercise substantial executive authority without sufficient accountability to the President." E.O. 14215 § 1.

38.    Executive Order 14215 goes on to proclaim that "these regulatory agencies have been permitted to promulgate significant regulations without review by the President" and that such "practices undermine . . . accountability[,] . . . prevent a unified and coherent execution of Federal law," and necessitate that their officers be "controlled" by the President. *Id.* The Executive Order declares, then, that "it shall be the policy of the executive branch to ensure Presidential supervision and control of the entire executive branch," including independent agencies. *Id.*

39.    To extinguish the independence that Congress vested in these agencies, Section 7 of the Executive Order proclaims: "The President and the Attorney General's opinions on questions of law are controlling on all employees in the conduct of their official duties. No employee of the executive branch acting in their official capacity may advance an interpretation of the law as the position of the United States that contravenes the President or the Attorney General's opinion on a matter of law, including but not limited to the issuance of regulations, guidance, and positions advanced in litigation, unless authorized to do so by the President or in writing by the Attorney General." *Id.* § 7.

40.    The Executive Order defines "employees" to have the same meaning as that term is given in 5 U.S.C. § 2105. *Id.* § 2.

41.    That statutory definition of "employee," in turn, includes "an officer and an individual who is . . . appointed in the civil service by [the President] acting in an official capacity . . . engaged in the performance of a Federal function under authority of law . . . [and] subject to

the supervision of" the President "while engaged in the performance of the duties of his position." 5 U.S.C. § 2105.

42.     The term "employees," as used in the Executive Order, encompasses the Commissioners and other employees of the FEC.

43.     Consequently, Executive Order 14215 purports to preclude the Commissioners and other FEC employees from advancing any legal positions other than those of the President and Attorney General in the course of their enforcement of FECA, on the ground that Article II requires the President to control legal interpretations for the entire executive branch.

44.     In other words, the Executive Order is grounded in the assertion that the provisions of FECA granting the Commissioners the power and duty to exercise independent legal judgment are unconstitutional infringements of the President's executive power.

45.     The assertion is incompatible with nearly a century's worth of Supreme Court precedent blessing Congress's authority to insulate certain agencies and officials from day-to-day control by the President. *See, e.g.*, *Morrison v. Olson*, 487 U.S. 654, 692–93 (1988); *Weiner v. United States*, 357 U.S. 349, 356 (1958); *Humphrey's Ex'r*, 295 U.S. at 629; *see also Buckley v. Valeo*, 424 U.S. 1, 141 (1976) (recognizing the FEC's functions "are of kinds usually performed by independent regulatory agencies" and that "Congress viewed [the FEC's] broad powers as essential to effective and impartial administration of the entire substantive framework of [FECA]").

**C.     Plaintiffs rely on the independent structure of the FEC established by law.**

46.     The extinction of the FEC's independence—and replacement with the President's decree—severely harms Plaintiffs by placing the head of the opposing political party in charge of interpreting campaign finance law for the executive branch. FECA and the FEC's regulations

structure nearly every aspect of Plaintiffs' activities, and Plaintiffs interact with the Commission on a regular basis.

47.    For one thing, when any individual files a complaint alleging a violation of FECA, the Commission must determine whether it has "reason to believe" that a violation has occurred—which requires an affirmative vote of four Commissioners—and, if so, "make an investigation of such alleged violation." 52 U.S.C. § 30109(a)(2). Complaints filed with the FEC often raise issues of law, and the Commission's determinations as to how to resolve those complaints often involve deciding questions of law, as illustrated further below. Plaintiffs have been the subjects of such complaints made with the Commission. For example, DCCC was the subject of two complaints in the 2021–22 election cycle, which have since been resolved in DCCC's favor.

48.    FECA also entitles individuals, candidates, or committees to submit written requests concerning the application of FECA or the FEC's rules or regulations "with respect to a specific transaction or activity." 52 U.S.C. § 30108(a). In response to such a request, the Commission "shall" render an advisory opinion on that question. *Id.* Plaintiffs sought two such advisory opinions from the Commission in the 2023–24 election cycle and four in the 2021–22 election cycle. The ability to seek such advisory opinions is critical to Plaintiffs' operations because it provides them with certainty and predictability with respect to potential courses of action. Specifically, FECA provides that anyone involved in the "specific transaction or activity" at issue in the advisory opinion as well as anyone involved in any "transaction or activity which is indistinguishable in all its material aspects" may rely on the advisory opinion, and that anyone who relies on an advisory opinion and acts in good faith in accordance with that opinion may not be subject to any sanction under FECA. 52 U.S.C. § 30108(c).

49.     As national party committees, Plaintiffs are also required to file monthly reports with the Commission. This requirement applies in both election and non-election years. In compiling those reports, Plaintiffs rely on FEC guidance, decisions, and practices interpreting FECA regarding the manner in which various transactions must be reported. The FEC will also periodically ask for follow-up information from Plaintiffs in response to monthly reports if the Commission believes it is needed.

50.     In addition, Plaintiffs rely on FEC guidance in numerous other areas in the day-to-day performance of their activities. For instance, DSCC and DCCC routinely help individual campaigns with political strategy and do so based on their understanding of FECA and regulations issued by the Commission.

51.     Further, DSCC is *currently* the subject of a pending FEC complaint, and the backstory behind that complaint reinforces the many ways in which Plaintiffs rely on the independent structure of the Commission as established by law.

52.     On September 18, 2024, DSCC and Rosen for Nevada (the principal campaign committee for Senator Jacky Rosen) filed a request for an advisory opinion from the Commission with respect to "hybrid" television advertisements, or ads that promote both a clearly identified federal candidate *and* a national committee of a political party. This advisory opinion request asked four questions with respect to a series of proposed hybrid advertisements to be run by DSCC and Rosen for Nevada. The first asked the Commission to expressly confirm the legality of arrangements to evenly split the costs of hybrid ads, provided they equally promoted Senator Rosen's candidacy for the U.S. Senate and generic candidates of the Democratic Party on a time/space basis. The other three questions dealt with whether specific elements of proposed

advertisements should be allocated as candidate advocacy or party advocacy for purposes of this analysis.

53.     In a bipartisan vote of five to zero, with one abstention, the Commission issued its opinion on this request, Advisory Opinion 2024-14, on October 10, 2024.[9] The advisory opinion answered the first question in the affirmative, ruling that DSCC and Rosen for Nevada could evenly split the costs of such hybrid television advertisements. The Commission also determined, in response to the second question, that portions of advertisements featuring Senator Rosen narrating or speaking directly to camera should be allocated as candidate advocacy. The Commission, however, did not approve a response to DSCC's and Rosen for Nevada's third and fourth questions.

54.     Just two weeks later, on October 24, 2024, the Ted Cruz for Senate campaign filed an FEC complaint against DSCC, then-Texas Senate candidate Colin Allred, and Allred's campaign. Consistent with Advisory Opinion 2024-14, DSCC and Allred had run four hybrid advertisements. The Cruz campaign's complaint alleged that these advertisements did not properly qualify as hybrid ads, resulting in in-kind contributions from DSCC to Allred in excess of the limits FECA imposes on national committees' contributions to and coordinated party expenditures with a candidate.[10] This complaint remains under review by the Commission.

55.     This series of events is typical for Plaintiffs, and it illustrates that Plaintiffs are repeat players before the FEC who interact with the Commission on an ongoing basis.

---

[9] Available at https://www.fec.gov/files/legal/aos/2024-14/2024-14.pdf.

[10] The Cruz campaign's complaint was reported on and republished by the *Daily Caller*. *See* Henry Rodgers, *EXCLUSIVE: Ted Cruz Campaign Accuses Political Opponent Of Violating Federal Law With Chuck Schumer, Fellow Democrats*, Daily Caller (Oct. 24, 2024), available at https://perma.cc/YP39-NLXZ.

56.    It also shows how complaints and requests for advisory opinions filed with the FEC often raise questions of law, which the Commission has historically answered based on its Commissioners' independent legal judgment. In Advisory Opinion 2024-14, for example, the Commission included significant legal analysis explaining its conclusion that hybrid advertisements were permissible under FECA and the Commission's regulations.

57.    Most importantly, it shows the extent to which Plaintiffs' core activities rely on the fundamental premise that the FEC's decisions will be rendered by a bipartisan Commission that is made up of members of multiple political parties, each exercising independent judgment to determine—consistent with the statutory language and any applicable judicial opinions—what the law requires. DSCC sought a determination regarding hybrid ads to obtain guidance for the ads that it would run in the closing weeks of contested Senate races. It did so with the understanding that the FEC's decisions will be made by bipartisan experts, and that the Commission will not take positions on questions of law for the partisan purpose of disadvantaging Democratic campaigns and Democratic candidates. The same is also true any time Plaintiffs decide, for instance, whether or not to file a complaint with the Commission, what advertisements to air, or what strategy to recommend to campaigns regarding how to operate while also complying with the Commission's regulations.

58.    Executive Order 14215 obliterates this understanding. By providing that no employee of the executive branch may advance an interpretation that contravenes the President or the Attorney General's opinion on a matter of law, the Executive Order purports to provide President Trump—the leader of the Republican Party—with the ability to order the FEC to take particular positions on any question of law arising in the Commission's performance of any of its duties.

59.     The inability to rely on the independent legal judgment of the FEC's Commissioners inevitably harms Plaintiffs. For example, DSCC's calculus as to whether to request an advisory opinion from the FEC in the final weeks of the 2024 general election as to its proposed advertisements would have surely been affected if DSCC knew that a Republican President could dictate the outcome of the case to the Commission as a matter of law. And DSCC's ability to defend itself against the pending complaint against it will be substantially impaired if the President is able to dictate that the Commission resolve disputed questions of law against DSCC and in favor of Senator Cruz.

60.     Executive Order 14215 is therefore already causing, and will continue to cause, direct and irreparable injury to Plaintiffs.

**CLAIMS FOR RELIEF**

**COUNT I**

**Action to Construe the Constitutionality of FECA**
**(28 U.S.C. § 2201; 52 U.S.C. § 30110)**

61.     Plaintiffs incorporate Paragraphs 1 through 60 above as if set forth fully herein.

62.     FECA provides that "the national committee of any political party . . . may institute such actions in the appropriate district court of the United States, including actions for declaratory judgment, as may be appropriate to construe the constitutionality of any provision of this Act." 52 U.S.C. § 30110.

63.     "Congress, in enacting [52 U.S.C. § 30110], intended to provide judicial review to the extent permitted by Art. III." *Buckley*, 424 U.S. at 11–12.

64.     Plaintiffs are national committees of the Democratic Party, as defined by 52 U.S.C. § 30101(14).

65.    As a result of Executive Order 14215, Plaintiffs have a concrete, ripe dispute with Defendants regarding the constitutionality of FECA's provisions vesting the Commissioners with the authority to exercise their independent legal judgment when interpreting the Act. *See* 52 U.S.C. §§ 30106(b), (c), (f)(4), 30107(a)(6), (7), 30108, 30109.

66.    In particular, Executive Order 14215 commands the Commissioners and the Commission's employees to treat Defendant Trump's and Defendant Bondi's "interpretations of law," including of FECA, as "authoritative" and "controlling on [the Commissioners and the Commission's employes] in the conduct of their official duties," and prohibits the Commissioners and the Commission's employees from "advanc[ing] any interpretation of the law as the position of the United States that contravenes the President or the Attorney General's opinion on a matter of law." E.O. 14215 § 7.

67.    Executive Order 14215's commands are inconsistent with FECA's vesting in the Commission—not the President and the Attorney General—of the exclusive authority to "administer, seek to obtain compliance with, and formulate policy with respect to" FECA, 52 U.S.C. § 30106(b)(1), to exercise its "duties and powers . . . by a majority vote of the Members of the Commission," *id.* § 30106(c), and to "appear in and defend against any action instituted under this Act" through "attorneys employed in its office" or "counsel whom it may appoint," *id.* § 30106(f)(4), among other provisions of FECA.

68.    Executive Order 14215 grounds its unlawful commands to the FEC entirely in a broad assertion of the President's constitutional power, contending that the vesting of "all executive power in the President" means that all "executive branch officials remain subject to the President's ongoing supervision and control. E.O. 14215 § 1.

69.     The sole basis for Executive Order 14215's command that the Commission and its employees follow the President's and the Attorney General's legal interpretations despite FECA's contrary provisions is therefore the Executive Order's implicit assertion that any contrary statutory provisions unconstitutionally abridge the President's executive authority under Article II.

70.     The issuance of the Executive Order has caused and will continue to cause Plaintiffs harm. Plaintiffs remain chilled from seeking legal guidance from the FEC as long as it appears that the guidance will reflect the singular strategic aims of a political opponent—the head of the Republican Party. And given the complaint pending against it, DSCC risks being deprived of its right to be free from a finding that it violated FECA absent the affirmative vote of at least four Commissioners exercising their independent judgment.

71.     Plaintiffs therefore bring this action under 52 U.S.C. § 30110 to "construe the constitutionality of" the provisions of the FECA that vest the members of the Commission, not the President and the Attorney General, with the authority to interpret FECA in the course of carrying out the Commission's statutory duties, in the face of Executive Order 14215's contrary assertion. *See* 52 U.S.C. §§ 30106(b), (c), (f)(4), 30107(a)(6), (7), 30108, 30109.

72.     FECA's vesting of authority to interpret the Act in the Commission, not the President and Attorney General, is consistent with Article II. Courts have long held that "[t]he Commission is patterned on the classic independent regulatory agency sanctioned" by longstanding Supreme Court precedent. *NRA Political Victory Fund*, 6 F.3d at 826; *see also Humphrey's Ex'r*, 295 U.S. at 629. The FEC's structure is strikingly similar to that of the Federal Trade Commission as upheld in *Humphrey's Executor*—it is led by a multimember body of experts who are balanced along partisan lines, appointed to staggered terms.

20

73.    Under 52 U.S.C. § 30110, the Court should therefore "immediately . . . certify" the "question[] of constitutionality" of the Act's provisions vesting the Commission with independent authority to interpret FECA to the U.S. Court of Appeals for the D.C. Circuit, "which shall hear the matter sitting en banc," and issue a declaratory judgment that contrary to Executive Order 14215, FECA's vesting of authority in the Commission to interpret FECA in the course of carrying out the Commission's statutory duties is consistent with Article II, and Section 7 of the Executive Order is therefore unlawful as applied to the Commission.

### COUNT II

### Equitable Relief for Violations of FECA
### (52 U.S.C. §§ 30106–30109)

74.    Plaintiffs incorporate Paragraphs 1 through 73 above as if set forth fully herein.

75.    The FEC is vested with "exclusive jurisdiction" to administer, interpret, and civilly enforce FECA. *See generally* 52 U.S.C. §§ 30106, 30107. For example, Congress authorized the FEC to "formulate policy" with respect to FECA, *id.* § 30106(b)(1); "to make, amend, and repeal such rules . . . as are necessary to carry out the provisions of [FECA]," *id.* §§ 30107(a)(8), 30111(a)(8); and to investigate possible violations of the Act, *id.* § 30109(a)(1)-(2). The Commission also has exclusive jurisdiction to initiate civil enforcement actions for violations of FECA in U.S. district courts. *Id.* §§ 30106(b)(1), 30109(a)(6).

76.    Section 7 of Executive Order 14215 purports to prevent the Commission from advancing any interpretation of law "that contravenes the President or the Attorney General's opinion on a matter of law," unless "authorized to do so by the President or in writing by the Attorney General."

77.    Section 7, as applied to the Commission, therefore violates FECA because it prohibits the Commissioners from exercising independent legal judgment in carrying out their

statutory duties and requires them instead to parrot the legal judgments of the President and Attorney General.

78.    Federal courts have equitable authority to "grant injunctive relief against . . . violations of federal law by federal officials," as part of "a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 326–27 (2015) (citing *Am. School of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902)).

79.    The Court should therefore enjoin Defendants from applying Executive Order 14215, Section 7, to the Commission or the Commissioners.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask for the following relief:

80.    Declare that the provisions of FECA empowering the Commissioners to exercise independent legal judgment, including but not limited to 52 U.S.C. §§ 30106, 30107, 30108, and 30109, do not violate the U.S. Constitution, notwithstanding the proclamations of Executive Order 14215.

81.    Declare that Section 7 of Executive Order 14215 is unlawful as applied to the Commission.

82.    Preliminarily and permanently enjoin Defendants, their officers, agents, servants, and employees from applying Section 7 of Executive Order 14215 to the Commission.

83.    Award Plaintiffs their costs, expenses, and reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988, and any other applicable law.

84.    Grant Plaintiffs any and all other relief as the Court deems just and proper.

Dated: February 28, 2025     Respectfully submitted,

              */s/ Marc E. Elias*

              **ELIAS LAW GROUP LLP**
              Marc E. Elias (DC 442007)
              David R. Fox (DC 1015031)
              Jacob D. Shelly (DC 90010127)
              Robert Golan-Vilella (DC 1724616)
              Omeed Alerasool (DC 90006578)
              Julie Zuckerbrod (DC 1781133)
              250 Massachusetts Ave. NW, Suite 400
              Washington, DC 20001
              T: (202) 968-4652

*Counsel for Plaintiffs Democratic National Committee, DSCC, and DCCC*

23