IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEMOCRATIC NATIONAL COMMITTEE,
*et al.*,

                    Plaintiffs,

        *v.*

DONALD J. TRUMP, *et al.*,

                    Defendants.

Civil Action No. 25-cv-587-AHA

(EXPEDITED HEARING REQUESTED)

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 3

I.  Congress vested "exclusive jurisdiction" in the Commissioners to administer, interpret, and civilly enforce FECA. ................................................................... 3

II.  Executive Order 14215 purports to transfer authority to interpret FECA to the President and Attorney General alone. ..................................................................... 6

LEGAL STANDARD ......................................................................................................... 8

ARGUMENT ...................................................................................................................... 9

I.  Plaintiffs are likely to prevail on the merits of their claims. ................................. 9

    A.  Executive Order 14215 impermissibly conflicts with FECA in purporting to strip Commissioners of their statutory authority. ....................................... 9

    B.  FECA's vesting of Commissioners with independent authority to interpret the Act is consistent with the Constitution. ............................................... 11

    C.  Plaintiffs have a ripe cause of action to challenge the Executive Order. .............. 16

II.  Plaintiffs will suffer irreparable harm in the absence of an injunction. ............................ 19

III.  The remaining equitable factors also strongly favor granting preliminary relief. ............ 22

CONCLUSION ................................................................................................................... 23

CERTIFICATE OF SERVICE ........................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.B.-B. v. Morgan,*
    548 F. Supp. 3d 209 (D.D.C. 2020) ........................................................................ 22

*Am. Sch. of Magnetic Healing v. McAnnulty,*
    187 U.S. 94 (1902) .................................................................................................. 18

*\*Armstrong v. Exceptional Child Ctr., Inc.,*
    575 U.S. 320 (2015) .......................................................................................... 17, 18

*Brown v. Fed. Election Comm'n,*
    386 F. Supp. 3d 16 (D.D.C. 2019) ........................................................................... 8

*Buckley v. Valeo,*
    424 U.S. 1 (1976) ............................................................................................. 13, 16

*Carey v. Fed. Election Comm'n,*
    791 F. Supp. 2d 121 (D.D.C. 2011) ................................................................. 20, 21

*\*Chamber of Commerce of U.S. v. Reich,*
    74 F.3d 1322 (D.C. Cir. 1996) .......................................................................... 11, 18

*Christian Legal Soc'y v. Walker,*
    453 F.3d 853 (7th Cir. 2006) .................................................................................. 23

*Citizens United v. Fed. Election Comm'n,*
    558 U.S. 310 (2010) ................................................................................................ 20

*Collins v. Yellen,*
    594 U.S. 220 (2021) ................................................................................................ 14

*Consumers' Rsch. v. Consumer Prod. Safety Comm'n,*
    91 F.4th 342 (5th Cir. 2024) ................................................................................... 14

*Elrod v. Burns,*
    427 U.S. 347 (1976) ................................................................................................ 21

*Emineth v. Jaeger,*
    901 F. Supp. 2d 1138 (D.N.D. 2012) ..................................................................... 21

*FEC v. DSCC,*
    454 U.S. 27 (1981) .................................................................................................... 1

*FEC v. NRA Pol. Victory Fund,*
   6 F.3d 821 (D.C. Cir. 1993) ....................................................................... 2, 4, 13

FEC v. NRA Pol. Victory Fund,
   513 U.S. 88 (1994) .............................................................................................. 13

Free Enterprise Fund v. Public Company Accounting Oversight Board,
   561 U.S. 477 (2010) ............................................................................................ 13

Harmon v. Brucker,
   355 U.S. 579 (1958) ............................................................................................ 17

Harris v. Bessent,
   No. 1:25-cv-00412-RC, 2025 WL 679303 (D.D.C. Mar. 4, 2025) ..................... 15

HIAS Inc. v. Trump,
   985 F.3d 309 (4th Cir. 2021) .............................................................................. 11

*Humphrey's Executor v. United States,*
   295 U.S. 602 (1935) ...................................................................................... 2, 11, 12

In re Georgia Senate Bill 202,
   No. 1:21-CV-01259-JPB, 2023 WL 5334582 (N.D. Ga. Aug. 18, 2023) ........................ 21

In re Olson,
   818 F.2d 34 (D.C. Cir. 1987) .............................................................................. 15

Leachco, Inc. v. Consumer Prod. Safety Comm'n,
   103 F.4th 748 (10th Cir. 2024) ........................................................................... 14

League of Women Voters of Mo. v. Ashcroft,
   336 F. Supp. 3d 998 (W.D. Mo. 2018) ................................................................ 19

League of Women Voters of N.C. v. North Carolina,
   769 F.3d 224 (4th Cir. 2014) .............................................................................. 21

*League of Women Voters of U.S. v. Newby,*
   838 F.3d 1 (D.C. Cir. 2016) ............................................................................ 8, 22

Libertarian Nat'l Comm. v. FEC,
   924 F.3d 533 (D.C. Cir. 2019) ............................................................................ 16

Louisiana v. Biden,
   55 F.4th 1017 (5th Cir. 2022) ............................................................................. 20

*Marks v. C.I.A.*,
    590 F.2d 997 (D.C. Cir. 1978) ................................................................................ 11

*Mathis v. U.S. Parole Comm'n*,
    --- F. Supp. 3d ----, No. 1:24-CV-01312, 2024 WL 4056568
    (D.D.C. Sept. 5, 2024) ........................................................................................... 18

*McCutcheon v. FEC*,
    496 F. Supp. 3d 318 (D.D.C. 2020) ....................................................................... 16

*Meta Platforms, Inc. v. Fed. Trade Comm'n*,
    723 F. Supp. 3d 64 (D.D.C. 2024) ......................................................................... 14

*Meyer v. Grant*,
    486 U.S. 414 (1988) ................................................................................................ 20

*\*Morrison v. Olson*,
    487 U.S. 654 (1988) ................................................................................................ 12

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
    --- F. Supp. ----, No. CV 25-239 (LLA), 2025 WL 597959
    (D.D.C. Feb. 25, 2025) ......................................................................................... 8, 9

*Nken v. Holder*,
    556 U.S. 418 (2009) .................................................................................................. 8

*NRSC v. FEC*,
    712 F. Supp. 3d 1017 (S.D. Ohio 2024) ................................................................ 16

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
    831 F.3d 500 (D.C. Cir. 2016) ............................................................................ 8, 20

*R.I.L.-R v. Johnson*,
    80 F. Supp. 3d 164 (D.D.C. 2015) ......................................................................... 22

*Rufer v. FEC*,
    64 F. Supp. 3d 195 (D.D.C. 2014) ........................................................................... 8

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
    591 U.S. 197 (2020) ................................................................................................ 14

*Sherley v. Sebelius*,
    644 F.3d 388 (D.C. Cir. 2011) ................................................................................. 8

*Washington v. Trump*,
    --- F. Supp. ----, No. C25-0127-JCC, 2025 WL 415165 (W.D. Wash. Feb. 6, 2025) ......... 18

*Wiener v. United States*,
    357 U.S. 349 (1958)..................................................................................... 12

*Wilcox v. Trump*,
    No. 1:25-cv-00334-BAH, 2025 WL 720914 (D.D.C. Mar. 6, 2025) ................................. 14

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008)......................................................................................... 8

**Statutes, Regulations, and Rules**

5 U.S.C.
    § 2105................................................................................................... 7

26 U.S.C.
    § 9010(d)................................................................................................ 5
    § 9040(d)................................................................................................ 5

52 U.S.C.
    § 30106............................................................................................. 3, 4, 5, 10
    § 30107............................................................................................. 4, 5, 10
    § 30109............................................................................................. 5, 10, 11
    § 30110............................................................................................. 8, 16, 17
    § 30111............................................................................................. 10

Bipartisan Campaign Reform Act of 2002, Pub. L. No. 107-155, 116 Stat. 81 (2002)................ 17

11 C.F.R.
    § 2.3.................................................................................................... 6
    § 7.2.................................................................................................... 5
    § 7.8.................................................................................................... 5
    § 201.2.................................................................................................. 5
    § 201.3.................................................................................................. 5
    § 201.4.................................................................................................. 6

Fed. R. Civ. P. 65(c) .......................................................................................... 9

**Other Authorities**

Certification, Agenda Document No. 21-21-A, Federal Election Commission
    (May 5, 2021), available at https://www.fec.gov/resources/cms-
    content/documents/Vote-Draft-Statement-of-Policy-Initial-Stage-in-the-
    Enforcement-Process-4-22-21.pdf ....................................................................... 6

Exec. Order No. 14215, 90 Fed. Reg. 10447 (Feb. 18, 2025) ...................................... 2, 7

FEC, MURs 7931/8059 & MURs 7968/7969, Statement of Reasons of Vice
    Chairman Sean J. Cooksey and Comm'rs Allen J. Dickerson and James E.
    "Trey" Trainor, III (Oct. 6, 2023), available at
    https://www.fec.gov/files/legal/murs/7968/7968_13.pdf ...................................... 6

FEC, MURs 7968 & 7969, Statement of Reasons of Comm'r Ellen L. Weintraub
    (Nov. 9, 2023), available at
    https://www.fec.gov/files/legal/murs/7968/7968_14.pdf ...................................... 6

Final Report of the Senate Select Comm. on Presidential Campaign Activities, S.
    Rep. No. 981, 93d Cong., 2d Sess. 581 (1974)...................................................... 3

H.R. Rep. No. 94-917 (1976)............................................................................................ 4

Memorandum from Comm'r Allen J. Dickerson to the Federal Election
    Commission (Aug. 9, 2023), available at
    https://www.fec.gov/resources/cms-content/documents/mtgdoc-23-21-A.pdf ................... 6

Memorandum from Comm'r Allen J. Dickerson to the Federal Election
    Commission (Oct. 12, 2023), available at https://www.fec.gov/resources/cms-
    content/documents/mtgdoc-23- 21-A1.pdf ............................................................ 6

Memorandum from Comm'r Shana M. Broussard & Chair Dara Lindenbaum to
    the Federal Election Commission (Oct. 26, 2023), available at
    https://www.fec.gov/resources/cmscontent/documents/mtgdoc-23-21-B.pdf...................... 6

MoNews, *Trump calls Democrats "enemies of democracy" for effort to dump
    Biden from the ballot*, YouTube (July 21, 2024),
    https://www.youtube.com/shorts/xjXu4IzPf9g........................................................ 2

Press Release, The White House, Statement by the President (Oct. 15, 1974),
    available at
    https://www.fordlibrarymuseum.gov/sites/default/files/pdf_documents/library/
    document/0019/4520542.pdf ............................................................................. 1

Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2954 (3d ed.) .................................... 9

WSJ News, *Trump Doubles Down on 'Enemy From Within' Comments About
    Democrats*, YouTube (Oct. 16, 2024), https://youtu.be/zbzfBW5rvgQ?t=20...................... 2

## INTRODUCTION

In 1972, checks payable to President Nixon's reelection campaign were used to finance the burglary and wiretapping of the Democratic National Committee's headquarters. The ensuing scandal resulted in a bipartisan recognition that federal campaign finance rules must be clear and fair, enforced neutrally without fear or favor. Those goals, Congress recognized, could best be achieved by conditioning the interpretation and enforcement of those rules on the consensus reached by members of an impartial oversight board.

That board—the Federal Election Commission ("FEC" or "Commission")—was created by 1974 amendments to the Federal Election Campaign Act ("FECA" or the "Act"). Upon signing the amendments into law, President Ford emphasized that "[b]oth the Republican National Committee and the Democratic National Committee have expressed their pleasure with this bill, noting that it allows them to compete fairly."[1] The fairness was by design. The FEC is led by six Commissioners, no more than three of whom may affiliate with the same political party, and at least four of whom must agree before the Commission may take any substantive action. This "inherently bipartisan structure" ensures that when political campaigns and party committees request rulemakings, seek advisory opinions, or defend against formal complaints—invariably on "issues charged with the dynamics of party politics"—they can be certain that the outcome will not reflect the raw pursuit of electoral advantage by political opponents. *FEC v. DSCC*, 454 U.S. 27, 37 (1981).

For over fifty years, that certainty held. But on February 18, 2025, President Trump issued Executive Order 14215, Section 7 of which provides that "the President and the Attorney General's

---

[1] Press Release, The White House, Statement by the President (Oct. 15, 1974), available at https://www.fordlibrarymuseum.gov/sites/default/files/pdf_documents/library/document/0019/4520542.pdf.

opinions on questions of law are controlling on all employees in the conduct of their official duties" and prohibits any executive branch employee from "advanc[ing] an interpretation of law as the position of the United States that contravenes the President or the Attorney General's opinion on a matter of law." Exec. Order No. 14215 ("E.O. 14215") § 7, 90 Fed. Reg. 10447, 10448 (Feb. 18, 2025). As applied to the Commission, Executive Order 14215 would eliminate FECA's requirement that the executive branch's legal interpretations of FECA's provisions reflect the bipartisan consensus of an expert multimember board and replace that bipartisan consensus with the judgment of a single partisan political figure—the President of the United States—who has described the Democratic Party as "the enemies of democracy"[2] and "the enemy from within."[3]

Executive Order 14215 grounds its unprecedented assertion of presidential power in Article II of the U.S. Constitution. But the constitutionality of FECA's vesting of authority in the FEC is beyond question. The FEC is "patterned on the classic independent regulatory agency." *FEC v. NRA Political Victory Fund*, 6 F.3d 821, 826 (D.C. Cir. 1993). As the Supreme Court has held for 90 years, it "cannot well be doubted" that Congress possesses the authority to insulate from presidential micromanagement agencies that are led by a multimember, bipartisan board—that is, agencies like the FEC. *Humphrey's Ex'r v. United States*, 295 U.S. 602, 629 (1935). Congress's authority is especially clear in this context, where the credibility of the entire regulatory enterprise would be fatally undermined if the party controlling the White House can unilaterally structure campaign rules and adjudicate disputes to disadvantage its electoral competitors.

---

[2] MoNews, *Trump calls Democrats "enemies of democracy" for effort to dump Biden from the ballot*, YouTube (July 21, 2024), https://www.youtube.com/shorts/xjXu4IzPf9g.

[3] WSJ News, *Trump Doubles Down on 'Enemy From Within' Comments About Democrats*, YouTube (Oct. 16, 2024), https://youtu.be/zbzfBW5rvgQ?t=20.

The Executive Order's abrupt departure from the statutory scheme—which explicitly prohibits any Commissioner from delegating any decisionmaking authority, 52 U.S.C. § 30106(c)—threatens irreparable harm to the Democratic Party's three national political committees, Plaintiffs Democratic National Committee ("DNC"), DSCC, and DCCC, who rely on impartial guidance from the FEC for virtually everything they do. Their ability to have their periodic reports and filings reviewed, petition for rulemakings, seek advisory opinions, file or defend against administrative complaints, and engage in litigation will be severely impaired if every legal determination of the agency is resolved under the binding legal interpretations of a political opponent instead of a bipartisan commission of experts. Indeed, the full weight of the equities tilts decisively in Plaintiffs' favor.

The Court should preliminarily enjoin the application of Section 7 of E.O. 14215 to the FEC as inconsistent with FECA's constitutionally valid provisions shielding FEC decision-making from presidential coercion or control.

## BACKGROUND

### I. Congress vested "exclusive jurisdiction" in the Commissioners to administer, interpret, and civilly enforce FECA.

Following serious financial abuses in the 1972 presidential campaign, the Senate Select Committee on Presidential Campaign Activities initiated a formal investigation and reported its findings and recommendations. "Surely one of the most penetrating lessons of Watergate," the Committee concluded, "is that campaign practices must be effectively supervised . . . if our free institutions are to survive." *Final Report of the Senate Select Comm. on Presidential Campaign Activities*, S. Rep. No. 981, 93d Cong., 2d Sess. 581 (1974).[4] In response, Congress enacted a

---

[4] Available at https://www.senate.gov/about/resources/pdf/watergate-final-report-1974.pdf.

series of substantive reforms, including by amending FECA to establish the FEC, an independent agency vested with "exclusive jurisdiction" to administer, interpret, and civilly enforce the Act. *See generally* 52 U.S.C. §§ 30106, 30107. As the House Report accompanying the 1974 FECA amendments explained, Congress viewed it as "essential in this sensitive area [of campaign regulation] that the system of administration and enforcement enacted into law does not provide room for partisan misuse." H.R. Rep. No. 94-917, at 3 (1976).

To prevent that misuse, Congress provided that the FEC would be multimember and bipartisan. By law today, the Commission is composed of six members appointed by the President, by and with the advice and consent of the Senate, and no more than three members of the Commission may be affiliated with the same political party. 52 U.S.C. § 30106(a)(1).[5] To mitigate the risk that the FEC's powers could be wielded to provide an electoral advantage to a favored candidate or political party, Congress required that the Commissioners be chosen "on the basis of their experience, integrity, impartiality, and good judgment"; it excluded from the Commission "elected or appointed officers or employees in the executive, legislative, or judicial branch of the Federal Government"; and it prohibited Commissioners from engaging "in any other business, vocation, or employment." 52 U.S.C. § 30106(a)(3). The Commissioners serve staggered six-year terms, and they choose from among their members a chairman and vice chairman who are not affiliated with the same political party. *Id*. § 30106(a)(2), (5).

The FEC is bipartisan not only in its composition but also in its operation. FECA requires affirmative votes from at least four Commissioners—which, given the bipartisan membership requirement, means Commissioners from at least two political parties—to (1) make, amend, or

---

[5] Legislative officers no longer serve as ex officio members of the Commission. *See NRA Political Victory Fund*, 6 F.3d at 827.

repeal rules, (2) approve enforcement actions, (3) initiate or defend the Commission in certain court actions, (4) issue advisory opinions, (5) develop forms, (6) conduct hearings and investigations, and (7) refer cases of apparent criminal conduct to law enforcement. *Id.* §§ 30106(c), 30107(a)(6)–(9), 30109(a). When voting on these matters, "[a] member of the Commission *may not delegate to any person* his or her vote or any decisionmaking authority or duty vested in the Commission by the provisions of this Act." 52 U.S.C. § 30106(c) (emphasis added).

The independence of Commissioners' legal determinations is required—or otherwise reflected—by other statutory provisions as well. For example, the Commission appoints its own Staff Director and General Counsel, and each Commissioner is required to consider the views of the FEC's General Counsel before voting on whether there is probable cause to believe a person has violated FECA. 52 U.S.C. § 30109(a)(3). The Commission also has independent litigation authority. The Commission "is authorized to appear in and defend against any action instituted under [the] Act" by employing or appointing its own counsel, 52 U.S.C. § 30106(f), and Congress even authorized the Commission to "appeal from, and to petition the Supreme Court for certiorari"—independent of the Department of Justice's Office of the Solicitor General—to review judgments in actions to enforce laws governing the public financing of presidential campaigns, 26 U.S.C. §§ 9010(d), 9040(d).

The FEC's internal operating procedures similarly anticipate that each Commissioner will exercise independent legal judgment. For example, the Commission sharply regulates ex parte communications with "any person outside the agency"—which necessarily includes the President and Attorney General—regarding any pending enforcement action, audit, litigation matter, rulemaking, advisory opinion request, or other matters. *See* 11 C.F.R. §§ 7.2, 7.8, 201.2, 201.3,

201.4. And when the Commission holds meetings to consider new regulations, advisory opinions, and other matters, Commissioners may share individual "[s]tatements of views or expressions of opinions." 11 C.F.R. § 2.3. Once Commissioners finalize their views, they regularly issue "statements of reasons" explaining their individual votes for or against proposals under consideration, even where their views depart from the Commission's General Counsel's analysis,[6] and even where their views are not shared by other Commissioners.[7] Individual Commissioners also regularly propose legal directives for the Commission to consider adopting;[8] they occasionally revise their proposals;[9] and other Commissioners may offer competing proposals.[10] When proposed legal interpretations come to a vote, Commissioners regularly disagree with each other about the appropriate outcome because each Commissioner registers their personally held views.[11]

## II.    Executive Order 14215 purports to transfer authority to interpret FECA to the President and Attorney General alone.

On February 18, 2025, President Trump issued Executive Order 14215, titled: "Ensuring Accountability for All Agencies." Asserting that "[t]he Constitution vests all executive power in

---

[6] *See, e.g.*, FEC, MURs 7931/8059 & MURs 7968/7969, Statement of Reasons of Vice Chairman Sean J. Cooksey and Comm'rs Allen J. Dickerson and James E. "Trey" Trainor, III (Oct. 6, 2023), available at https://www.fec.gov/files/legal/murs/7968/7968_13.pdf.

[7] *See, e.g.*, FEC, MURs 7968 & 7969, Statement of Reasons of Comm'r Ellen L. Weintraub (Nov. 9, 2023), available at https://www.fec.gov/files/legal/murs/7968/7968_14.pdf.

[8] *See, e.g.*, Memorandum from Comm'r Allen J. Dickerson to the Federal Election Commission (Aug. 9, 2023), available at https://www.fec.gov/resources/cms-content/documents/mtgdoc-23-21-A.pdf.

[9] *See, e.g.*, Memorandum from Comm'r Allen J. Dickerson to the Federal Election Commission (Oct. 12, 2023), available at https://www.fec.gov/resources/cms-content/documents/mtgdoc-23-21-A1.pdf.

[10] *See, e.g.*, Memorandum from Comm'r Shana M. Broussard & Chair Dara Lindenbaum to the Federal Election Commission (Oct. 26, 2023), available at https://www.fec.gov/resources/cmscontent/documents/mtgdoc-23-21-B.pdf.

[11] *See, e.g.*, Certification, Agenda Document No. 21-21-A, Federal Election Commission (May 5, 2021), available at https://www.fec.gov/resources/cms-content/documents/Vote-Draft-Statement-of-Policy-Initial-Stage-in-the-Enforcement-Process-4-22-21.pdf.

the President," the Executive Order criticizes "independent regulatory agencies" that "currently exercise substantial executive authority without sufficient accountability to the President." E.O. 14215 § 1. Executive Order 14215 goes on to proclaim that "these regulatory agencies have been permitted to promulgate significant regulations without review by the President" and that such "practices undermine . . . accountability[,] . . . prevent a unified and coherent execution of Federal law," and necessitate that their officers be "controlled" by the President. *Id.* The Executive Order declares, then, that "it shall be the policy of the executive branch to ensure Presidential supervision and control of the entire executive branch," including independent agencies. *Id.*

To extinguish the independence that Congress vested in these agencies, Section 7 of the Executive Order proclaims:

> The President and the Attorney General's opinions on questions of law are controlling on all employees in the conduct of their official duties. No employee of the executive branch acting in their official capacity may advance an interpretation of the law as the position of the United States that contravenes the President or the Attorney General's opinion on a matter of law, including but not limited to the issuance of regulations, guidance, and positions advanced in litigation, unless authorized to do so by the President or in writing by the Attorney General.

*Id.* § 7. The term "employees," as used in the Executive Order, encompasses the Commissioners and other employees of the FEC. *See id.* § 2 (defining "employees" to have the same meaning as that term is given in 5 U.S.C. § 2105); 5 U.S.C. § 2105 (defining "employee" to include officers and individuals appointed by the President, engaged in the performance of a federal function, and subject to supervision of the President). Thus, Executive Order 14215 purports to preclude the Commissioners and other FEC employees from advancing any legal positions other than those of the President and Attorney General in the course of their enforcement of FECA, on the ground that Article II requires the President to control legal interpretations for the entire executive branch.

## LEGAL STANDARD

To obtain a preliminary injunction, Plaintiffs must show that "four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in [their] favor, and accord with the public interest." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (citation omitted). When a preliminary injunction is sought against the government, as here, the final two factors merge. *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016); *see also Nken v. Holder*, 556 U.S. 418, 435 (2009). Before the Supreme Court's decision in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), courts in this Circuit applied a "sliding-scale analysis" under which "a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). The D.C. Circuit has expressly declined to resolve "whether the 'sliding scale' approach remains valid after *Winter*." *League of Women Voters of U.S.*, 838 F.3d at 7; *see also Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, --- F. Supp. ----, No. CV 25-239, 2025 WL 597959, at *12 (D.D.C. Feb. 25, 2025) (noting this issue remains unresolved).

One of Plaintiffs' claims is brought under 52 U.S.C. § 30110, which provides that "the district court immediately shall certify all questions of constitutionality of [FECA] to the United States Court of Appeals for the circuit involved, which shall hear the matter sitting en banc." But courts have held that this provision "does not deprive [the district court] of its jurisdiction to rule on [a] preliminary injunction motion." *Brown v. Fed. Election Comm'n*, 386 F. Supp. 3d 16, 25 (D.D.C. 2019); *see also Rufer v. FEC*, 64 F. Supp. 3d 195, 205–06 (D.D.C. 2014) (addressing preliminary injunction motion in claim under what is now § 30110). The Court therefore has

jurisdiction to rule on Plaintiffs' motion, based on the likelihood of Plaintiffs succeeding in obtaining relief on the merits through § 30110's certification process.[12]

## ARGUMENT

### I.  Plaintiffs are likely to prevail on the merits of their claims.

Plaintiffs are likely to succeed on their claims because Executive Order 14215's command that the Commissioners and their employees follow the President and Attorney General's legal opinions is inconsistent with the provisions of FECA that vest independent authority in the FEC, because those provisions are constitutionally valid, and because Plaintiffs are legally entitled to relief from the unlawful application of the Executive Order.

#### A.  Executive Order 14215 impermissibly conflicts with FECA in purporting to strip Commissioners of their statutory authority.

The application of Section 7 of Executive Order 14215 to the FEC is contrary to FECA. Section 7 purports to prevent the Commission from advancing any interpretation of law "that contravenes the President or the Attorney General's opinion on a matter of law," unless "authorized to do so by the President or in writing by the Attorney General." The order therefore prohibits the Commissioners from exercising independent legal judgment in carrying out their statutory duties and requires them instead to parrot the legal judgments of the President and Attorney General.

That prohibition is irreconcilable with multiple provisions of FECA that make the Commission—not the President and the Attorney General—responsible for interpreting and

---

[12] Federal Rule of Civil Procedure 65(c) authorizes the court to require security before issuing a preliminary injunction, but security is not appropriate here because Defendants will not sustain any "costs and damages" if wrongfully enjoined. Fed. R. Civ. P. 65(c); *see* Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2954 (3d ed.) (collecting cases holding that "the court may dispense with security altogether if the grant of an injunction carries no risk of monetary loss to the defendant"); *Nat'l Council of Nonprofits*, 2025 WL 597959 at *19 (declining to require security where governmental defendants faced "no monetary injury from the injunction").

administering FECA. The FEC is vested with "exclusive jurisdiction" to administer, interpret, and civilly enforce FECA. *See generally* 52 U.S.C. §§ 30106–07; *see also supra* Background § I. Congress authorized the FEC to "formulate policy" with respect to FECA, *id.* § 30106(b)(1); "to make, amend, and repeal such rules . . . as are necessary to carry out the provisions of [FECA]," *id.* §§ 30107(a)(8), 30111(a)(8); and to investigate possible violations of the Act, *id.* § 30109(a)(1)–(2). The Commission also has exclusive jurisdiction to initiate civil enforcement actions in U.S. district courts for violations of FECA. *Id.* §§ 30106(b)(1), 30109(a)(6). All of these provisions require the exercise of independent legal judgment by the Commissioners and are thus squarely incompatible with Executive Order 14215.

Still other FECA provisions reinforce this conclusion. FECA requires affirmative votes from at least four Commissioners—meaning from Commissioners of at least two political parties—to, for example, approve enforcement actions, initiate or defend the Commission in certain court actions, issue advisory opinions, and conduct hearings and investigations. *Id.* §§ 30106(c), 30107(a)(6)–(9), 30109(a). It is inconceivable that Congress would have created the FEC as a bipartisan, multimember commission or imposed such a requirement if each Commissioner were not intended to exercise his or her own judgment on such determinations of law. FECA further makes this explicit by directing that a "member of the Commission *may not delegate to any person*"—necessarily including the President and the Attorney General—"his or her vote or any decisionmaking authority or duty vested in the Commission by the provisions of this Act." *Id.* § 30106(c) (emphasis added). The Commission appoints its own Staff Director and General Counsel, and it "is authorized to appear in and defend against any action instituted under [the] Act" by employing or appointing its own counsel. *Id.* § 30106(f). Commissioners must also consider the views of the FEC's General Counsel before voting on whether there is probable cause

to believe a person has violated FECA. *Id.* § 30109(a)(3). This mandate would be a pure nullity if the Commissioners were obligated to vote in line with legal interpretations of FECA issued by the President or Attorney General.

It is axiomatic that "an executive order cannot supersede a statute," *Marks v. C.I.A.*, 590 F.2d 997, 1003 (D.C. Cir. 1978), and an executive order that conflicts with a statute is thus unenforceable. *See, e.g.*, *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1332–39 (D.C. Cir. 1996) (striking down executive order because it conflicted with National Labor Relations Act); *HIAS Inc. v. Trump*, 985 F.3d 309, 316 (4th Cir. 2021) (affirming grant of preliminary injunction prohibiting enforcement of executive order because order likely violated Refugee Act). Because Section 7 of E.O. 14215 is plainly in direct conflict with the numerous provisions of FECA vesting the Commissioners with and requiring them to exercise independent legal judgment, Plaintiffs are likely to succeed on their claim that the order violates FECA as applied to the FEC and is thus unenforceable.

### B.    FECA's vesting of Commissioners with independent authority to interpret the Act is consistent with the Constitution.

Executive Order 14215 attempts to justify its seizure of absolute legal authority over independent agencies, notwithstanding contrary statutory provisions, in the President's executive power under Article II. But, at least as applied to the FEC, the asserted constitutional theory—that Congress may never require principal officers to exercise independent judgment, no matter the context—is wrong. Nearly a century's worth of precedent confirms that the FEC is exactly the sort of agency that Congress may make independent of the President's whims: a multimember commission of appointed experts tasked with enforcing laws in a sensitive area.

In *Humphrey's Executor v. United States*, the Supreme Court upheld the independence of the Federal Trade Commission ("FTC"), which provided a template that Congress carefully traced

when designing the FEC decades later. 295 U.S. at 629. The FTC is led by five commissioners appointed by the President and confirmed by the Senate; no more than three of the commissioners may be members of the same political party; the commissioners serve staggered seven-year terms; and they are prohibited from engaging in other employment. *Id.* at 619–20. These requirements were chosen so that the FTC would "exercise the trained judgment of a body of experts 'appointed by law and trained by experience.'" *Id.* at 624. Given the sensitive economic matters within the FTC's purview, "it was essential that the commission should not be open to the suspicion of partisan direction," which, Congress made clear, meant that the FTC would be "separate and apart from any existing department of the government—not subject to the orders of the President." *Id.* at 625. Having scrutinized this arrangement for any infringement of the President's constitutional powers and finding none, the Court blessed Congress's decision to prohibit the President from removing commissioners for mere policy disagreements. *Id.* at 629.

The Supreme Court reaffirmed these principles in *Wiener v. United States*, 357 U.S. 349 (1958), and *Morrison v. Olson*, 487 U.S. 654 (1988). In *Wiener*, the Court held that the President could not remove members of the three-person War Claims Commission because "no such power is given to the President directly by the Constitution." 357 U.S. at 356. And in *Morrison*, the Court affirmed the constitutionality of protections from at-will removal afforded to an independent counsel tasked with investigating and prosecuting executive branch officials. 487 U.S. at 677. As the Court explained with approval, "Congress, of course, was concerned when it created the office of independent counsel with the conflicts of interest that could arise in situations when the Executive Branch is called upon to investigate its own high-ranking officers." *Id.*

The FEC fits neatly into this precedent blessing Congress's authority to insulate certain agencies and officials from day-to-day control by the President. Like the FTC, the FEC's

leadership is required to be bipartisan and serves staggered terms; like the FTC and War Claims Commission, the FEC has a multimember leadership appointed by the President and confirmed by the Senate; and like the FTC, War Claims Commission, and independent counsel, the FEC operates in a sensitive sphere where impartiality is at a premium. Indeed, like the independent counsel, the FEC is tasked with investigating high-ranking officials—or prospective officials—in a manner that would create obvious conflicts of interest if directly overseen by political leaders.

Courts have had no trouble appreciating the FEC's need for independence. The Supreme Court has explained that the Commission's independent litigating authority in cases involving controversies over public election financing is "quite understandable" because "Presidential influence through the Solicitor General might be thought more likely in [these] cases." *FEC v. NRA Pol. Victory Fund*, 513 U.S. 88, 94 (1994). "Congress' decision to create the FEC as an independent agency and to charge it with the civil enforcement of the FECA," the Court continued, "was undoubtedly influenced by Congress' belief that the Justice Department, headed by a Presidential appointee, might choose to ignore infractions committed by members of the President's own political party." *Id.* at 95–96; *see also Buckley v. Valeo*, 424 U.S. 1, 141 (1976) (recognizing the FEC's functions "are of kinds usually performed by independent regulatory agencies" and that "Congress viewed [the FEC's] broad powers as essential to effective and impartial administration of the entire substantive framework of [FECA]"); *NRA Pol. Victory Fund*, 6 F.3d at 826 (recounting Congress's decision to pattern the Commission "on the classic independent regulatory agency" sanctioned by Supreme Court precedent).

Cases rejecting agency independence, in contrast, are far afield. In *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 492 (2010), the Supreme Court held that Congress could not provide inferior officers with a double layer of removal protections,

such that the inferior officers are removable only for cause by principal officers who themselves are removable only for cause by the President. Because FEC Commissioners are principal officers, E.O. 14215's direct attack on their independence does not implicate *Free Enterprise Fund*'s concerns about excessively insulated inferior officers. The Supreme Court has also held that Congress cannot shield from at-will removal the heads of agencies that are led by a single director because, aside from the presidency, the Constitution "scrupulously avoids concentrating power in the hands of any single individual." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 223 (2020) (analyzing the Consumer Financial Protection Bureau); *see also Collins v. Yellen*, 594 U.S. 220, 251 (2021) (analyzing the Federal Housing Finance Agency). But because the FEC requires the agreement of four commissioners to take any substantive action, these cases, too, are inapposite. *See Seila Law LLC*, 591 U.S. at 228 ("[W]e do not revisit *Humphrey's Executor* or any other precedent today.").

No court (without being reversed) has ever interpreted the Constitution to prohibit Congress from preserving the independent judgment exercised by leaders of multimember, bipartisan boards or commissions tasked with enforcing laws that could be completely sabotaged by partisan interference. Instead, courts across the country consistently approve the independence of agencies designed in this way. *See, e.g.*, *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 762 (10th Cir. 2024), *cert. denied*, No. 24-156, 2025 WL 76435 (U.S. Jan. 13, 2025) (rejecting constitutional challenge to independence of Consumer Product Safety Commission); *Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 91 F.4th 342, 354–55 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 414 (2024) (same); *Meta Platforms, Inc. v. Fed. Trade Comm'n*, 723 F. Supp. 3d 64, 87 (D.D.C. 2024) (rejecting renewed constitutional challenge to independence of the FTC); *Wilcox v. Trump*, No. 1:25-cv-00334-BAH, 2025 WL 720914, at *18 (D.D.C. Mar. 6, 2025)

(affirming independence of National Labor Relations Board); *Harris v. Bessent*, No. 1:25-cv-00412-RC, 2025 WL 679303, *13 (D.D.C. Mar. 4, 2025) (affirming independence of Merit Systems Protection Board).

Moreover, each of the cases just discussed involved—and, for agencies like the FEC, upheld—restrictions on the President's authority to remove government officers. Even untrammeled removal authority, however, leaves officers free to exercise their own judgment as long as they remain employed, and requires the President to obtain Senate confirmation for a replacement nominee if he removes an officer with whom he disagrees. *See, e.g.*, *In re Olson*, 818 F.2d 34, 41 (D.C. Cir. 1987) (recounting Watergate-era "Saturday Night Massacre," where President Nixon had no mechanism to contravene the exercise of independent judgment by his Attorney General and Deputy Attorney General other than to remove them). In Executive Order 14215, however, the President has claimed a power far more intrusive: to directly order existing officers to follow his legal interpretations and thereby effectively dictate the result whenever a political rival seeks an advantageous advisory opinion or defends against a spurious complaint. The President may influence the Commission's activities by nominating Commissioners who share his priorities and interpretive approach. But, once confirmed, Commissioners must exercise their independent judgment in carrying out their duties.

And if ever the Constitution allows for agency independence, it must be for the FEC. Other agencies regulate delicate economic matters where independence may foster stability, or they handle internal personnel matters where independence may improve oversight. But the FEC's portfolio is more fundamental yet—it is charged with securing the fairness and integrity of federal elections, upon which our entire constitutional system of democratic governance depends. By obligating Commissioners to vote consistently with diktats from the President, Executive Order

15

14215 reduces the Commission's entire operations to mere theater. Nothing in the Constitution permits the President to flout Congress's careful design in this way.

### C.    Plaintiffs have a ripe cause of action to challenge the Executive Order.

Finally, Plaintiffs are likely to succeed because they have ripe causes of action to challenge application of Section 7 of the Executive Order to the FEC under both 52 U.S.C. § 30110 and the established equitable authority of the federal courts.

Section 30110 expressly authorizes "[t]he Commission, the national committee of any political party, or any individual eligible to vote" for President to "institute such actions in the appropriate district court . . . , including actions for declaratory judgment, as may be appropriate to construe the constitutionality of any provision of this Act." 52 U.S.C. § 30110. National party committees and others have repeatedly brought suit under Section 30110 seeking declaratory judgments about the constitutional validity of various provisions of FECA, outside the context of any particular challenged FEC action. *See, e.g.*, *NRSC v. FEC*, 712 F. Supp. 3d 1017 (S.D. Ohio 2024); *Libertarian Nat'l Comm. v. FEC*, 924 F.3d 533 (D.C. Cir. 2019). As the Supreme Court has explained, "Congress, in enacting [52 U.S.C. § 30110], intended to provide judicial review to the extent permitted by Art. III." *Buckley*, 424 U.S. at 11–12.

To be sure, claims under Section 30110 have historically been brought to argue that provisions of FECA were *unconstitutional*. But the statutory text is unmistakably broader than that. It authorizes "such actions . . . as may be appropriate to *construe the constitutionality* of any provision of this Act." 52 U.S.C. § 30110; *see also McCutcheon v. FEC*, 496 F. Supp. 3d 318, 332 (D.D.C. 2020) (explaining that § 30110 allows suits "to challenge *or construe* the constitutionality of any statutory provision of FECA" (emphasis added)). A claim that FECA is constitutional, as Plaintiffs argue here, is every bit as much an action to "construe the constitutionality of" FECA as a claim that it is unconstitutional. The authorization for the Commission itself to bring actions

16

under Section 30110 reinforces this conclusion, as the Commission would be unlikely to bring an action contending that its own organic statute is unconstitutional, but quite likely to desire a declaratory judgment of constitutionality if—as has now occurred with Executive Order 14215— other government actors argue otherwise. And the similar judicial review provision in the Bipartisan Campaign Reform Act of 2002, Pub. L. No. 107-155, 116 Stat. 81 (2002), removes any lingering doubt, because that provision—which is codified in a note to 52 U.S.C. § 30110—*is* limited to actions "to challenge the constitutionality of any provision of this Act." *See* 52 U.S.C. § 30110 note. That shows just how easily Congress could have limited Section 30110 itself to constitutional challenges, had it wished to do so.

Plaintiffs' claim here fits neatly into the Section 30110 cause of action. Plaintiffs are national committees of the Democratic Party, Compl. ¶¶ 13–15, and they seek a declaratory judgment "construing the constitutionality of" the provisions of FECA requiring the Commissioners to exercise their independent judgment in administering FECA, in the face of the Executive Order's assertion that such independent judgment is incompatible with Article II of the United States Constitution.

Moreover, Plaintiffs are also likely to succeed on their equitable claim in Count II. Federal courts have equitable authority to "grant injunctive relief against . . . violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015); *see also Harmon v. Brucker*, 355 U.S. 579, 581–82 (1958) (per curiam) ("Generally, judicial relief is available to one who has been injured by an act of a government official which is in excess of his express or implied powers."). The ability to bring such suits "is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong*, 575 U.S. at 327. Indeed, for nearly two centuries the Supreme Court has made clear

17

that "relief may be given in a court of equity . . . to prevent an injurious act by a public officer." *Id.* (quoting *Carroll v. Safford*, 44 U.S. (3 How.) 441, 463 (1845)). The Supreme Court has recognized that in the absence of such relief, "the individual is left to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902) (allowing for judicial review over claim that postmaster general acted *ultra vires*); *see also Armstrong*, 575 U.S. at 327 (citing *McAnnulty* with approval).

Federal courts' power to grant such relief "operates even in the absence of a statutory cause of action." *Mathis v. U.S. Parole Comm'n*, --- F. Supp. 3d ----, No. 1:24-CV-01312, 2024 WL 4056568, at *11 (D.D.C. Sept. 5, 2024). And it does not depend on whether a plaintiff's claim is statutory or constitutional in nature. To the contrary, as here, "a party may seek to enjoin acts of a public officer that run counter to statute." *Washington v. Trump*, --- F. Supp. 3d ----, No. C25-0127-JCC, 2025 WL 415165, at *2 (W.D. Wash. Feb. 6, 2025), *stay denied*, 2025 WL 553485 (9th Cir. Feb. 19, 2025) (granting preliminary injunction to enjoin enforcement of presidential executive order based on likely violations of Immigration and Nationality Act); *see also Chamber of Commerce of U.S.*, 74 F.3d at 1327, 1332–39 (allowing plaintiff to bring "non-statutory cause of action questioning the legality of the Executive Order" and finding executive order violated National Labor Relations Act); *Mathis*, 2024 WL 4056568, at *11–12 (granting preliminary injunction against federal agencies based on court's inherent equitable power to enjoin violations of Rehabilitation Act). That is precisely the relief that Plaintiffs seek here. Accordingly, this Court is likely to conclude that Section 7 of Executive Order 14215 violates FECA as applied to the FEC and to follow the long tradition of granting injunctive relief to enjoin federal officials from violating federal law.

18

**II.      Plaintiffs will suffer irreparable harm in the absence of an injunction.**

Plaintiffs are already suffering irreparable harm due to Executive Order 14215, and they will continue to suffer such harm absent an injunction. "Courts routinely recognize that organizations suffer irreparable harm when a defendant's conduct causes them to lose opportunities to conduct election-related activities." *League of Women Voters of Mo. v. Ashcroft*, 336 F. Supp. 3d 998, 1005 (W.D. Mo. 2018) (collecting cases). Here, E.O. 14215 fundamentally chills Plaintiffs' core election-related activities by instilling them with fear that their political opponents will take adverse actions against them through the FEC.

For example, Plaintiffs' staff consistently work to explore new strategies to solicit contributions, communicate with supporters, and support Democratic candidates. Ex. 1 ("Schneider Decl.") ¶ 14; Ex. 2 ("Snyder Boss Decl.") ¶ 21; Ex. 3 ("Ruselowski Decl.") ¶ 16. But because of Executive Order 14215, DNC, DSCC, and DCCC employees must make decisions about whether to engage in innovative and different fundraising and communications strategies with a new perspective. Schneider Decl. ¶ 14; Snyder Boss Decl. ¶ 21; Ruselowski Decl. ¶ 16. They reasonably fear that any new or different approach could result in an FEC complaint against the Committees, as has occurred in previous election cycles. Schneider Dec. ¶ 14; Snyder Boss Decl. ¶ 21; Ruselowski Decl. ¶ 16. Although previously, Plaintiffs could expect that any complaint lodged against them would be resolved in an evenhanded manner, Plaintiffs now anticipate that President Trump and Attorney General Bondi will ensure an adverse ruling to thwart their efforts to raise money, reach new audiences, and support their candidates. Schneider Decl. ¶ 14; Snyder Boss Decl. ¶ 21; Ruselowski Decl. ¶ 16. Plaintiffs expect that such official actions will not just be unfavorable toward Democrats, but will be punitive. Schneider Decl. ¶ 18; Ruselowski Decl. ¶ 19. Plaintiffs will accordingly be forced to limit their efforts to innovate in their programs and activities. Schneider Dec. ¶ 14; Snyder Boss Decl. ¶ 21; Ruselowski Decl. ¶ 16.

In this way, Plaintiffs' reasonable fear of retaliation has chilled their ability to engage in "interactive communication[s] concerning political change" that sits at the heart of First Amendment protections. *Meyer v. Grant*, 486 U.S. 414, 421-22 (1988). It is well established that "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Pursuing Am.'s Greatness*, 831 F.3d at 511 (quotation marks omitted). Moreover, curtailing these communications puts Plaintiffs' ability to successfully solicit funds at risk, further threatening their core political speech. *Carey v. Fed. Election Comm'n*, 791 F. Supp. 2d 121, 133 (D.D.C. 2011) ("The right to speak effectively would be diluted if it does not include the right to pool money through contributions, for funds are often essential if advocacy is to be truly or optimally effective.") (cleaned up). Stifling such speech during a campaign "runs contrary to the entire history of First Amendment jurisprudence in this country." *Id.* at 132–33; *cf. Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 324 (2010) ("The First Amendment does not permit laws that force speakers to retain a campaign finance attorney, conduct demographic marketing research, or seek declaratory rulings before discussing the most salient political issues of our day.").

Additionally, the Executive Order's dramatic restructuring of the FEC will harm Plaintiffs' core activities and cause Plaintiffs to divert their limited resources in response. *See Louisiana v. Biden*, 55 F.4th 1017, 1033 (5th Cir. 2022) (affirming preliminary injunction based on "diversion of resources" resulting from "nonrecoverable compliance costs"). Plaintiffs have a significant interest in a pending petition for the Commission to issue regulations regarding the use of national party committees' building, legal, and convention accounts. Schneider Decl. ¶ 15; Snyder Boss Decl. ¶ 22; Ruselowski Decl. ¶ 17. But because President Trump and Attorney General Bondi can now unilaterally decide that FECA requires restrictions on these accounts, Plaintiffs will need to

reassess their use of resources and may need to reorganize their budgets to ensure that they can fund their programs. Schneider Decl. ¶ 15; Snyder Boss Decl. ¶ 22; Ruselowski Decl. ¶ 17. This work shifting budgets will drain resources from certain programs that are critical to Plaintiffs' core mission of supporting Democrats and will require Plaintiffs to make decisions about which programs to scale back or cut entirely. Schneider Decl. ¶ 15; Snyder Boss Decl. ¶ 22; Ruselowski Decl. ¶ 17. "Such mobilization opportunities cannot be remedied once lost," *In re Georgia Senate Bill 202*, No. 1:21-CV-01259-JPB, 2023 WL 5334582, at *11 (N.D. Ga. Aug. 18, 2023) (quotation omitted), because "once the election occurs, there can be no do-over and no redress," *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). "Elections are, by nature, time sensitive and finite. While there will be other elections, no future election will be *this* election." *Emineth v. Jaeger*, 901 F. Supp. 2d 1138, 1142 (D.N.D. 2012) (emphasis in original).

Finally, the first half of 2025 is a critical time for Plaintiffs to implement strategies for the 2026 midterm elections and the 2028 presidential election. Schneider Decl. ¶ 16; Snyder Boss Decl. ¶ 23; Ruselowski Decl. ¶ 18; *see also Carey*, 791 F. Supp. 2d at 134 (concluding in June 2011 that "the political season for the [2012] presidential election is already underway and the time to participate is *now*" (emphasis in original)); *cf. Elrod v. Burns*, 427 U.S. 347, 374 n.29 (1976) ("The timeliness of political speech is particularly important."). But as the foregoing examples illustrate, Plaintiffs are being forced to mitigate the effects of Executive Order 14215 instead of strategizing and preparing for successful election cycles. Schneider Decl. ¶ 16; Snyder Boss Decl. ¶ 23; Ruselowski Decl. ¶ 18. Critically, all of this puts Plaintiffs at a competitive disadvantage. Schneider Decl. ¶ 17; Snyder Boss Decl. ¶ 24; Ruselowski Decl. ¶ 19. It is all but certain that President Trump and Attorney General Bondi will interpret or enforce FECA—or require the Commission to do so—in a manner that favors Republicans and harms Democrats.

Thus, the parties are operating on an uneven playing field. The Republican committees can continue to seek advisory opinions, experiment with new tools and tactics, and pursue communications strategies that have demonstrated success, without fear or interruption. Schneider Decl. ¶ 17; Snyder Boss Decl. ¶ 24; Ruselowski Decl. ¶ 19. Meanwhile, Plaintiffs are exposed to increased risk through every interaction they have with the Commission and are accordingly forced to act with increased caution. Schneider Decl. ¶ 17; Snyder Boss Decl. ¶ 24; Ruselowski Decl. ¶ 19.

### III.    The remaining equitable factors also strongly favor granting preliminary relief.

Finally, this Court should grant a preliminary injunction because the balance of equities favors relief and an injunction is in the public interest. "The Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)); *see also League of Women Voters of U.S.*, 838 F.3d at 12 ("There is generally no public interest in the perpetuation of unlawful agency action."); *A.B.-B. v. Morgan*, 548 F. Supp. 3d 209, 222 (D.D.C. 2020) ("the Government and public can have little interest in executing [] orders that are based on statutory violations"). Because Plaintiffs are likely to succeed on the merits of their claim that Section 7 of Executive Order 14215 is unlawful as applied to the FEC, no harm will befall Defendants if a preliminary injunction is granted. *See supra* § I.

Conversely, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *League of Women Voters of U.S.*, 838 F.3d at 12 (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). Plaintiffs' likelihood of success thus means that an injunction will serve the public interest by preventing the enforcement of an order that violates federal law. *See id.*; *see also supra* § I. An injunction will also serve the public's interest in fair competition in the political process by preventing a situation

in which one of the country's two major parties is disparately constrained in its fundraising and communications approaches and in all of its dealings with the FEC. *See supra* § II. Finally, because "injunctions protecting First Amendment freedoms are always in the public interest," *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006), E.O. 14215's chilling effect on the exercise of Plaintiffs' First Amendment freedoms is yet another reason why the public interest points in favor of an injunction here. *See supra* § II.

## CONCLUSION

For the reasons set forth above, the Court should grant Plaintiffs' motion for a preliminary injunction. A proposed order is attached.


Dated: March 11, 2025                              Respectfully submitted,

                                                   */s/ Marc E. Elias*

                                                   **ELIAS LAW GROUP LLP**
                                                   Marc E. Elias (DC 442007)
                                                   David R. Fox (DC 1015031)
                                                   Jacob D. Shelly (DC 90010127)
                                                   Robert Golan-Vilella (DC 1724616)
                                                   Omeed Alerasool (DC 90006578)
                                                   Julie Zuckerbrod (DC 1781133)
                                                   250 Massachusetts Ave. NW, Suite 400
                                                   Washington, DC 20001
                                                   T: (202) 968-4652

                *Counsel for Plaintiffs Democratic National Committee, DSCC, and DCCC*

## CERTIFICATE OF SERVICE

I hereby certify that this document will be served on the Defendants in accordance with Federal Rule of Civil Procedure 5(a).

*/s/ Marc E. Elias*
Marc E. Elias