**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE, *et al.,*<br><br>     Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *et al.,*<br><br>     Defendants. | Civil Action No. 25-cv-587-AHA |

---

**BRIEF OF ELLEN L. WEINTRAUB**
**AS *AMICUS CURIAE***

---

Andrea Forsee
Mehri & Skalet PLLC
2000 K Street NW, Suite 325
Washington, DC 20006
Telephone: (202) 822-5100
aforsee@findjustice.com


Nicholas O. Stephanopoulos*
Election Law Clinic, Harvard Law School
6 Everett Street, Suite 4105
Cambridge, MA 02138
(617) 496-2181
nstephanopoulos@law.harvard.edu


*Counsel for Amicus Curiae*


*Counsel for Amicus Curiae*
 *pro hac vice pending

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. ii

STATEMENT OF INTEREST ......................................................................................... 1

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 4

    I.    Executive Order 14215 Flouts Congress's Intent That the FEC Be Independent. ............. 4

        A.    Congress Established the FEC in 1974 as an Independent Agency ................................ 4

        B.    The FEC's Independence Remained the Central Concern of the 1976 FECA
             Amendments ....................................................................................................... 7

        C.    For Nearly Fifty Years, the Other Branches Have Recognized the FEC's
             Independence. ..................................................................................................... 8

        D.    Subjecting the FEC's Legal Interpretations to Presidential Oversight Will Conflict
             with the FECA and Undermine the FEC's Institutional Credibility. ........................... 9

    II.    Executive Order 14215 Is Part of a Broader Attack on the FEC's Independence. ........... 11

    III.    Executive Order 14215 Bucks the Global Trend Toward Independent Election
        Administration. ....................................................................................................... 16

CONCLUSION ............................................................................................................... 19

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Buckley v. Valeo*, 424 U.S. 1 (1976) ............................................................... 3, 7

*Chamber of Commerce v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996)................................. 16

*Citizens United v. FEC*, 558 U.S. 310 (2010)........................................................ 2

*FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27 (1981)........................ 8

*FEC v. NRA Pol. Victory Fund*, 513 U.S. 88 (1994) ............................................. 8

*FEC v. NRA Pol. Victory Fund*, 6 F.3d 821 (D.C. Cir. 1993) ....................... 4, 8, 12, 15

*Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524 (1838)........................ 16

*Seila Law LLC v. CFPB*, 591 U.S. 197 (2020)..................................................... 15

*Wilcox v. Trump*, No. 25-334 (BAH), ___ F. Supp. 3d ___, 2025 WL 720914  (D.D.C. Mar. 6, 2025) ........................................................................................................ 16

**Statutes**                                                              **Page(s)**

52 U.S.C. § 30106............................................................................................ 9

52 U.S.C. § 30106(a)(1)................................................................................... 15

52 U.S.C. § 30106(a)(2)(B) .............................................................................. 12

52 U.S.C. § 30107(a)(7).................................................................................... 9

52 U.S.C. § 30107(a)(8).................................................................................... 9

52 U.S.C. § 30108....................................................................................... 9, 10

52 U.S.C. § 30109............................................................................................ 9

**Other Authorities**                                                     **Page(s)**

120 Cong. Rec. 4459 (1974)............................................................................... 7

122 Cong. Rec. 6693......................................................................................... 8

Daniel P. Tokaji, *Comparative Election Administration: A Legal Perspective on Electoral Institutions*, *in* Comparative Election Law 436 (James A. Gardner, ed., 2022)............. 4, 17, 18

Daniel P. Tokaji, *Public Rights and Private Rights of Action: The Enforcement of Federal Election Law*, 44 Ind. L. Rev. 113 (2010) ........................................................ 17, 18

Eur. Comm'n for Democracy Through L., Code of Good Practice in Electoral Matters (2002) . 17

Exec. Order No. 14215, 90 Fed. Reg. 10447 (Feb. 18, 2025) .................................................. 2, 9

*Federal Election Campaign Act Amendments of 1974: Hearing on H.R. 16090 Before the H. Comm. on Rules*, 93d Cong. 86 (1974) ...................................................................................... 6

H.R. Rep. No. 93-1239 (1974) .................................................................................................... 5, 6

H.R. Rep. No. 93-1438 (1974) (Conf. Rep.) ...................................................................................... 5

H.R. Rep. No. 94-917 (1976) ...................................................................................................... 3, 7

Letter from Eleven U.S. Senators to President Donald J. Trump (Feb. 12, 2025) ...................... 15

Rafael López-Pintor, Principles for Independent and Sustainable Electoral Management: International Standards for Electoral Management Bodies (United Nations Development Programme ed. 2012) ....................................................................................................................... 18

Richard L. Hasen, *Beyond the Margin of Litigation: Reforming U.S. Election Administration to Avoid Electoral Meltdown*, 62 Wash. & Lee L. Rev. 937 (2005) .......................................... 18

S. Rep. No. 93-689 (1974) ............................................................................................................ 3, 5

S. Rep. No. 94-677 (1976) ................................................................................................................. 7

Shaheen Mozaffar & Andreas Schedler, *The Comparative Study of Electoral Governance– Introduction*, 23 Int'l Pol. Sci. Rev. 5 (2002) ............................................................................ 17

Statement of Reasons of Commissioner Ellen L. Weintraub, MUR 7609R (Donald J. Trump, et al.) (Dec. 5, 2023) .................................................................................................................... 14

Statement of Reasons of Commissioners Shana M. Broussard and Ellen L. Weintraub, MUR 7784 (Make America Great Again PAC, *et al.*) (June 15, 2022) ............................................. 10

Statement on Signing the Federal Election Campaign Act Amendments of 1976, 2 Pub. Papers 1529 (May 11, 1976) ................................................................................................................... 9

Statement on the Federal Campaign Act Amendments of 1974, 2 Pub. Papers 303 (Oct. 15, 1974) ............................................................................................................................................ 8

## Constitutional Provisions                                      Page(s)

U.S. Const. art. II, § 2 ................................................................................................................... 13

U.S. Const. art. II, § 3, cl. 3 ......................................................................................................... 15

## STATEMENT OF INTEREST

Amicus curiae Ellen L. Weintraub has served as a Commissioner on the U.S. Federal Election Commission since 2002. In this role, Commissioner Weintraub has administered campaign finance and disclosure laws, participated in the issuance of hundreds of advisory opinions addressing how federal campaign finance law should be applied, testified before Congress nearly a dozen times, and voted on thousands of enforcement matters involving campaigns, political action committees, and candidates running for federal office.

Commissioner Weintraub seeks leave to file a brief as amicus curiae because this case implicates issues of fundamental concern to her work. As a government official, campaign finance expert, and concerned citizen, Commissioner Weintraub has had a longstanding and substantial interest in the fair interpretation and enforcement of federal election law and in ensuring that the FEC can carry out its mission. She seeks to participate in this case as amicus curiae to explain how Executive Order 14215 erodes the FEC's independence and is part of an ongoing effort to bring the FEC under the direct control of the President, which would undermine trust in the democratic nature of free and fair elections. Specifically, because of the threats to the FEC's independence that are the subject of this lawsuit, Commissioner Weintraub feels her perspective may be particularly valuable.

Commissioner Weintraub's counsel, the Election Law Clinic at Harvard Law School, authored this brief. No party nor other person contributed money that was intended to fund the preparation or submission of this brief.

## INTRODUCTION

If there is any agency that partisan elected officials—including the President—must not be allowed to bend to their will, it is the body that regulates them when they run for office: the Federal Election Commission ("FEC" or "Commission"). The FEC administers and enforces the

nation's campaign finance laws. In an electoral system that allows billions of dollars to be raised and spent on campaign advocacy, the FEC's core mission is to ensure the essential "transparency [that] enables the electorate to make informed decisions and give proper weight to different speakers and messages." *Citizens United v. FEC*, 558 U.S. 310, 371 (2010).

To perform this role properly, the FEC must be—and, since its inception, has been— independent and bipartisan. The FEC's independence is crucial to its ability to implement campaign finance laws fairly, neutrally, and without seeking to benefit or handicap any individual or party. The FEC's bipartisanship is no less important, ensuring that neither major party can dominate the body and that both parties' views are heard on matters vital to their operations. Indeed, the FEC's independence and bipartisanship are mutually integral to its mission. A lack of independence would undermine the Commission's hallmark bipartisan decision-making, which in turn ensures the Commission's independence.

As applied to the FEC, Executive Order 14215 frontally assaults the agency's independence and bipartisanship. Executive Order 14215 empowers the President and the Attorney General to issue "authoritative interpretations of law" for the FEC. Exec. Order No. 14215, 90 Fed. Reg. 10447, 10448 (Feb. 18, 2025). These "opinions on questions of law" are deemed "controlling" on the Commissioners "in the conduct of their official duties." *Id.* No Commissioner "may advance an interpretation of the law . . . that contravenes the President or the Attorney General's opinion." *Id.* at 10449. Together, these provisions render the FEC subservient to—not independent of—the President. The President may opine on any of the myriad legal issues faced by the FEC, and, if he chooses to do so, the FEC must then parrot his positions. Executive Order 14215 similarly transforms the FEC from a bipartisan into a partisan body. Commissioners from both major parties are forbidden from disagreeing with the legal

views of a President from a single party, thus obviating the statutory role of Commissioners from the other party.

Ellen L. Weintraub has served as a Commissioner of the FEC since December 2002 and has held the annually rotating Chair position four times. As one of the FEC's longest-serving Commissioners, Commissioner Weintraub is uniquely well-qualified to comment on the mission and operations of the Commission and the law it administers and interprets. She submits this brief in order to highlight three points. *First*, Congress unquestionably wanted the FEC to be independent and bipartisan when it created the agency. According to the Senate report that accompanied the 1974 amendments to the Federal Election Campaign Act ("FECA"), to "prevent[] discriminatory [policies] in favor of any candidate or party," federal campaign finance "would be overseen by the Independent Elections Commission, which itself is subject to judicial review of alleged discrimination." S. Rep. No. 93-689, at 10 (1974). Congress had the same aim when it amended the FECA in 1976 to respond to the Supreme Court's decision in *Buckley v. Valeo*, 424 U.S. 1 (1976). Per the relevant House report, one of the "basic principles" underpinning these amendments was that the FEC would possess "independence" so that it "does not provide room for partisan misuse." H.R. Rep. No. 94-917, at 2–3 (1976).

*Second*, as illustrated by Commissioner Weintraub's own experience, Executive Order 14215 is only part of a broader attack on the FEC's independence and bipartisanship. Earlier this year, President Trump fired Commissioner Weintraub from her position without cause. This removal was unprecedented, with no Commissioner having previously been fired for any reason. The removal subverted the FEC's independence and bipartisanship. It targeted a specific Democratic Commissioner. The removal was unlawful. "[T]he President can remove [FEC]

commissioners only for good cause. . ." *FEC v. NRA Pol. Victory Fund*, 6 F.3d 821, 826 (D.C. Cir. 1993).

And *third*, effective election administrators around the world are characterized by their separation from the executive. In fact, this separation (or its absence) is the key criterion used to categorize election administrators, who can be independent, controlled by the executive, or mixed. *See, e.g.*, Daniel P. Tokaji, *Comparative Election Administration: A Legal Perspective on Electoral Institutions*, *in* Comparative Election Law 436, 438–40 (James A. Gardner, ed., 2022) [hereinafter Tokaji, *Comparative Election Administration*]. In this typology, most Western democracies rely on independent election administrators. And for good reason: Elections are run impartially—and, equally critically, in a manner *perceived* to be impartial—only if election administrators (including those implementing campaign finance laws) are independent of the executive. Consequently, Executive Order 14215 diverges from the global consensus on the proper administration of elections. It compromises the independence of the one body in the complex American electoral system that, until now, has been insulated from the executive.

## ARGUMENT

### I. Executive Order 14215 Flouts Congress's Intent That the FEC Be Independent.

Executive Order 14215 contravenes Congress's purpose for establishing the FEC. The legislative history of the FECA shows that Congress designed the FEC to be an independent agency free from partisan control. Executive Order 14215 defies this founding purpose by transferring effective control over many campaign finance issues to the President and the Attorney General. This move is wholly inconsistent with the FEC's independent and bipartisan structure.

### A. Congress Established the FEC in 1974 as an Independent Agency.

Congress created the FEC as part of a broad effort to safeguard democratic values and prevent partisan bias from influencing campaign finance regulation. The Commission was established in the wake of Watergate, in a rare moment of bipartisan commitment to regulating money in politics. Tom van der Voort, *Watergate: The Cover-Up*, UVA | Miller Center, https://millercenter.org/the-presidency/educational-resources/watergate/watergate-cover [https://perma.cc/SEP4-QL5Y]. After Watergate, Congress realized that democratic values could only be protected, and campaign finance rules should only be enforced, by an independent, bipartisan agency.

The conference and committee reports for the 1974 FECA amendments consistently affirm Congress's commitment to establishing an independent FEC. *See, e.g.*, S. Rep. No. 93-689, at 16 (1974) (emphasizing that the 1974 FECA amendments aimed to "establish[] an independent [FEC] within the executive branch to enforce . . . reporting and disclosure requirements"). The reports further reflect a strong desire to shield campaign finance regulation from elected officials and partisan politics, declaring that an independent agency was necessary to avoid "[f]ederal interference with a candidate's campaign." *Id.* at 9. In particular, the Senate report states that political interference would be prevented by having an "Independent Elections Commission, which itself is subject to judicial review of alleged discrimination." *Id.* at 10.

Congress's structure for the FEC was selected to secure the agency's independence and bipartisanship. FEC Commissioners would be chosen "from among individuals who are not officers or employees of the . . . Federal Government (including elected and appointed officials)." H.R. Rep. No. 93-1438, at 90 (1974) (Conf. Rep.). This selection condition, was intended to insulate FEC Commissioners from partisan politics and diminish the President's influence over the agency. *See, e.g.*, H.R. Rep. No. 93-1239, at 137 (1974) (supplemental views

of Rep. Frenzel) (noting that Congress intentionally gave "the President . . . limited discretion" over FEC appointments and that, in order to "assure the Commission's independence," Congress created a bipartisan FEC).

Members of Congress from both parties emphatically voiced their preference for an independent, bipartisan FEC during debates and in committee reports, further demonstrating the intent behind the agency's structure. Representative Frenzel commented favorably on the fact that the "Commission would be similar in structure to [other] independent agencies of the executive branch" and would have "constitutional authority to enforce the laws under their jurisdiction." *Id.* Representative Hays explained that "the thrust of [the] amendment is to provide for an independent elections commission." *Federal Election Campaign Act Amendments of 1974: Hearing on H.R. 16090 Before the H. Comm. on Rules*, 93d Cong. 86 (1974) (statement of Rep. Wayne Hays, Member, H. Comm. on Rules).

Representative Brademas was even more specific about Congress's aim to insulate the FEC from the President and partisan considerations more generally. He stated that "a feeling . . . widespread on both sides of the aisle . . . [was that] we could not tolerate [a] . . . commission that . . . would be appointed by the White House." *Id*. at 91 (statement of Rep. John Brademas, Member, H. Comm. on Rules). He added that "[w]hether the President is a Democrat or Republican is not the point here, but [having the Commission] . . . appointed in toto by the White House . . . from one party . . . [we] felt that that was very unwise, not only in the present circumstances in this country but in terms of the proper balance and the separation of powers." *Id.* Representative Stanton further expressed support for giving the FEC independent enforcement authority. In his view, the Commission had to be "a new agency of Government that would need no one's permission to exercise its police powers with respect to electioneering by

candidates . . . [that] would have built-in authority to compel reporting by the candidates . . . to subpoena persons and documents, to hold hearings, to publicize its findings and, when necessary, to initiate and prosecute its own cases in court." 120 Cong. Rec. 4459 (1974).

**B.    The FEC's Independence Remained the Central Concern of the 1976 FECA Amendments.**

In 1976, Congress amended the FECA to bring the FEC's appointment structure into compliance with the Supreme Court's ruling in *Buckley*. *See* 424 U.S. at 143. While the Court voided the FEC's original appointment structure, it did not disturb Congress's general objective to insulate the agency from partisan politics. To that end, the 1976 FECA amendments retained the hallmarks of the FEC's independence—namely its partisan balance requirement and its authority to independently interpret and enforce campaign finance laws.

Indeed, the overriding intent of the 1976 FECA amendments is clear: to comply with *Buckley* while ensuring maximum independence for the FEC. This theme—the necessity of neutral and independent election supervision—pervades the congressional record. The Senate report, published thirty-three days after *Buckley*, stated the purpose of the amendments in its very first sentence: "to reconstitute the Federal Election Commission as an independent executive branch agency." S. Rep. No. 94-677, at 1 (1976). Two weeks later, the House report elaborated on this goal: "[E]lection campaigns are the central expression of this country's democratic ideal. It is therefore essential in this sensitive area that the system of administration and enforcement enacted into law does not provide room for partisan misuse." H.R. Rep. No. 94-917, at 3 (1976). Likewise, the House report recognized that the FEC "must have the independence required by the tripartite system of government created by the Constitution." *Id*. While members disagreed on how to achieve this aim, *see id.* at 92 (supplemental views of Rep. Frenzel), the core aspiration was non-negotiable: FEC independence.

The 1976 FECA amendments ultimately passed with supermajorities in both congressional chambers. Even with the changes, members felt certain that the FEC's structural safeguards against partisanship were sufficient "to keep politics, or the appearance of politics, out of the actions of the Commission." 122 Cong. Rec. 6693 (statement of Sen. Howard Cannon).

### C.    For Nearly Fifty Years, the Other Branches Have Recognized the FEC's Independence.

FEC independence is not an artifact of congressional debates of the 1970s. It is a mainstay of American democracy. The judicial and executive branches have long acknowledged the essential role of FEC independence.

Following the 1976 FECA amendments, the Supreme Court explicitly recognized Congress's intent to make the Commission "inherently bipartisan." *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37 (1981). The Court noted the FEC's sensitive functions: to "decide issues charged with the dynamics of party politics, often under the pressure of an impending election." *Id*. The D.C. Circuit later observed that, due to the FEC's responsibility for safeguarding democratic values, Congress chose to "pattern[] [the Commission] on the classic independent regulatory agency." *NRA Pol. Victory Fund*, 6 F.3d at 826. The Supreme Court echoed this conclusion, stating that the FEC's structure was "undoubtedly influenced by Congress's belief" that an independent body was needed to avoid partisan biases. *FEC v. NRA Pol. Victory Fund*, 513 U.S. 88, 95–96 (1994).

Traditionally, Presidents have also respected the FEC's bipartisan structure. In his signing statements, President Ford praised the bipartisanship of both the original and the amended FEC. *See* Statement on the Federal Campaign Act Amendments of 1974, 2 Pub. Papers 303 (Oct. 15, 1974); Statement on Signing the Federal Election Campaign Act Amendments of

1976, 2 Pub. Papers 1529 (May 11, 1976) (noting "widespread, bipartisan support"). In the half-century since these FECA amendments, no President has ever attempted to nominate a new Commissioner in violation of the FEC's partisan balance requirement. Nor, until Executive Order 14215, had any President asserted that his opinions on questions of law were definitive and binding upon the FEC. That assertion defies fifty years of presidential practice as well as Congress's unmistakable intent that the FEC be insulated from total presidential control.

### D.    Subjecting the FEC's Legal Interpretations to Presidential Oversight Will Conflict with the FECA and Undermine the FEC's Institutional Credibility.

The heart of Executive Order 14215 states: "The President and the Attorney General, subject to the President's supervision and control, shall provide authoritative interpretations of law for the executive branch," including independent agencies such as the FEC. Exec. Order No. 14215, 90 Fed. Reg. 10447, 10447 (Feb. 18, 2025). Applying this Executive Order to the FEC would countermand the FEC's authorizing statute and would risk the weaponization of the federal body that regulates how money is raised and spent in U.S. elections.

The FEC interprets the law through regulations of general applicability, 52 U.S.C. § 30107(a)(8), through advisory opinions on specific transactions, 52 U.S.C. §§ 30107(a)(7), 30108, and through the factual and legal analyses it issues in enforcement matters, 52 U.S.C. § 30109. All of these are subject to Commission votes and cannot issue without the statutory minimum of four affirmative votes, in a body where no more than three commissioners can be of the same political party. 52 U.S.C. §§ 30106(a)(1), 30106(c). Thus, by statute, the FEC's authoritative interpretations of the FECA must be made on a bipartisan basis. It is doubtful, in light of the legislative history described above, that Congress would have entrusted this power to a body that could be captured by one party and used to disadvantage, and potentially use the enforcement process to financially penalize, the other.

9

The enforcement process presents the most serious concerns with respect to attempted Presidential supervision and control. Complaints are often filed by one political adversary against another. Commissioners vote on how to interpret the law with respect to whether it was violated on the specific facts before it and if so, what civil penalty, if any, the Commission should seek. Commissioner Weintraub is well aware of the limitations of this process, but subjecting it to Presidential supervision would be a cure worse than the disease. It opens the door to the risk that the law could be interpreted in ways that subject one party to findings that they have violated the law and resulting civil penalties while comparable complaints against the other party result in exoneration.[1]

Regulations and advisory opinions might seem to be less fraught than enforcement but can present similar issues. One candidate or party may organize their campaigns and fundraising apparatus differently than another. Subjecting FEC regulations and advisory opinions to Presidential supervision risks rulings that the way one party does business complies with the law while innovations pioneered by the other side do not. The advisory opinion process can be a shield against future enforcement actions. 52 U.S.C. § 30108(c)(2) (creating safe harbor for persons who in good faith rely on advisory opinions). If some partisans feel that their advisory opinion requests, their rulemaking petitions and comments, and their responses to enforcement complaints filed against them will not get the same consideration as those of their opponents, the FEC as an institution will slide into further disfunction and loss of credibility.

---

[1] Inconsistent adjudications have already been a problem at the FEC, *see, e.g.*, Statement of Reasons of Commissioners Shana M. Broussard and Ellen L. Weintraub, MUR 7784 (Make America Great Again PAC, *et al.*) (June 15, 2022) https://www.fec.gov/files/legal/murs/7784/7784_43.pdf [https://perma.cc/TM7C-5SSK], but the Executive Order would exponentially magnify the concern.

In sum, Executive Order 14215 is inconsistent with the statutory framework set out in the FECA and the bipartisan, independent character of the FEC that is fundamental to its operations.

## II.    Executive Order 14215 Is Part of a Broader Attack on the FEC's Independence.

While this case involves only Executive Order 14215, this administration's challenge to the FEC's independence and bipartisanship extends beyond this Order.[2] By a letter dated January 31, 2025 (but not transmitted until February 6, 2025), President Trump sought to remove Commissioner Weintraub without cause. In a 25-word letter, the President did not claim any wrongdoing by Commissioner Weintraub. Instead, he summarily stated, "You are hereby removed as a Member of the Federal Election Commission." *See* Ellen L. Weintraub (@EllenLWeintraub), https://x.com/EllenLWeintraub/status/1887648967300694270 [https://perma.cc/VAV7-4C4F]. President Trump's firing of Commissioner Weintraub was (1) unprecedented, (2) a blatant attack on the independent and bipartisan structure of the FEC, and (3) unlawful.

The President's attempt to remove, but not replace, an FEC Commissioner runs counter to the entire history of the FEC. Commissioner Weintraub, a Democrat, was unanimously

---

[2] This administration has also challenged the independence, bipartisanship, and very existence of numerous agencies beyond the FEC. *See, e.g.*, Danielle Kaye & Rebecca Davis O'Brien, *Trump Firings at Labor Board Paralyze the Agency*, N.Y. Times (Jan. 28, 2025), https://www.nytimes.com/2025/01/28/us/politics/trump-nlrb-jennifer-abruzzo.html [https://perma.cc/ZN45-3YDK]; David McCabe & Cecilia Kang, *Trump Fires Democrats on Federal Trade Commission*, N.Y. Times (Mar. 18, 2025), https://www.nytimes.com/2025/03/18/technology/trump-ftc-fires-democrats.html [https://perma.cc/YJB7-5N5D]; Tyler Pager, *Trump Orders Gutting of 7 Agencies, Including Voice of America's Parent*, N.Y. Times (Mar. 17, 2025), https://www.nytimes.com/2025/03/15/us/politics/trump-order-voice-of-america.html [https://perma.cc/BGM3-59AK]; Charlie Savage, *Trump Issues Order to Expand His Power Over Agencies Congress Made Independent*, N.Y. Times (Feb. 18, 2025), https://www.nytimes.com/2025/02/18/us/trump-executive-order-sec-ftc-fcc.html [https://perma.cc/G4HJ-E8YT].

confirmed by the U.S. Senate in 2003 after being appointed by President George W. Bush. Fed.

Election Comm'n, *Ellen L. Weintraub*, https://www.fec.gov/about/leadership-and-structure/ellen-

l-weintraub/ [https://perma.cc/C747-YEJW]. Although she completed her initial term in 2007,

Commissioner Weintraub continued to lawfully serve in a holdover capacity because no

successor has been nominated by the President and confirmed by the Senate. Serving as a

holdover is both typical for the FEC (which currently includes two other holdover

Commissioners) and statutorily authorized. The FECA explicitly permits any Commissioner to

serve "until his or her successor has *taken office as a member of the Commission*." 52 U.S.C. §

30106(a)(2)(B) (emphasis added).

This statutory limitation barring removal without replacement is crucial for three reasons.

*First*, the limitation promotes continuous oversight of key campaign finance laws and

regulations. *See, e.g.*, *Staebler v. Carter*, 464 F. Supp. 585, 593 (D.D.C. 1979) (discussing

Congress's rationales for authorizing holdover officials in the organic statutes of several

independent agencies and concluding that "[t]he thrust of all the comments is that continuity in

office is important and that the disruption caused by prolonged vacancies should be avoided").

Given the FEC's role in regulating the conduct of the very political actors charged with

appointing and confirming Commissioners, it would be all too easy for officeholders passively to

allow their own regulators to go out of business by simply not replacing Commissioners at the

expiration of their terms. The FECA anticipates this possibility and contains the means to

prevent it by allowing for holdovers. *Second*, the statutory limitation on removal shields

Commissioners from presidential pressure. *See NRA Pol. Victory Fund*, 6 F.3d at 826 (agreeing

that Congress intended to provide for-cause protection to FEC Commissioners). And *third*,

removal without replacement undermines important checks and balances between the executive

and legislative branches by denying the Senate its statutory and constitutional role in advising on and consenting to nominations. *See* U.S. Const. art. II, § 2.

President Trump's choice to remove Commissioner Weintraub undermines the agency's independence. Her firing serves notice to the remaining Commissioners that they, like Commissioner Weintraub, could be removed at any moment, for partisan or ideological reasons or on no basis at all. To avoid this fate, these Commissioners may well feel pressured to change their behavior, preemptively acting in ways expected to please the President. This anticipatory skewing of agency action is exactly what the FEC's independence is meant to prevent.

Commissioner Weintraub's firing also leaves the FEC with a mere four Commissioners—the bare minimum to form a quorum. By removing Commissioner Weintraub, an advocate for more effective enforcement of the FECA, the President has thus already reshaped "the only agency that regulates the president" to his benefit. Press Release, Trevor Potter, President, Campaign Legal Center, Trump Illegally Attempts to Fire Federal Election Commission Chair Ellen Weintraub (Feb. 6, 2025), https://campaignlegal.org/press-releases/trump-illegally-attempts-fire-federal-election-commission-chair-ellen-weintraub [https://perma.cc/PL9N-WBYD]. In the future, if President Trump repeats this gambit, he could further distort the FEC's composition. For example, he could remove, but not replace, one of the other Democratic Commissioners and then appoint someone to the empty Republican position on the FEC. These steps would give the President's party a lopsided advantage irreconcilable with the FEC's bipartisan structure. Even without further removals, the resignation of any of the other four Commissioners could leave the Commission without a quorum and thus unable to perform its enforcement and policy-making duties.

The President's manipulation of the FEC's membership is especially worrisome since it comes just as the agency is reportedly poised to consider several campaign finance complaints against his 2024 campaign. *See, e.g.*, Ashley Lopez, *Federal Election Commissioner Says Trump Is Trying to Improperly Remove Her*, NPR (Feb. 7, 2025, 2:57 PM), https://www.npr.org/2025/02/07/nx-s1-5290112/trump-federal-election-commissioner-weintraub [https://perma.cc/E98D-YLWP]. In the recent past, the FEC received fifty-nine "allegations that Mr. Trump or his committees violated the FECA." Statement of Reasons of Commissioner Ellen L. Weintraub, MUR 7609R, at 3 (Donald J. Trump, *et al.*) (Dec. 5, 2023), https://www.fec.gov/files/legal/murs/7609R/7609R_18.pdf [https://perma.cc/H3H9-ND7S]. In approximately half of these cases, the FEC's Office of General Counsel—staffed by nonpartisan civil servants— recommended finding reason to believe that the law had been violated and taking some action against the respondents. *Id.* In every case, Republican FEC Commissioners voted not to take action. *Id.* This pattern of obstruction may be unlikely to change, but the FEC's record could become even more problematic if, in the future, the President seizes an edge for his party, exacerbating pressure on a future lone Democrat.

By removing without replacing Commissioner Weintraub, President Trump further ignored the historic role of the opposition party in Congress in recommending new members of the FEC, as well as the full Senate's role in confirming new nominees. By statute, the President and the Senate share responsibility for the composition of the Commission. As eleven Senators wrote to the President: "Unlawfully removing a commissioner with an existing vacancy, without consultation with the Senate on nominations to replace them, demonstrates an intent to ignore the Senate's constitutional role and diminish the Commission's ability to hold accountable potential violations of campaign finance law." Letter from Eleven U.S. Senators to President Donald J.

Trump (Feb. 12, 2025), https://www.padilla.senate.gov/wp-content/uploads/02.12.25_Letter-to-POTUS-on-Removal-of-FEC-Chair-Weintraub.pdf [https://perma.cc/UVN4-TX52].

President Trump's removal of Commissioner Weintraub not only threatens the FEC's independence but also violates the law. As noted above, the FECA was designed for replacement, not removal of commissioners, and it "is likely correct" that, under the FECA, "the President can remove [FEC] commissioners only for good cause." *NRA Pol. Victory Fund*, 6 F.3d at 826. This protection from removal in the absence of a good reason is plainly constitutional. In *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020), the Supreme Court confirmed the longstanding rule that "permit[s] Congress to give for-cause removal protections to a multi-member body of experts, balanced along partisan lines, that perform[s] legislative and judicial functions." *Id.* at 216. The FEC is precisely this kind of body. "The Commission is patterned on the classic independent regulatory agency" for whose heads arbitrary removal may constitutionally be barred. *NRA Pol. Victory Fund*, 6 F.3d at 826.

Requiring the President to remove holdover Commissioners by actually replacing them hardly "extend[s] Congress's authority to limit the President's removal power to a new situation, never before confronted by the Court." *Seila Law*, 591 U.S. at 238. The President may effectuate a holdover Commissioner's removal through the traditional advice-and-consent process. *See* 52 U.S.C. § 30106(a)(1). Alternatively, the President may remove a holdover Commissioner by making a recess appointment. *See Staebler*, 464 F. Supp. at 601 (holding that it is lawful for the President to use recess appointments to fill FEC vacancies). However, the President may not manufacture a third removal option by circumventing a clearly stated congressional directive. *Cf.* U.S. Const. art. II, § 3, cl. 3 (the President "shall take Care that the Laws be faithfully executed."). The FECA's provision authorizing holdover Commissioners is a duly enacted

"statutory limitation[] on governmental authority" that cannot be disregarded. *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1332 (D.C. Cir. 1996).

Long ago, the Supreme Court rejected the argument that "the obligation imposed on the President to see the laws faithfully executed . . . implies a power to forbid their execution." *Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524 (1838). "An American President is not a king . . . and his power to remove federal officers . . . may be constrained in appropriate circumstances . . . ." *Wilcox v. Trump*, No. 25-334 (BAH), ___ F. Supp. 3d ___, 2025 WL 720914, at *18 (D.D.C. Mar. 6, 2025). Few, if any, circumstances are more appropriate than these, where free and fair elections hinge on the independence of the body that regulates the billions of dollars spent to influence those elections.

### III.    Executive Order 14215 Bucks the Global Trend Toward Independent Election Administration.

Turning from the United States to the rest of the world, a comparative survey of mature democracies reveals the threat posed by Executive Order 14215. By compromising the FEC's independence, the Order moves American election administration away from the international gold standard.

To be sure, most foreign election administrators actually run elections in addition to enforcing campaign finance laws. That is, the functions of foreign election administrators tend to be broader than those of the FEC. Agency independence is equally vital, however, with respect to both administering elections and implementing campaign finance laws. In both contexts, impartiality and legitimacy are essential so that elections themselves, as well as electoral funding, are regulated in ways that are, and are seen to be, fair. Accordingly, foreign election administrators are appropriate comparators for the FEC notwithstanding their more expansive authority.

Scholars typically classify systems of election administration into one of three categories: independent, executive or government controlled, or mixed.[3] The independent model is "properly viewed as the gold standard when it comes to election management." Daniel P. Tokaji, *Public Rights and Private Rights of Action: The Enforcement of Federal Election Law*, 44 Ind. L. Rev. 113, 121 (2010) [hereinafter Tokaji, *Public Rights and Private Rights of Action*]. An independent election administrator is "a compelling international norm, a *sine qua non* of electoral credibility." Shaheen Mozaffar & Andreas Schedler, *The Comparative Study of Electoral Governance–Introduction*, 23 Int'l Pol. Sci. Rev. 5, 15 (2002). "Only . . . independence from politically motivated manipulation will ensure proper administration of the election process . . . ." Eur. Comm'n for Democracy Through L., Code of Good Practice in Electoral Matters 24 (2002).

Mature Western democracies, including Australia, Canada, Mexico, New Zealand, South Africa, the United Kingdom, and many others, tend to use the independent model of election administration. Overall, this model is the clear global favorite, relied on by nearly two-thirds of countries worldwide. Tokaji, *Comparative Election Administration*, at 439; *see also Comparative Data*, ACE Electoral Knowledge Network, https://aceproject.org/epic-en?question=EM003 [https://perma.cc/2T4F-Y72P]. This model is particularly recommended for nascent democracies to ensure the impartiality and legitimacy of their elections. *See, e.g.*, Rafael López-Pintor, Principles for Independent and Sustainable Electoral Management: International Standards for Electoral Management Bodies 11–12 (United Nations Development Programme

---

[3] Independent election administrators are not directly controlled by, or accountable to, elected officials. *See, e.g.*, Tokaji, *Comparative Election Administration*, at 439. Under the "executive/governmental model," "a component of the executive branch . . . run[s] elections." *Id.* And in mixed systems, "authority is divided among different public entities," which vary in their degree of independence from the executive. *Id.*

ed. 2012). Numerous older democracies have also switched from election administration systems with significant executive control to the independent model. *Id.* at 10.

Independent election administration is thought to be desirable because of its tight connection to impartiality: running elections objectively, neutrally, without favor or disfavor for any candidate or party. "[I]nternational experience shows that impartiality is closely linked to independence from government and political parties." López-Pintor, *supra*, at 15. "[A]n independent electoral commission . . . . tends to promote impartiality by insulating those running the election from political pressures." Tokaji, *Public Rights and Private Rights of Action*, at 120. Equally importantly, the independent model is compelling because it improves electoral legitimacy: the perception among the public that elections are run fairly. "Election management bodies . . . that are independent of partisan politics . . . . increase public confidence [and] promote legitimacy . . . ." Tokaji, *Comparative Election Administration*, at 436. An independent election administrator "is an absolute requirement for credible elections and legitimate results." López-Pintor, *supra*, at 15.

Because of its complex, decentralized structure, American election administration is difficult to categorize under this typology. Until now, the FEC has been an independent agency, leading some observers to classify United States elections as independent. *See, e.g.*, *Comparative Data*, ACE Electoral Knowledge Network, *supra*. On the other hand, state election officials are almost always appointed by the executive or elected through a partisan process. *See, e.g.*, Richard L. Hasen, *Beyond the Margin of Litigation: Reforming U.S. Election Administration to Avoid Electoral Meltdown*, 62 Wash. & Lee L. Rev. 937, 974 (2005); Tokaji, *Public Rights and Private Rights of Action*, at 121. However the United States has historically fit into this framework, it is plain that Executive Order 14215 diminishes the independence of the FEC. The

18

Order thus pushes American election administration even further from the global gold standard, under which independence is prescribed for the entire electoral system, not merely the lead federal electoral body.

## CONCLUSION

This brief provides the Court with valuable context for adjudicating Plaintiffs' challenge to Executive Order 14215 as applied to the FEC. The Order flouts Congress's intent that the FEC be an independent, bipartisan agency. The Order is part of a broader attack on the FEC that includes the unprecedented removal of Commissioner Weintraub from office. And the Order bucks the global trend toward independent election administration in mature democracies.

Dated: March 26, 2025

Respectfully submitted,

| | |
|---|---|
| */s/ Andrea Forsee* | */s/ Nicholas O. Stephanopoulos* |
| Mehri & Skalet PLLC | Nicholas O. Stephanopoulos* |
| 2000 K Street NW, Suite 325 | Election Law Clinic, Harvard Law School |
| Washington, DC 20006 | 6 Everett Street, Suite 4105 |
| Telephone: (202) 822-5100 | Cambridge, MA 02138 |
| aforsee@findjustice.com | (617) 496-2181 |
| | nstephanopoulos@law.harvard.edu |
| | |
| *Counsel for Amicus Curiae* | *Counsel for Amicus Curiae* |
| | *pro hac vice pending |