**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) No. 25-cv-587 |
| v. | ) ) ) |
| DONALD J. TRUMP, *et al.*, | ) ) ) REPLY IN SUPPORT ) OF MOTION TO DISMISS |
| Defendants. | ) ) ) |

**FEDERAL ELECTION COMMISSION'S REPLY
IN SUPPORT OF ITS MOTION TO DISMISS**

Lisa J. Stevenson (D.C. Bar No. 457628)
Acting General Counsel
lstevenson@fec.gov

James D. McGinley (D.C. Bar No. 1017536)
Associate General Counsel
jmcginley@fec.gov

Christopher H. Bell (D.C. Bar No. 1643526)
Acting Assistant General Counsel
chbell@fec.gov

Sophia H. Golvach (D.C. Bar No. 1656365)
Blake L. Weiman (D.C. Bar No. 1725165)
Michael D. Contino (D.C. Bar No. 1782269)
Attorneys
sgolvach@fec.gov
bweiman@fec.gov
mcontino@fec.gov

FEDERAL ELECTION COMMISSION
1050 First Street, NE
Washington, DC 20463
(202) 694-1650

April 7, 2025

## INTRODUCTION

In their response to the Federal Election Commission's (the "FEC" or the "Commission") Motion to Dismiss, plaintiffs offer a series of arguments regarding the sufficiency of their pleadings and justification for their constitutional claim, the latter of which they seem to agree should be dismissed.  However, plaintiffs' few pages devoted to the threshold question of whether there is a live case or controversy for this Court to adjudicate offer remarkably little new information, and fail to meaningfully address their core deficiency: the FEC's structure and operations remain unchanged, and plaintiffs have not demonstrated that Executive Order 14,215 (the "Executive Order" or "E.O. 14,215") evidences a "certainly impending" effort to change this state of affairs.  And while this larger question is dispositive, the Court lacks jurisdiction for a more fundamental reason: plaintiffs have not connected Executive Order 14,215 to any injuries they are suffering personally.

*First*, plaintiffs identify no government action that has harmed them, and their allegations that they are nonetheless "chilled" or will be subject to biased proceedings in the future are far too speculative, and in any case unripe.  Plaintiffs argue that they are and will continue to be harmed by the application of the Executive Order to the FEC, contending that it will prevent Commissioners from exercising independent judgment in violation of the Federal Election Campaign Act ("FECA").  Yet plaintiffs have not identified a single instance where the President or the Attorney General have adopted a definitive interpretation of FECA, and as the President and Attorney General represented to this Court, there is not "any indication that [they] will issue any such interpretation."  (*See* Defs' Trump & Bondi's Mem. in Supp. of Mot. to Dismiss the Compl. (ECF No. 17-1) (filed Mar. 14, 2025), at 7 ("Administration Defs.' Mot.").)  Though plaintiffs frame their injuries as immediate and persistent, they offer no specifics about what

actions they desire the FEC to take or how the President or Attorney General will interfere with those specific requests.  (*See generally* Pls.' Compl. for Declaratory and Injunctive Relief ("Compl.") (ECF No. 1) (filed Feb. 28, 2025).)  And the declarations of plaintiffs' officers do not fill in the blanks; instead, they merely state that E.O. 14,215 may impact their "calculus" regarding how to allocate resources and when to seek guidance from the FEC, without identifying particular spending or areas of law requiring clarification.  (*See generally id.*; Decls. Accompanying Pls.' Mot. for Prelim. Inj. (ECF No. 12-2, 12-3, 12-4) (filed Mar. 11, 2025) (collectively "Plaintiffs' Declarations").)  And because withholding judgment on plaintiffs' claims unless and until any such injuries materialize will cause plaintiffs no harm, their claims are not ripe.

*Second*, E.O. 14,215 itself cannot substitute for plaintiffs' lack of harm, because the Order's general statement of policy is not self-executing and explicitly provides that it will be carried out consistent with applicable law.  Section 7 of the Executive Order broadly applies to the entire federal government, and does not commit the President or Attorney General to any particular action, let alone specific action targeting the Commission.  Where, as here, plaintiffs' allegations of harm are necessarily limited to the Order itself, only language that "unambiguously commands action" will merit judicial intervention.  In the absence of such language the Court must give effect to Section 8, which specifies that the Executive Order must be carried out consistent with applicable law, including the agency's structure and authority as provided in FECA.  There is no reason to assume the Executive Order will be carried out unlawfully; as such, plaintiffs are left completely uninjured.  Plaintiffs' Complaint should be dismissed.

## ARGUMENT

### I.    PLAINTIFFS' CLAIMS ARE NOT JUSTICIABLE

#### A.    Plaintiffs' Injuries are Speculative and Not Imminent

Plaintiffs lack standing because Executive Order 14,215 "has not been applied to the Commission's legal interpretations of the FECA, nor is there any indication that the President or Attorney General will issue any such interpretation."  (Administration Defs.' Mot. at 7.)  Indeed, the cornerstone of plaintiffs' Complaint is that "[t]he President *could* impose legal positions on the FEC *tomorrow*[.]"  (Pls.' Consolidated Mem. in Opp. to Defs.' Mot. to Dismiss (ECF No. 39) (filed Apr. 2, 2025), at 11 ("Opp.") (emphasis added).)  But as the Commission explained in its Motion, plaintiffs merely allege that, in an unspecified manner, on an unspecified date, regarding an unspecified issue, the President and Attorney General *might* issue a definitive interpretation of federal campaign finance law, which *might* differ from the Commissioners' own views, which *might* have a dispositive impact on a matter impacting plaintiffs, and which *might* ultimately be to their disadvantage.  (*See* FEC Mem. in Supp. of Mot. to Dismiss the Compl. (ECF No. 26-1) (filed Mar. 21, 2025), at 20 ("FEC Mot."); *see generally* Compl.).)

Presented with an opportunity to fill in the blanks of their Complaint, plaintiffs come up short.  They continue to fail to identify any concrete, tangible injury resulting from E.O. 14,215's alleged application to the FEC.  This is because plaintiffs have no definite injury to which they can point.  Plaintiffs cannot meet their burden where they allege inherently speculative injuries that have not come to fruition and may, in fact, never come to fruition.  *See also infra* Part B (describing E.O. 14,215 Section 8's limits on Section 7 with respect to the FEC).  This is especially so when a theory of harm relies on an attenuated chain of government actions that

might affect the parties resting on a series of assumptions that the dominos will fall a particular way. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411-12 (2013).

Plaintiffs are indeed committees regulated by the FEC and are doubtless impacted by certain agency decisions, but what is lacking is any connection between any one of the enforcement, rulemaking, or other Commission responsibilities in which plaintiffs may have an interest on the one hand and the Executive Order they challenge on the other. As discussed *infra* pp. 17-18, the provision of the Executive Order plaintiffs challenge is a broadly applicable statement of policy, not a self-executing plan of action. In the absence of concrete action, the Court is left to guess as to what the Executive Order "purport[s]" to do. (Compl. ¶¶ 17, 18, 43, 58, 76.)

Until plaintiffs come to this Court with more than speculation, there is no live case or controversy to adjudicate, and this Court is left in the untenable position of rendering an advisory opinion. *See id.*; *see also Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) ("A plaintiff must also show that the particularized injury is at least imminent in order to reduce the possibility that a court might unconstitutionally render an advisory opinion by 'deciding a case in which no injury would have occurred at all.'") (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 n.2 (1992)). And even if plaintiffs could establish the "constitutional minima," prudential concerns dictate their claims be dismissed as unripe. *See Church v. Biden*, 573 F. Supp. 3d 118, 135 (D.D.C. 2021). On either ground, the Court need not go further and must dismiss plaintiffs' nonjusticiable causes of action.

### i.    Plaintiffs' Alleged Injuries Cannot Support Standing

Plaintiffs' principal argument to establish their standing is to describe interest in a neutral, independent agency and allege that the Executive Order "changes and impairs [their]

calculus in deciding" how and when to seek guidance from the agency or how to structure their political activities.  (Opp. at 7-9.)  This effort fails because plaintiffs fail to establish the premise that the FEC is acting in any way other than the neutral, independent manner established by statute, nor do plaintiffs make any connection to matters presently affecting them.  Without citing any instance in which the Commissioners have failed to act on their own independent views, plaintiffs claim the Order has affected their "calculus" on, "for instance, whether or not to file a complaint with the Commission, what advertisements to air, or what strategy to recommend to campaigns regarding how to operate while also complying with the Commission's regulations," whether it "seek[s] legal guidance from the FEC," or whether it makes "interactive communications concerning political change."  (*Id*. at 8, 11.)  In their Complaint, plaintiffs also reference an allegedly pending matter under review.  (*See id*. at 8 (citing Compl. ¶¶ 51-54).)  But plaintiffs fail to connect this alleged matter, or any other of their alleged injuries, to the application of the Executive Order in any tangible way, arguing only that DSCC is deprived "of its right to fair proceedings before Commissioners exercising their independent judgment."  (*Id*.)  Indeed, plaintiffs later make clear they cannot connect the alleged matter to an application of E.O. 14,215 when they explain "the legal interpretation of the relevant FECA provisions *will be* dispositive [in the alleged matter.]"  (Opp. at 22 (emphasis added).)  That is the sort of "conclusory" statement tantamount to a legal conclusion, rather than a fact-based allegation, that cannot be simply "taken as true" in order to find standing.  *See Mapp v. District of Columbia*, 993 F. Supp. 2d 22, 25 (D.D.C. 2013); *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993).

All defendants in this matter have made clear on the record that there is no indication the Administration will impose its legal views on the Commission, and the Court is entitled to rely

on this record, notwithstanding plaintiffs' breezy dismissal of this "unsworn assurance[.]"  (Opp. at 10.)  *First*, this "assurance" is entirely appropriate for this Court to rely on and consistent with the Commission's "presumption of regularity."  *See, e.g.*, *Shays v. FEC*, 424 F. Supp. 2d 100, 109 (D.D.C. 2006) (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415-16 (1971)).  Plaintiffs do not provide "any evidence to overcome the presumption of regularity" afforded to agencies.  *Int'l Dark-Sky Ass'n, Inc. v. FCC*, 106 F.4th 1206, 1215 (D.C. Cir. 2024); *see also Abdellatif v. DHS*, 109 F.4th 562, 570 (D.C. Cir. 2024) ("Nor do petitioners make any showring of bad faith or improper behavior of a kind that could upset the presumption of regularity afforded executive action." (internal citations and quotations omitted)).

*Second*, the burden of proof is not defendants' but plaintiffs', and they have not met it.  In light of a "motion to dismiss under Rule 12(b)(1) . . . call[ing] the jurisdiction of the Court into question, . . . plaintiffs will bear the burden of establishing that jurisdiction is proper" through its "factual allegations[.]"  *D.C. Ret. Bd. v. United States*, 657 F. Supp. 428, 431 (D.D.C. 1987) (citing *KVOS, Inc. v. Associated Press*, 299 U.S. 269 (1936)).  And when defendants deny or controvert the plaintiffs' allegations proffered to establish subject matter jurisdiction, such allegations in the complaint are not inherently controlling.  *See, e.g.*, *id*. at 431-32.  That is precisely what the Administration and the Commission have done here–contradicting plaintiffs' theory that an alleged present matter under review has already been affected by E.O. 14215–by submitting that the President has not "imposed any particular legal interpretation on the Commission."  (Opp. at 10.)  The Court cannot rely on conclusory allegations that one of the plaintiff committees has been "deprive[d] . . . of its right to fair proceedings" in the face of defendants' countervailing response.

Plaintiffs' allegations are noticeably vague, failing to allege any specific matter that they would like the FEC to act on in a particular fashion or in which the Administration is likely to interfere regarding those specific actions. As noted *supra*, neither the Complaint nor plaintiffs' declarations ever point to any specific action taken by the Commission regarding an advisory opinion request, enforcement proceeding, rulemaking, or any other activity impacting plaintiffs since the Executive Order was issued, much less an action taken *as a result of* that Order, that would warrant this court's jurisdiction. *See California v. Trump*, 613 F. Supp. 3d 231, 240 (D.D.C. 2020) (quoting *Lujan*, 504 U.S. at 560) (rejecting "conjectural or hypothetical" injuries that are neither "actual [n]or imminent" as insufficient for standing).

Given the lack of information provided by plaintiffs, it is apparently undisputed that the FEC has taken no specific action adverse to the interests of plaintiffs since the Executive Order was issued. In response, plaintiffs offer the unremarkable observation that "regulated parties have standing to challenge FECA's prohibitions as unconstitutional where the plaintiff wishes to engage in prohibited activities." (Opp. at 9 (emphasis omitted).) Fair enough. But plaintiffs here are not seeking to engage in activities that FECA prohibits. This fact alone entirely obviates their cited authorities, each of which involved plaintiffs who were subject to FECA's prohibitions and sought to immunize their preferred course of conduct. (Opp. at 9-10 (citing *Wagner v. FEC*, 717 F.3d 1007, 1008–09 (D.C. Cir. 2013) (plaintiffs sought to make federal campaign contributions in violation of prohibition on such contributions by government contractors), *Libertarian Nat'l Comm., Inc. v. FEC*, 228 F. Supp. 3d 19, 22 (D.D.C. 2017) (political committee sought to accept full value of testamentary bequest in violation of FECA's limitations); *NRSC v. FEC*, 712 F. Supp. 3d 1017, 1024 (S.D. Ohio 2024) (Senator wished to coordinate campaign spending with national party committee in excess of FECA's limitations).)

In short, these plaintiffs were able to clearly identify a course of conduct they would engage in but for FECA's then-existing prohibitions and limitations. This is hardly comparable to the scenario here, where plaintiffs challenge an Executive Order that lacks the same force of law. Here, plaintiffs articulate no provision of law or other "certainly impending" action that threatens their activities. There is thus every "reason to treat [p]laintiffs' claims in this case [] differently." (Opp. at 10.)

Moreover, plaintiffs' observation that their rights may be violated by "[a] public-official defendant who threatens to employ coercive state power[,]" (Opp. at 10,) is similarly anodyne, and dodges the pertinent question of what constitutes a "threat." The cases on which plaintiffs rely stand in sharp contrast to the instant facts and demonstrate that defendants here have engaged in no conduct meeting this threshold. For instance, in *Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015), an operator of a classified advertising website brought action alleging that the county sheriff imposed informal prior restraint on speech by sending letters to credit card companies requesting that they stop processing payments to the website. The court described the sheriff's actions as "suffocation," by "scaring off its payments-service providers" and "threaten[ing] legal sanctions" against the companies "for facilitating future speech[.]" *Id.* at 231. Plaintiffs also cite *National Rifle Ass'n of America v. Vullo* for the proposition that the Court may review a government official "threaten[ing] to wield her power against" the plaintiff. 602 U.S. 175, 194 (2024). But there, as superintendent of the New York Department of Financial Services, Vullo was alleged to have taken concrete steps to harm plaintiff: overtly "pressur[ing] regulated entities to help her stifle the NRA's pro-gun advocacy by threatening enforcement actions against those entities that refused to disassociate from the NRA and other gun-promotion advocacy groups." *Id.* at 180-81. Record evidence demonstrated that the

8

superintendent had delivered the message "loud and clear": insurance companies "could avoid liability for [unrelated infractions]" if they "aided [the government's] campaign against gun groups" by terminating business relationships with the NRA. *Id.* at 192-93. Here, in contrast, plaintiffs cannot credibly argue that they are suffering similar threats or coercion. Plaintiffs seek "certainty that the Commission will not be controlled by the head of the opposing political party" without pointing to anything showing that this has happened. (Opp. at 8 (citing Compl. ¶ 16).) They allege the Executive Order has changed their "calculus" regarding "what advertisements to air, or what strategy to recommend to campaigns regarding how to operate[.]" (*Id.* (citing Compl. ¶ 57).) But the mere fact that a government action has changed plaintiffs' "calculus" cannot be the standard.

In an attempt to establish the immediacy of their alleged injury, plaintiffs aver that "[t]he President could impose legal positions on the FEC tomorrow without contradicting a word of his brief, and he could do so in the context of backward-looking enforcement actions penalizing Plaintiffs for things they are doing today." (Opp. at 11.) Yet plaintiffs do not explain why their actions today should *not* be subject to scrutiny, and indeed law enforcement is inherently "backward-looking[.]" If plaintiffs are at any point the subject of an enforcement proceeding, they will have all the procedural and substantive rights afforded such parties, including the right to challenge those proceedings as being improperly influenced if they can substantiate such a claim. But plaintiffs overreach by suggesting that those *future* proceedings are presumptively improper based on the existence of E.O. 14,215 and entitle them to preemptive relief or prospective enforcement decisions in their favor. Plaintiffs may not invoke the Court's jurisdiction on the basis of such assumptions. *Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317, 1324-25 (D.C. Cir. 2013).

Indeed, plaintiffs' purported injuries here rely on precisely the kinds of speculative contingencies that have led courts to dismiss similar claims, including claims challenging executive orders.  For instance, plaintiffs attempt to distinguish *Clapper* on the basis that the *Clapper* plaintiffs' "claimed injury relied upon a series of contingencies conditional on the collapse of guardrails against improper surveillance."  (Opp. at 12 (citing *Clapper*, 568 U.S. at 402, 410)).)  But plaintiffs' own description of the case demonstrates precisely why it applies, since FECA's very structure and makeup provide "guardrails against" arbitrary enforcement of campaign finance law.  Similarly, plaintiffs seek to distinguish *United Presbyterian Church in the U.S.A. v. Reagan* on the basis that "[t]here 'no part of the challenged scheme impose[d] . . . any direct governmental constraint upon the plaintiffs[.]'"  (Opp. at 12 (quoting *United Presbyterian Church*, 738 F.2d 1375, 1380-81 (D.C. Cir. 1984)).)  But again, plaintiffs' own characterization of this case explains precisely why it is applicable, since plaintiffs cannot credibly claim that E.O. 14,215 places any "direct governmental constraint upon" plaintiffs themselves.  And like here, "[i]t must be borne in mind that [E.O. 14,215] does not *direct*" a particular legal position to be taken by the FEC, and thus, the Complaint presents "mere speculative harm."  *United Presbyterian Church*, 738 F.2d at 1380 (internal citation omitted); *see also id.* (explaining "there is no reason why [plaintiffs] would be unable to challenge any illegal [action]" they fear "when (and if) it occurs").

Plaintiffs are unable to refute that the Executive Order has not been applied to the Commission's legal interpretations of FECA; nor is there any indication that the President or Attorney General will ever issue any such interpretation.  *See id.* (plaintiffs failed to show injury from executive order that "issue[d] no commands or prohibitions to these plaintiffs" such that plaintiffs could not "adequately ave[r] that any specific action is threatened or even contemplated

against them").  Finding that an injury exists to confer standing under these circumstances "is not

the law."  *Id*.

ii.         **Plaintiffs' Alleged Injuries Are Not Ripe**

Because plaintiffs' claims are fundamentally contingent and hypothetical, even if

plaintiffs meet the bare minimum to establish their standing this Court should dismiss this action

as unripe.

"[T]he ripeness requirement dictates that courts go beyond constitutional minima and

take into account prudential concerns which in some cases may mandate dismissal even if there

is not a constitutional bar" to the court considering the case.  *Wyo. Outdoor Council v. U.S.*

*Forest Serv.*, 165 F.3d 43, 48 (D.C. Cir. 1999).  To weigh the prudential ripeness of a case,

courts consider: (1) the "'fitness of the issues for judicial decision'"; and (2) the "extent to which

withholding a decision will cause hardship to the parties.'"  *See Church*, 573 F. Supp. 3d at 135

(quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated on other grounds by*

*Califano v. Sanders*, 430 U.S. 99 (1977)).  As to the first prong, plaintiffs' speculative, non-

specific injuries are by their nature not fit for judicial decision.  *See Roshan v. Smith*, 615 F.

Supp. 901, 904-05 (D.D.C. 1985) ("[T]o the extent that the justiciability challenge focuses on the

sufficiency versus remoteness of the alleged injury, ripeness and standing concerns merge.").

Plaintiffs also fail the second prong: no harm has yet befallen them, and may never.  *See Church*,

573 F. Supp. 3d at 135; *see also, e.g.*, Compl. ¶ 59 (stating that "DSCC's ability to defend

itself . . . *will be* substantially impaired *if* the President is able to dictate that the Commission

resolve" controversies against it (emphasis added)).

Plaintiffs' attempt to frame the ripeness question here as a "purely legal issue," (Opp. at

14,) fails both because this is not a purely legal issue and because this is only one of multiple

factors the Court must weigh.  In reviewing whether a matter is fit for judicial review, courts look to see "whether the issue is purely legal, *whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final.*"  *U.S. Air Tour Ass'n v. FAA*, 298 F.3d 997, 1014 (D.C. Cir. 2002) (emphasis added).  And "[e]ven a purely legal issue is not fit for judicial review if further factual development would significantly advance [the Court's] ability to deal with the legal issues presented."  *Church*, 573 F. Supp. 3d at 135; *see Roshan*, 615 F. Supp. at 905 ("Even when the action challenged is final and the issues raised are purely legal, a case is not ripe for adjudication absent the threat of significant and immediate impact on the plaintiff." (cleaned up)).

As explained *supra*, this matter would plainly benefit from a more "concrete setting," *i.e.* one in which plaintiffs articulate current or certainly impending harm to their interests.  *See supra* pp. 9-10; *see also Roshan*, 615 F. Supp. at 904.  In *Church v. Biden*, the court determined that plaintiff federal employees' claims that they were harmed by an executive order mandating COVID vaccination were not ripe because "[t]o date, none of these Plaintiffs have been disciplined or terminated for electing not to be vaccinated against COVID-19."  573 F. Supp. 3d at 136.  Likewise, plaintiffs have suffered no ill effects as a result of the Executive Order, nor has the President or Attorney General supplanted the Commissioners' statutory authority under FECA, much less with respect to any specific situation involving plaintiffs.  *See id.*; *see also* Administration Defs.' Mot. at 7.

Plaintiffs' cited cases do not alter the analysis.  In *Pacific Gas and Electric. Co. v. State Energy Resources Conservation & Development Commission*, 461 U.S. 190 (1983), the Supreme Court determined a controversy was ripe when utility companies were obliged to expend millions of dollars continuing to build and maintain new nuclear power plants in the midst of

uncertainty that they would be "certif[ied]" under a new amendment to a California law. *See id.* at 200-02. There can be nothing more "concrete" than constructing nuclear power plants, which take over a decade to plan. *See id.* Moreover, the regulatory "uncertainty" those plaintiffs faced represented a live controversy over a *specific legal provision* directly applicable to those nuclear plants, *i.e.* interim storage requirements for the plants' nuclear fuel.[1] *See id.* at 199-200. By contrast, while plaintiffs might be preparing for the 2026 federal mid-term elections, they have not shown that any planned outlays of money are being diverted or that critical campaign finance law questions remain unresolved as a result of E.O. 14,215, certainly nothing so tangible as the construction of multimillion-dollar utilities. *See id.* 201-02; *see generally* Compl.; Plaintiffs' Decls. And, unlike the amendments to the California law at issue in *Pacific Gas and Electric Co.* that prompted the lawsuit in that case, the operative law here–FECA–remains unchanged. *See* 461 U.S. at 197-98.

Plaintiffs' other authorities are similarly unavailing. Plaintiffs mention *Chamber of Commerce. v. Reich* for the proposition that they should not be forced to choose "between taking immediate action . . . and risking substantial future penalties for non-compliance[.]" (Opp. at 15 (quoting 57 F.3d 1099 (D.C. Cir. 1995) (per curiam).) But plaintiffs identify no law they are at risk of violating and no penalties to which they may be subjected. In contrast, the *Reich* court based its holding in part on the fact that the Secretary of Labor had "promulgated final regulations" in response to the executive order at issue. 57 F.3d at 1100. That court also relied on those plaintiffs' articulation of the harm they would face due to new labor policies resulting in

---

[1]    Notably, the Court determined that "[q]uestions concerning the constitutionality of the interim storage provision, § 25524.1(b), however, are not ripe for review." *Pac. Gas & Elec. Co.*, 461 U.S. at 203.

"skew[ed]" labor negotiations, *id.*, but plaintiffs here identify no corresponding change regarding federal campaign finance law that could similarly impact their core business.

In addition, *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175 (2023) and *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477 (2010) are particularly inapposite. In each of those cases, plaintiffs claimed that a fundamental aspect of an agency's structure was unconstitutional thus rendering those agencies illegitimate decisionmakers. *See Axon Enter.*, 598 U.S. at 182; *Free Enter. Fund*, 561 U.S. at 487. In contrast, plaintiffs here seek to *uphold* the constitutionality of FECA and the structure of the FEC. (*See* Compl. ¶ 73 (requesting that the D.C. Circuit Court of Appeals "issue a declaratory judgment that "FECA's vesting of authority in the Commission . . . is consistent with Article II").) While the FEC's structure remains unchanged, plaintiffs' claims are plainly unripe.

Plaintiffs also overreach by suggesting that "any subsequent proceeding [before the FEC] would be rendered unlawful" by the very existence of the Executive Order. (Opp. at 15.) Plaintiffs plainly believe the FEC was lawfully constituted on February 18 prior to issuance of the Executive Order, and until they can show that the Executive Order has resulted in a material change in the operation of the Commission such that the Commission will then adopt a view of FECA in a way that harms plaintiffs, they are poorly positioned to question the FEC's legitimacy writ large. This is doubly so because, as explained *infra* pp. 18-19, the provisions of the Executive Order they challenge are written in broad terms that require no action, and explicitly provide that the Order must be interpreted consistent with applicable law, which includes FECA. Without evidence to the contrary, the Commission's decisions affecting plaintiffs are due the "presumption of regularity[,]" *Int'l Dark-Sky Ass'n, Inc.*, 106 F.4th at 1215, and plaintiffs have not met *their* burden to establish the ripeness of their claim.

Finally, with regard to plaintiffs' apparent concession, the FEC agrees that "there is no live dispute for the Court to resolve under Count I[,]" (Opp. at 18,) and agrees that plaintiffs' Count I should be dismissed.  In addition, the Court should dismiss Count I because it is not ripe. Even assuming standing, plaintiffs' challenge to a Constitutional argument no party has made is plainly not "fit[] . . . for judicial decision" nor will deferring judgment "cause hardship to the parties." *Church*, 573 F. Supp. 3d at 135 (internal citations omitted).  Count I is also outside the scope of FECA's judicial review provision plaintiffs invoke, 52 U.S.C. § 30110, because they seek only to construe *the Executive Order* in light of *FECA*, and do not seek to "construe the constitutionality of" FECA itself.  (*See* FEC Opp'n to Pls.' Mot. for Prelim Inj. (ECF No. 31) (filed Mar. 25, 2025), at 30-33.)  That is not to say that plaintiffs may not articulate a challenge to the Executive Order in some other way, including on constitutional grounds.  It simply means that plaintiffs are not entitled to the extraordinarily expedited review provisions applicable to constitutional questions regarding FECA pursuant to Section 30110.

### B.    The Court Should Not Assume the Executive Order's General Statement of Policy Will Be Carried Out Unlawfully

Because it is not seriously contested that the government has taken no action as a result of the Executive Order that is inconsistent with FECA, the Court is left only with the Executive Order itself.  And the Executive Order, standing alone, does not harm plaintiffs for purposes of establishing standing.

As the FEC explained in its Motion, there is no tension between FECA and Executive Order 14,215 because the Executive Order, through Section 7, articulates a general statement of policy concerning interpretations of law by executive branch employees without reference to the FEC or campaign finance law.  This section provides for the *possibility* of definitive interpretations of law by the President and Attorney General, but clearly does not

"unambiguously command action," the threshold articulated by Courts of Appeal to determine whether judicial intervention is warranted. *Id.* at 28. Particularly in light of Section 8's clear statement that the Executive Order may only apply to the extent it does not "impair or otherwise affect . . . the authority granted by law to an . . . agency, or the head thereof[,]" and must be implemented in a manner "consistent with applicable law[,]" E.O. 14,215 § 8(b)(i), (c), plaintiffs merely assume that the Order will be implemented unlawfully, and the Court must insist that plaintiffs articulate real-world harm before they may invoke the Court's authority. The FEC continues to operate consistent with FECA, and the Executive Order provides no "certainly impending" change to this state of affairs. Plaintiffs have failed to articulate a live case or controversy, and therefore lack standing.

Unable to point to concrete examples of harm, plaintiffs' Response reverts to arguing that the mere existence of E.O. 14,215 "facially cover[ing] the FEC" and "Section 7 do[ing] just what it says" constitutes injury. (Opp. at 8-9.) But that notion is belied by plaintiffs' recognition that the "President and Attorney General have not yet taken further steps to enforce the Order against the FEC." (*Id.* at 8 (citing both the Administration and FEC Defendants' briefing).) This reality is precisely why a broad, generally applicable provision in the Executive Order does "leave . . . room to doubt" how it will be applied in a particular context when it has not been, especially considering the inclusion of Section 8, which undermines their injury-in-fact hinging solely on "Section 7 do[ing] just what it says[.]" Opp. at 9; *see also infra* Part B. Plaintiffs' strained, hypothetical and unrealized injuries, which stem from only "predictive assumptions[,]" must "'confront[] a significantly more rigorous burden to establish standing'" than if they were showing present harm. *Pub. Citizen, Inc. v. Trump*, 435 F. Supp. 3d 144, 155-56 (D.D.C. 2019) (quoting *United Transp. Union v. I.C.C.*, 891 F.2d 908, 913 (D.C. Cir. 1989)).

Plaintiffs attempt to link FECA and the Executive Order by casting Section 7 as a call to action for violating the FEC's enabling statute, but it is not.  By the terms of the Executive Order, Section 7 applies broadly to the agencies of the federal government.  The Executive Order generally seeks to establish a "unified and coherent execution of Federal law."  E.O. 14, 215 § 1.  Section 7 does not unambiguously command the executive to "develop policies that run afoul of the separation of powers," commands which in turn would render Section 8 "purely theoretical." *See PFLAG, Inc. v.* Trump, Civ. No. 25-337, --- F. Supp. 3d ----, 2025 WL 510050, at *15 (D. Md. Feb. 14, 2025).  Executive Order 14,215 also does not specifically target the FEC, as it applies to the entire executive branch.  Section 8 explains that nothing in the Executive Order impairs or otherwise affects the authority granted to an agency by law.  The "law" to apply here is FECA, which vests the Commission with "exclusive jurisdiction" to administer, interpret, and civilly enforce the Act.  See 52 U.S.C. §§ 30106, 30107; *see also* FEC Mot. at 25-26 (explaining bipartisan structure of the Commission).  Plaintiffs themselves concede and indeed emphasize these unique features, but FECA's provisions in fact *reduce* the likelihood that the agency's authority will be supplanted.  Further, as "the present record reveals," there is no more than a "mere possibility" that some legally suspect decision will ensue from Executive Order 14,215. *See Bldg. & Constr. Trades Dep't AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.D. Cir. 2002).  The President and Attorney General's statement that the Executive Order does not obligate them to make *any* legal determinations only bolsters the proposition that plaintiffs' concerns are but a "mere possibility."  (FEC's Mot. at 31 (citing Administration Defs.' Mot. at 11).)

In effect plaintiffs' reading of Section 7 renders Section 8 superfluous, which in addition to being particularly implausible with regards to the FEC is also disfavored in the construction of statutes. *Bruesewitz v. Wyeth, LLC*, 562 U.S. 223, 236 (2011).  And because courts "approach

the construction of Executive Order[s] as [they] would approach the construction of

legislation[,]" this Court should apply that same level of skepticism to E.O. 14,215.  *See Ex parte*

*Endo*, 323 U.S. 283, 298 (1944); *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1238-39 (9th Cir.

2018).  The Commission's reading of the Executive Order "gives effect to every word," and

should be adopted by this Court.  *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013); *see In*

*Re Shek*, 947 F.3d 770, 777 (11th Cir. 2020) ("We must interpret statutes 'harmoniously,'

reconciling separate sections so that they are compatible and not contradictory.") (quoting

Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 180 (2012)).

   Plaintiffs' arguments that focus on Section 8 itself are also unavailing.  First, plaintiffs

contend the Commission reads Section 8 in a way that would prevent judicial review of any kind.

(Opp. at 23-24.)  This misstates the FEC's Motion.  The FEC explained that Section 8 directs the

implementation of an executive order consistent with applicable law but it "cannot save the

government" in either of two following scenarios.  (FEC Mot. at 28.)  The first scenario is when

the administration "takes concrete action pursuant to a presidential order that itself violates the

law."  (*Id.*)  The second scenario occurs where an executive order "unambiguously commands

action" or otherwise offers "clear and specific language" that an order's savings clause does not

apply.  (*Id.*)  The language of E.O. 14,215 demonstrates that neither case is before the Court, and

it underscores the overarching point that plaintiffs fail to make out a showing of harm.

   Absent "command[ing] any action" that the section "purports to negate," plaintiffs have

no basis for disregarding Section 8's provisions here.  *See Common Cause v. Trump*, 506 F.

Supp. 3d 39, 53 n.8 (D.D.C. 2020).  Section 8 thus serves as a critical context regarding the

implementation of the Executive Order, Section 7 included.  *See id.* at 47 ("We cannot ignore

these repeated and unambiguous qualifiers imposing lawfulness and feasibility constraints on

implementing the memorandum."). Second, and relatedly, plaintiffs seek to portray Executive

Order 14,215 and the circumstances surrounding it as immediately causing them harm, or as

portending harm that is very soon to come.  (*See* Opp. at 24 ("[T]here is therefore no 'open

question' as to what 'interpretation' the President will adopt of the [Executive] Order.").)  While

it is true that a "boilerplate" phrase cannot override the plain meaning of an executive order, *id*.

(citing *PFLAG*, 2025 WL 510050, at *15), the problem with plaintiffs' position is that they are

reading explicit commands into the Executive Order where they do not exist.

Plaintiffs summarize the ramifications arising from executive orders that *did*

unambiguously command action, but those ramifications are inapposite to this case.  Here,

plaintiffs' allegations of harm depend not on the Executive Order's text but on "significant

contingenc[ies]" beyond the Executive Order.  *See Common Cause*, 506 F. Supp. F.3d at 47, 53

n.8.  The main contingency is a presumption that the government intends to violate FECA by

way of Executive Order 14,215, but this is not the only one.  Plaintiffs' theory of standing relies

on the following series of assumptions: (1) the President or Attorney General issue a definitive

interpretation of FECA; (2) that view differs from the interpretation Commissioners reach

independently;[2] (3) that interpretation has both a direct and dispositive effect on a matter before

the Commission; (4) plaintiffs have a concrete interest in the result; and (5) the matter is resolved

to plaintiffs' detriment as opposed to their benefit.  Such a hypothetical sequence of events does

"not satisfy the requirement that threatened injury must be certainly impending."  *See Clapper*,

568 U.S. at 410.  Indeed, the *Clapper* Court relied on a similar list of contingencies to reject the

---

[2]     There are at present four serving Commissioners, two Democrats and two Republicans,
each of whose votes are necessary to reach any decision requiring the affirmative votes of at least
four Commissioners including, *inter alia*, significant actions regarding enforcement proceedings,
rulemakings and advisory opinions.  *See* 52 U.S.C. §§ 30106(c); 30107(a).

plaintiffs' standing in that case. *Id.* ("[R]espondents' argument rests on their highly speculative fear that: (1) the Government will decide to target the communications of non-U.S. persons with whom they communicate; (2) in doing so, the Government will chose to invoke its authority under § 1881a rather than utilizing another method of surveillance; (3) the Article III judges who serve on the Foreign Intelligence Surveillance Court will conclude that the Government's proposed surveillance procedures satisfy §1881a's many safeguards and are consistent with the Fourth Amendment; (4) the Government will succeed in intercepting the communications of respondents' contacts; and (5) respondents will be parties to the particular communications that the Government intercepts."). At best, plaintiffs' standing theory "require[s] guesswork as to how independent decisionmakers will exercise their judgment." *Id.* at 413. As a result, plaintiffs fail to make out the necessary showing of harm, and their complaint should be dismissed.

## CONCLUSION

Plaintiffs' Response fails to fill in the gaps in their Complaint and does not establish the threshold requirement to establish a live case or controversy for this Court to adjudicate. The FEC's structure and operations remain unchanged, and plaintiffs have not demonstrated that Executive Order 14,215 evidences a "certainly impending" effort to change this state of affairs. Moreover, plaintiffs have not connected Executive Order 14,215 to any injuries they are suffering personally. For the foregoing reasons, the Court should grant the FEC's and President Trump and Attorney General Bondi's motions and dismiss plaintiffs' Complaint.

Respectfully submitted,

Lisa J. Stevenson (D.C. Bar No. 457628)
Acting General Counsel
lstevenson@fec.gov

James D. McGinley (D.C. Bar No. 1017536)
Associate General Counsel
jmcginley@fec.gov


April 7, 2025

*/s/ Christopher H. Bell*
Christopher H. Bell (D.C. Bar No. 1643526)
Acting Assistant General Counsel
chbell@fec.gov

Sophia H. Golvach (D.C. Bar No. 1656365)
Blake L. Weiman (D.C. Bar No. 1725165)
Michael D. Contino (D.C. Bar No. 1782269)
Attorneys
sgolvach@fec.gov
bweiman@fec.gov
mcontino@fec.gov

FEDERAL ELECTION COMMISSION
1050 First Street, NE
Washington, DC 20463
(202) 694-1656