UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEMOCRATIC NATIONAL COMMITTEE, *et al.*,

    *Plaintiffs*,

v.

DONALD J. TRUMP, *et al.*,

    *Defendants*.

Civil Action No. 25-00587 (AHA)

## **Memorandum Opinion**

The Democratic Party's three national political committees brought this action against the President, Attorney General, Federal Election Commission ("FEC"), and FEC Commissioners after the President signed Executive Order 14215. The committees challenge a section of the order that states "the President and the Attorney General's opinions on questions of law are controlling on all employees" of the executive branch and "[n]o employee of the executive branch acting in their official capacity may advance an interpretation of the law as the position of the United States that contravenes the President or the Attorney General's opinion on a matter of law." Exec. Order No. 14215, 90 Fed. Reg. 10447, 10448–49 (Feb. 18, 2025). Concerned that these pronouncements undermine the FEC's independence, the committees seek a declaration that the Federal Election Campaign Act ("FECA")—which establishes the FEC and requires its Commissioners to exercise independent legal judgment—is constitutional, and an order enjoining all the defendants from applying this section of the executive order to the FEC or its Commissioners. The committees move for preliminary relief, while the President and Attorney General and, separately, the FEC

and its Commissioners, move to dismiss the action for lack of jurisdiction and failure to state a claim.

In response to the committees' lawsuit, the President and Attorney General affirmatively disclaim a challenge to FECA's constitutionality. Counsel for the President and Attorney General also offer affirmative representations to the Court that they have not attempted to apply—and they are aware of no indication there ever will be an attempt to apply—the executive order to dictate or influence the FEC's interpretations of FECA. Counsel for the FEC represents to the Court further that the agency and its Commissioners would not understand directives received from the President or Attorney General to interfere with the Commissioners' independent judgment or how they vote. On this record—lacking any specific allegations that the challenged section has been or will be applied to the FEC or its Commissioners, in accord with the representations of counsel—the Court grants the defendants' motions to dismiss for lack of a concrete and imminent injury sufficient to establish standing and ripeness.

**I.      Background**

      **A.      FECA, The FEC, And Their Regulation Of The Committees.**

In 1971, Congress passed FECA to regulate campaign fundraising and spending in federal elections. Among other things, FECA sets limits on campaign contributions, rules for how political committees can organize themselves and operate, reporting requirements for political committees, and disclosure requirements for political advertisements. *See* 52 U.S.C. §§ 30102, 30104, 30116, 30120.

Less than one year after FECA became law, affiliates of President Richard Nixon's reelection campaign used campaign contributions to pay for burglary and wiretapping of the Democratic National Committee's headquarters at the Watergate Hotel and office complex. After this came to light, the Senate Select Committee on Presidential Campaign Activities investigated

this and other misconduct connected to Watergate and observed that "[s]urely one of the most penetrating lessons of Watergate is that campaign practices must be effectively supervised . . . if our free institutions are to survive." S. Rep. No. 93-981, at 564 (1974).

Congress responded by amending FECA and, relevant here, ensuring that the interpretation and enforcement of FECA's federal campaign finance rules would be conducted by a bipartisan oversight board—the FEC. Congress understood itself to be creating "an independent nonpartisan agency to supervise the enforcement of the laws relating to the conduct of elections" and described this new agency as "[p]robably the most significant reform that could emerge from the Watergate scandal." *Id.* In the years after, the Supreme Court recognized the FEC as an "inherently bipartisan" agency that carries "primary and substantial responsibility for administering and enforcing" FECA and "extensive rulemaking and adjudicative powers." *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37 (1981) (quoting *Buckley v. Valeo*, 424 U.S. 1, 109–10 (1976)).

In structure, the FEC "is patterned on the classic independent regulatory agency." *FEC v. NRA Pol. Victory Fund*, 6 F.3d 821, 826 (D.C. Cir. 1993). Congress required the FEC be composed of six members appointed to staggered terms by the President with the Senate's advice and consent, with no more than three members who are "affiliated with the same political party." 52 U.S.C. § 30106(a)(1)–(2). Congress also embedded that independence into the FEC's decisionmaking. It assigned the FEC authority to "administer, seek to obtain compliance with, and formulate policy" under FECA, including "exclusive jurisdiction with respect to the civil enforcement" of that Act and the power "to render advisory opinions" to parties and campaigns concerning the application of FECA. *Id.* §§ 30106(b)(1), 30107(a)(7), 30108. In doing so, Congress limited exercise of the FEC's most significant powers—making, amending, and repealing rules, approving enforcement actions, issuing advisory opinions, and referring apparent violations to law enforcement—to when

at least four Commissioners agree. *Id*. §§ 30106(c), 30107(a)(6)–(9). This "inherently bipartisan structure" guarantees that when political campaigns and parties request rules or advisory opinions, or defend against complaints—all in an area necessarily "charged with the dynamics of party politics"—they can expect fairness. *Democratic Senatorial Campaign Comm.*, 454 U.S. at 37.

The Democratic National Committee, Democratic Senatorial Campaign Committee, and Democratic Congressional Campaign Committee, together, are the national Democratic Party for purposes of campaign finance law. ECF No. 1 ¶ 16. Virtually everything the committees do, from how they raise and spend money to how they interact with candidates and other political actors, is regulated by FECA. *Id.* ¶¶ 13–16, 46. Accordingly, FEC guidance in the form of policy documents, rulemakings, and other sources structures nearly every aspect of the committees' activity. *Id.* ¶¶ 16, 46. For example, the committees regularly seek FEC advisory opinions explaining whether a proposed course of action violates FECA, which can be important because good faith reliance on such opinions immunizes a party from any sanctions for violating FECA. *Id.* ¶ 48; 52 U.S.C. § 30108(c). The committees also defend against complaints filed with the FEC alleging they have violated FECA—indeed, one of the plaintiffs, the Democratic Senatorial Campaign Committee, is currently defending against a challenge to its classification of advertisements in a 2024 Senate campaign. ECF No. 1 ¶¶ 47, 51–54.

  **B.**  **Executive Order 14215 And The Present Action.**

On February 18, 2025, the President issued Executive Order 14215, entitled "Ensuring Accountability for All Agencies." Exec. Order No. 14215, 90 Fed. Reg. at 10447. The order states that "previous administrations have allowed so-called 'independent regulatory agencies' to operate with minimal Presidential supervision" and sets out to "ensure Presidential supervision and control of the entire executive branch." *Id.* § 1. Most relevant here, section seven of the order states that "the President and the Attorney General's opinions on questions of law are controlling on all

4

employees in the conduct of their official duties." *Id.* § 7. It also states that executive branch employees acting in their official capacities cannot "advance an interpretation of law as the position of the United States that contravenes the President or the Attorney General's opinion on a matter of law." *Id.*[1]

Shortly after the President signed Executive Order 14215, the committees brought this action asserting two claims. The first asks for a declaration that FECA's provisions insulating the FEC from partisan control are constitutional. ECF No. 1 ¶ 73. Because "all questions of [FECA's] constitutionality" are certified to the court of appeals for *en banc* review, the complaint asked this Court to certify the question of FECA's constitutionality to the *en banc* D.C. Circuit. 52 U.S.C. § 30110; ECF No. 1 ¶ 73. The second claim asks the Court to enjoin application of section seven of the executive order as it relates to the FEC and its Commissioners, and the committees moved for a preliminary injunction providing that relief while they litigate this case. ECF No. 1 ¶ 79; ECF No. 12.

The President and Attorney General and, separately, the FEC and its Commissioners, filed motions to dismiss for lack of subject-matter jurisdiction and failure to state a claim under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). ECF Nos. 17, 26.[2]

---

[1] The executive order includes other sections addressing Presidential control over the executive branch, including expanding the list of agencies that must submit regulatory actions to the Office of Information and Regulatory Affairs for review and instructing the Director of the Office of Management and Budget to "establish performance standards and management objectives for independent agency heads, as appropriate and consistent with applicable law." Exec. Order No. 14215 §§ 3, 4. The committees limit their challenge to section seven.

[2] The FEC and its Commissioners are represented by their own counsel. Counsel appeared and made submissions for all four Commissioners, affiliated with both major parties.

**II.     Discussion**

To survive dismissal under Rule 12(b)(1), a plaintiff must show that the Court has subject-matter jurisdiction to hear their claim. *See Shuler v. United States*, 531 F.3d 930, 932 (D.C. Cir. 2008). Article III of the Constitution restricts the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. The Supreme Court has said that "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). Federal courts are accordingly confined to live controversies—ones that the plaintiff has standing to bring, that have ripened into a concrete dispute, and that have not become moot. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

**A.     All Defendants Concede FECA Is Constitutional, So There Is No Live Dispute About That.**

FECA authorizes the national committee of any political party to file a federal action "for declaratory judgment, as may be appropriate to construe the constitutionality" of the Act and provides that the district court "immediately shall certify all questions of constitutionality" to the *en banc* court of appeals. 52 U.S.C. § 30110. When a party seeks certification, a district court must undertake limited screening of the claim—for example, a district court must examine jurisdiction over the claim and may forgo certification of "frivolous" or "purely hypothetical" questions. *Cal. Med. Ass'n v. FEC*, 453 U.S. 182, 192 n.14 (1981); *see also Wagner v. FEC*, 717 F.3d 1007, 1009 (D.C. Cir. 2013).

Here, the committees' first count asserts that the executive order's pronouncement that the President and Attorney General may issue "authoritative" and "controlling" legal interpretations to executive employees creates "a concrete, ripe dispute" about "the constitutionality of FECA's provisions vesting the Commissioners with the authority to exercise their independent legal

judgment when interpreting the Act." ECF No. 1 ¶¶ 65–66. The complaint details the provisions of FECA setting forth the FEC's independent structure and responsibilities and guaranteeing the exclusivity and independence of the FEC's decisionmaking. *Id.* ¶¶ 22–30. The complaint further requests immediate certification to the *en banc* D.C. Circuit to defend the constitutionality of "FECA's vesting of authority to interpret the Act in the Commission, not the President and Attorney General." *Id.* ¶¶ 72–73.[3]

The President and Attorney General argue for dismissal of this count by relinquishing any challenge to FECA's constitutionality. They repeatedly urge that certification to the *en banc* D.C. Circuit would be inappropriate because "*[n]one* of the parties before the Court has asserted that the FECA is unconstitutional." ECF No. 17-1 at 2; *see also* ECF No. 30 at 16 ("[N]o Defendant is arguing that FECA is unconstitutional."). The FEC and its Commissioners similarly state their "agree[ment] with Plaintiffs as to FECA being constitutional." ECF No. 26-1 at 21.[4] Given these representations, the committees accept "there is no live constitutional question" remaining for the *en banc* Circuit or this Court. ECF No. 39 at 2; *see id.* at 18. The Court accordingly dismisses the first count of the committees' complaint seeking a declaration of FECA's constitutionality.

### B. The Committees Have Not Shown An Article III Injury Allowing Injunctive Relief.

The committees' second count asks the Court to enjoin application of section seven of the executive order to the FEC or its Commissioners. ECF No. 1 ¶ 79. The President and Attorney

---

[3] Plaintiffs moved for a preliminary injunction prior to certification based on cases recognizing that § 30110 "does not deprive [a district court] of its jurisdiction to rule on [a] preliminary injunction motion." *Brown v. FEC*, 386 F. Supp. 3d 16, 25 (D.D.C. 2019); *see also Rufer v. FEC*, 64 F. Supp. 3d 195, 205–06 (D.D.C. 2014).

[4] By disclaiming a challenge to FECA's constitutionality as an affirmative basis to defeat certification to the *en banc* Circuit, the President, Attorney General, FEC, and Commissioners have "knowingly and intelligently relinquished" any such argument. *Wood v. Milyard*, 566 U.S. 463, 470 n.4 (2012).

7

General respond that the committees have not shown sufficiently concrete and imminent injury, arguing that section seven of the executive order does not specifically mention or require that any action be taken with respect to the FEC in the first place. They also emphasize through briefing and oral representations of counsel that the section has not been applied to employees of the FEC and there is no plan to apply it to the FEC. *See* ECF No. 44 at 50 ("There have been no authoritative legal opinions on anything touching the FEC."); *id.* at 47 (arguing "there are many agencies," so the order "certainly doesn't . . . indicate a specific intent or plan to do something specifically involving the FEC"); *see also* ECF No. 17-1 at 7, 11; ECF No. 30 at 3, 8, 10, 14; ECF No. 42 at 5. For their part, the FEC and its Commissioners also insist that the committees have not been injured in any relevant way, confirming that the agency and its Commissioners have not received any directives about FECA or otherwise under section seven of the executive order. ECF No. 26-1 at 11 (emphasizing that the injury the committees allege "has not come to pass, and indeed there are particular reasons to believe it *will* not come to pass"); ECF No. 31 at 2, 15; ECF No. 44 at 86. The FEC and its Commissioners add further that even if they were to receive a directive interpreting FECA from the President or Attorney General, they would not allow it to interfere with the Commissioners' statutory obligation to vote based on their independent judgment. ECF No. 44 at 84–85, 88 (representing that, irrespective of the order, "the Commission is conducting its business as it has two weeks ago, two months ago, two years ago").

The possibility that the President and Attorney General would take the extraordinary step of issuing a directive to the FEC or its Commissioners purporting to bind their interpretation of FECA is not sufficiently concrete and imminent to create Article III injury. Whether viewed as a question of standing—requiring "an injury that is concrete, particularized, and imminent rather than conjectural or hypothetical"—or of ripeness—requiring an injury that is "not dependent on

8

contingent future events that may not occur as anticipated, or indeed may not occur at all"—this type of allegation would fall short. *Trump v. New York*, 592 U.S. 125, 131 (2020) (quotation marks omitted) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)); *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007) (recognizing that Article III standing and ripeness generally "boil down to the same question" in cases where the plaintiff challenges a law before it is enforced against them). The Supreme Court has held future injury suffices only "if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quotation marks omitted) (quoting *Clapper*, 568 U.S. at 414 n.5); *see also Clapper*, 568 U.S. at 412 (holding that future injury was "necessarily conjectural" because it stemmed from a statute that merely authorized but did not "*mandate* or *direct*" allegedly unlawful conduct); *Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317, 1324–25 (D.C. Cir. 2013) (concluding that a consent decree that set a timeline by which an agency must conduct a rulemaking but did not require the agency to promulgate a rule or dictate the rule's substance did not produce a cognizable injury because "Article III standing requires more than the possibility of adverse regulation").

Here, the committees do not allege that the President or Attorney General has applied section seven of the executive order to the FEC or its Commissioners by purporting to issue an "authoritative" or "controlling" interpretation of FECA despite the FEC and its Commissioners' statutorily protected independence. Exec. Order No. 14215 § 7. Nor do the committees plausibly allege the President or Attorney General plans to do so. And the Court cannot conclude from the text of section seven alone, which refers to executive employees generally and does not mention the FEC, that this type of extraordinary step by the President or Attorney General is certainly impending or a "substantial risk." *Clapper*, 568 U.S. at 414 n.5; *see also Chamber of Com. of U.S.*

9

*v. EPA*, 642 F.3d 192, 200 (D.C. Cir. 2011) (explaining that "alleging only future injuries confronts a significantly more rigorous burden to establish standing" (quoting *United Transp. Union v. ICC*, 891 F.2d 908, 913 (D.C. Cir. 1989))).

While courts have allowed plaintiffs to bring actions challenging FECA regulations that have not yet been enforced, in those cases the plaintiffs were able to point to a particular prohibition that blocked a specific action they wanted to take. *See, e.g.*, *Wagner*, 717 F.3d at 1009; *Libertarian Nat'l Comm. v. FEC*, 228 F. Supp. 3d 19, 22–23 (D.D.C. 2017); *Nat'l Republican Senatorial Comm. v. FEC*, 712 F. Supp. 3d 1017, 1029 (S.D. Ohio 2024); *see also Susan B. Anthony List*, 573 U.S. at 159 (explaining that the Supreme Court has "permitted pre-enforcement review under circumstances that render the threatened enforcement sufficiently imminent"). Here, there is no allegation that the defendants have prohibited or expressed an intention to prohibit any actions the committees wish to take, so there is no "credible threat of enforcement." *Susan B. Anthony List*, 573 U.S. at 159.[5]

The committees claim that their injury does not depend on any future action. They argue that the executive order language requiring executive employees to abide by the President and Attorney General's legal interpretations itself marks "[t]he extinction of the FEC's independence." ECF No. 1 ¶ 46; *see also* ECF No. 39 at 7. The committees point out that they represent one of only two major political parties and virtually everything they do is regulated by the FEC, including critical election activities. ECF No. 39 at 7. They contend that this amounts to present harm—an

---

[5] The committees express concern that they may never know if the President or Attorney General purports to issue a controlling interpretation of FECA because the executive order does not require a public announcement. ECF No. 44 at 17. In response, counsel for the President and Attorney General confirmed that the executive order, by its terms, can only be effectuated through a formal legal opinion "that contains some indication that it's expressing a legal view for the entire executive branch," rather than a private communication between the President or Attorney General and the FEC. *Id.* at 51.

FEC whose independence has been compromised must be accounted for in their strategic and day-to-day decisionmaking. The committees allege that they are taking costly precautions to limit their interactions with the FEC to minimize the risk that the FEC will take adverse actions against them based on a legal position dictated by the President or the Attorney General. ECF No. 1 ¶ 70. In part, that means the committees have decided against seeking FEC guidance through, for example, petitions for FEC rulemaking or requests for advisory opinions, in situations where they otherwise would have. *Id.* ¶¶ 8, 59–60, 70. It also means that the committees are avoiding campaign strategies that could result in unwanted FEC attention, possibly in the form of a complaint filed with the agency. *Id.* ¶¶ 50, 57, 70. In short, the committees are chilled from engaging in political activity and interacting with the agency as they normally would because of the serious potential consequences of doing business as usual with an FEC whose legal positions are decided by a political opponent.

The Court does not doubt that the committees would have cause for profound concern were the FEC's independence to be compromised. *See id.* ¶ 46. Given the FEC's central role in overseeing parties and campaigns, a compromise of its independence would pose an immense threat to our democratic elections, for all the reasons Congress established the FEC's independence in the first place. But the Supreme Court has explicitly rejected the notion that a plaintiff can show cognizable injury by claiming "that they experienced a 'chilling effect' that resulted from a governmental policy that does not regulate, constrain, or compel any action on their part." *Clapper*, 568 U.S. at 419. In cases where activity is chilled, the Supreme Court has limited Article III injury to where "the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging." *Laird v. Tatum*, 408 U.S. 1,

11 (1972). Here, the executive order does not "presently or prospectively subject" the committees to any "regulations, proscriptions, or compulsions." *Id.*; *see also United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1380 (D.C. Cir. 1984) (holding that plaintiffs' allegations of chill stemming from an executive order that "merely *authorizes*" but "does not *direct*" allegedly unlawful government activity did not establish cognizable injury). And although the committees emphasize section seven's compulsory nature in that it requires executive employees to comply with the President and Attorney General's legal opinions, the section does not require the President or the Attorney General to issue any opinions in the first place. *See* ECF No. 39 at 12–13 (distinguishing Executive Order 14215 from the executive orders at issue in *United Presbyterian Church*, 738 F.2d 1375; *Center for Democracy & Technology v. Trump*, 507 F. Supp. 3d 213 (D.D.C. 2020); and *Public Citizen, Inc. v. Trump*, 435 F. Supp. 3d 144 (D.D.C. 2019)); ECF No. 17-1 at 12 ("The Executive Order does not bind the President or Attorney General to stake a position on any or every legal issue that will appear before the Commission.").

In *Clapper*, attorneys, journalists, and other plaintiffs with foreign contacts sought to enjoin application of a statute authorizing extensive surveillance of foreign intelligence targets. *Clapper*, 568 U.S. at 401. In addition to alleging injury based on the likelihood that their communications would be surveilled in the future, they argued injury based on "present costs and burdens" they had undertaken based on fear of surveillance. *Id.* at 416. After rejecting the future harm as too speculative, the Supreme Court rejected the present costs as well. As the Supreme Court saw it, finding injury based on the burdens caused by uncertainty would permit plaintiffs to "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Id.* The Supreme Court accordingly held that the fact plaintiffs "incurred certain costs as a reasonable reaction to a risk of harm" based on subjective fear could

not demonstrate Article III injury. *Id.* The Court said this is so even if the fear giving rise to the costs and burdens is not "fanciful, paranoid, or otherwise unreasonable." *Id.*; *see also Saline Parents v. Garland*, 88 F.4th 298, 300–01, 305 (D.C. Cir. 2023) (concluding that parents who opposed "progressive" curricula in public schools and felt chilled by a government policy of investigating and tracking intimidation of public school staff could not show an Article III injury because "initial plans by [the government] to investigate and strategize internally" do not "threaten imminent legal action against anyone").

It follows that the committees' allegation of current burdens out of fear that the President or Attorney General will apply section seven of the executive order to the FEC or its Commissioners, reasonable or not, is not Article III injury. At bottom, the committees' claim and stated basis for an injunction is that their dealings with the FEC have changed or will change, and governing precedent requires them to point to a concrete basis for this conclusion. They have not done so here. The committees point to the executive order, but they have not alleged any concrete basis to infer that the FEC is targeted by section seven, which does not single out the FEC and applies broadly to all executive employees. The committees have not alleged any concrete steps to issue a directive to the FEC or its Commissioners under the executive order, or even an intent to do so.[6] And the committees have not alleged any concrete basis for inferring that the FEC or any of its Commissioners have changed their practices in any way that could be traced back to the executive order. Plausible allegations as to any of these things would be relevant to demonstrating injury; the absence of allegations as to any deprives the Court of a controversy it can resolve.

---

[6] The President and Attorney General have acknowledged that if they were to issue an opinion that purported to control an interpretation of FECA that conflicts with the FEC's interpretation, there would be an Article III injury. ECF No. 44 at 53–54. They also acknowledge that, short of an opinion, the announcement of a specific intent to issue such an opinion can satisfy the requisite injury as well. *Id.* at 57–58.

To the contrary, the Court is mindful that the FEC and its Commissioners—affiliated with both major political parties—avowed that section seven has not and will not change the Commissioners' exercise of independent judgment. Counsel for the FEC and Commissioners has represented to the Court that the agency "is conducting its business as it has two weeks ago, two months ago, two years ago" irrespective of the executive order. When asked about the agency's hypothetical receipt of a directive from the President or Attorney General, counsel for the FEC and its Commissioners represented that their position would be to "look at their charge, their duties under FECA, and then they would take and come to a decision on how best to proceed based on that." ECF No. 44 at 85. Indeed, the FEC and Commissioners accept the committees' premise that the Commissioners' failure to exercise independent legal judgment to implement the executive order would "violate the law." ECF No. 26-1 at 16. While by no means dispositive, it is meaningful that the FEC and its bipartisan Commissioners—the very agency and offices Congress created to safeguard the vital issues that the committees fear is under threat—have made representations that the executive order has and will have no effect on their operations or decisionmaking.

This Court's doors are open to the parties if changed circumstances show concrete action or impact on the FEC's or its Commissioners' independence. Absent such allegations, however, the Court must dismiss the case for lack of jurisdiction and therefore does so.

**III.   Conclusion**

The defendants' motions to dismiss are granted. The committees' motion for preliminary injunction is denied as moot. A separate order accompanies this memorandum opinion.

_____

AMIR H. ALI
United States District Judge

Date:   June 3, 2025

14