## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP*, et al.,* <br><br> *Defendants*. | No. 25-cv-587 (AHA) |

## BRIEF OF *AMICUS CURIAE* CAMPAIGN LEGAL CENTER
## IN SUPPORT OF PLAINTIFFS

Adav Noti (D.C. Bar No. 490714)
Tara Malloy (D.C. Bar No. 988280)
Erin Chlopak (D.C. Bar No. 496370)
Kevin P. Hancock (D.C. Bar No. 90000011)
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Ste. 400
Washington, DC 20005
(202) 736-2200
anoti@campaignlegalcenter.org
tmalloy@campaignlegalcenter.org
echlopak@campaignlegalcenter.org
khancock@campaignlegalcenter.org

*Counsel for Amicus Curiae*

**TABLE OF CONTENTS**

INTERESTS OF AMICUS CURIAE ................................................................................................1

SUMMARY OF ARGUMENT.....................................................................................................3

ARGUMENT .................................................................................................................................5

I.      Section 7 of the Order Conflicts with FECA's Creation of an Independent and Bipartisan
        FEC .................................................................................................................................5

        A.      Congress intended for the FEC to be independent and bipartisan. ..........................5

        B.      FECA creates an independent and bipartisan FEC. ................................................7

        C.      Section 7 undermines the FEC's independence and bipartisan structure. .............10

II.     Concerns about Presidential Overreach Are Exacerbated by the Lack of Transparency
        About How the Order Will Be Implemented. ..................................................................14

        A.      Defendants should not be permitted to leverage the lack of transparency around
                their implementation of the Order to challenge plaintiffs' standing .....................15

        B.      The lack of disclosure about the Order's implementation harms CLC's regulatory
                practice and its interest in transparent government................................................19

CONCLUSION.........................................................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*American Federation of Labor & Congress of Industrial Organizations v. Federal Election Commission*, 177 F. Supp. 2d 48 (D.D.C. 2001) .......................................................................10

*American History Association v. National Archives & Records Administration*, 516 F. Supp. 2d 90 (D.D.C. 2007) ....................................................................................12

*Buckley v. Valeo*, 424 U.S. 1 (1976)..........................................................................................19

*Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009) .........................................................16

*Citizens United v. FEC*, 558 U.S. 310 (2010) ..........................................................................20

*CLC v. FEC*, 106 F.4th 1175 (D.C. Cir. 2024)...........................................................................2

*Combat Veterans for Congress PAC v. FEC*, 795 F.3d 151 (D.C. Cir. 2015) ..............................3

*Common Cause v. FEC*, 842 F.2d 436 (D.C. Cir. 1988) ............................................................13

*FEC v. Democratic Senatorial Campaign Committee*, 454 U.S. 27 (1981) ...........................2, 13

*FEC v. NRA Political Victory Fund*, 513 U.S. 88 (1994)....................................................4, 8, 12

*Marks v. Central Intelligence Agency*, 590 F.2d 997 (D.C. Cir. 1978)........................................3

*Myers v. United States*, 272 U.S. 52 (1926)..............................................................................16

*Portland Audubon Society v. Endangered Species Committee*, 984 F.2d 1534 (9th Cir. 1993)....12, 13

*Professional Air Traffic Controllers Org. v. Federal Labor Relations Authority*, 685 F.2d 547 (D.C. Cir. 1982).....................................................................................16

*Public Citizen, Inc. v. FERC*, 839 F.3d 1165 (D.C. Cir. 2016) ..................................................13

*Schweiker v. McClure*, 456 U.S. 188 (1982)..............................................................................16

*Sierra Club v. Costle*, 657 F.2d 298 (D.C. Cir. 1981) ................................................................16

*United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954)............................................12

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ...................................................7

**Statutes and Regulations**

5 U.S.C. § 552....................................................................................................................20

5 U.S.C. § 552b..................................................................................................................20

52 U.S.C. § 30106(a)(1)..................................................................................................8, 12

52 U.S.C. § 30106(a)(2) ........................................................................................................8

52 U.S.C. § 30106(a)(3)....................................................................................................9, 11

52 U.S.C. § 30106(a)(5)........................................................................................................8

52 U.S.C. § 30106(b)(1) ........................................................................................................8

52 U.S.C. § 30106(b)(2) ........................................................................................8

52 U.S.C. § 30106(f) ..............................................................................................8

52 U.S.C. § 30106(c) ..............................................................................................8

52 U.S.C. § 30107(a) ..............................................................................................8

52 U.S.C. § 30107(a)(6) .........................................................................................8

52 U.S.C. § 30107(a)(7) .........................................................................................8

52 U.S.C. § 30107(a)(8) .........................................................................................8

52 U.S.C. § 30107(a)(9) .........................................................................................8

52 U.S.C. § 30107(d)(2) .........................................................................................9

52 U.S.C. § 30109 ..................................................................................................8

52 U.S.C. § 30109(a)(8) ...................................................................................16, 17

52 U.S.C. § 30109(a)(12)(A) ................................................................................10

11 C.F.R. § 7.2 ......................................................................................................10

11 C.F.R. § 7.8 ......................................................................................................10

11 C.F.R. § 201.2 ..................................................................................................10

11 C.F.R. § 201.3 ..................................................................................................10

11 C.F.R. § 201.4 ..................................................................................................10

**Legislative materials**

120 Cong. Rec. 35,135 (1974) ...............................................................................7

125 Cong. Rec. 36,754 (1979) ...............................................................................9

Final Report of the Select Committee on Presidential Campaign Activities,
S. Rep. No. 93-981, (1974) ...........................................................................3, 5, 6

H.R. Rep. No. 93-1239 (1974) ...............................................................................6

Legislative History of Federal Election Campaign Act Amendments of 1976, FEC (1977),
https://perma.cc/G23G-SQ7T .............................................................................10

**Other authorities**

Charles N. Steele and Jeffrey H. Bowman, The Constitutionality of Independent Regulatory
Agencies Under the Necessary and Proper Clause: The Case of the Federal Election
Commission, 4 Yale J. on Reg. 363 (1987) ...........................................................5

CLC Advisory Opinion Request (Mar. 10, 2025), https://campaignlegal.org/document/clc-
requests-advisory-opinion-clarify-enforcement-rights-after-trumps-executive-order. ...........19

CLC Amended Advisory Opinion Request (Mar. 25, 2025),
https://campaignlegal.org/document/clc-revises-request-asking-fec-clarify-enforcement-
rights-after-trumps-executive-order .......................................................................19

CLC Letter Re: Executive Order "Ensuring Accountability for All Agencies" (Feb. 28, 2025), https://campaignlegal.org/sites/default/files/2025-02/2025-02-28_CLC%20Letter%20re%20Indep%20Agency%20EO_FINAL.pdf ...................................19

*CLC v. FEC (Dismissal Suit—Jeb Bush super PAC)*, CLC (Sept. 25, 2024), https://campaignlegal.org/cases-actions/opposing-use-super-pacs-slush-funds-presidential-candidates-clc-v-fec-dismissal-suit...................................................................................2

*Closing Letter - CLC Complaint to FEC Against de Blasio 2020, Fairness PAC, and NY Fairness PAC*, CLC (Apr. 19, 2023), https://campaignlegal.org/document/closing-letter-clc-complaint-fec-against-de-blasio-2020-fairness-pac-and-ny-fairness-pac....................................................2

Compl., MUR 8366 (Adams), https://campaignlegal.org/document/clc-files-fec-complaint-against-mayor-eric-adams-violations-ban-soliciting-and-accepting?utm_source=cision&utm_medium=press&utm_campaign=february_2025_mayor_adams_fec_complaint ....................................................................................................2

Devlin Barrett, *The U.S. attorney general derides the merits of the Adams case in New York*, N.Y. Times (Feb. 20, 2025), https://www.nytimes.com/2025/02/20/us/politics/trump-eric-adams-pam-bondi.html......................................................................................................................2

Exec. Order No. 14,215, 90 Fed. Reg. 10447, 10448 (Feb. 18, 2025), https://perma.cc/3J7Y-ZEWL .......................................................................................................................................1

Exec. Order No. 14,230, *Addressing Risks From Perkins Coie LLP* (Mar. 6, 2025), https://www.federalregister.gov/documents/2025/03/11/2025-03989/addressing-risks-from-perkins-coie-llp ...........................................................................................................17

*Fact Sheet: President Donald J. Trump Reins in Independent Agencies to Restore a Government that Answers to the American People*, The White House, (Feb. 18, 2025), https://perma.cc/NY82-QNWT. .............................................................................................11

FEC Response to CLC's March 10 Advisory Opinion Request (Mar. 20, 2025), https://campaignlegal.org/document/fec-denies-clcs-request-clarify-enforcement-rights-after-trumps-executive-order. ....................................................................................................19

Statement of FEC Commissioner Ellen L. Weintraub, *On the Voting Decisions of FEC Commissioners* (Oct. 4, 2022), https://perma.cc/9LRY-3Z5E. .................................................9

Statement of Reasons of Commissioners Shana M. Broussard and Ellen L. Weintraub, *In re Matter of Make America Great Again PAC, et al.* (MUR 7784) (June 15, 2022)....................17

## INTERESTS OF AMICUS CURIAE

Campaign Legal Center ("CLC") is a nonpartisan, nonprofit organization dedicated to solving the wide range of challenges facing American democracy. CLC is concerned that President Donald Trump's February 18, 2025 Executive Order "Ensuring Accountability for All Agencies" attempts to exert presidential control over the decision-making of the Federal Election Commission ("FEC") and thereby strips the agency of its independence and partisan balance, both of which are necessary for the FEC to fairly administer, interpret, and enforce the Federal Election Campaign Act ("FECA" or "Act"). *See* Exec. Order No. 14,215, 90 Fed. Reg. 10447, 10448 (Feb. 18, 2025), https://perma.cc/3J7Y-ZEWL (the "Order"). CLC files in support of plaintiffs Democratic National Committee, et al. (collectively "DNC"), and urges this Court to deny the motions to dismiss filed by defendants President Trump and U.S. Attorney General Pamela Bondi (collectively, "the Administration") and defendant FEC.

CLC was founded in 2002 by former FEC Commissioner and Chairman Trevor Potter for the purpose of defending the then newly enacted Bipartisan Campaign Reform Act of 2002 ("BCRA") against constitutional challenge. After BCRA survived legal challenge, CLC began an FEC regulatory practice and a public education effort to ensure that federal campaign finance law was effectively interpreted, enforced, and defended.

Today, CLC's practice before the FEC includes researching, identifying, and publicizing potential violations of FECA; filing administrative enforcement complaints under 52 U.S.C. § 30109(a)(1) to address potential FECA violations; and participating in rulemaking, advisory opinion, and other policy proceedings. In the period from January 2024 through January 2025 alone, CLC filed 15 new administrative enforcement complaints or supplements with the FEC. Consistent with its nonpartisan mission, CLC files complaints that target apparent FECA violations

1

by candidates and political committees across the political spectrum; with respect to candidates for the office of President, CLC filed complaints against the 2016 presidential campaign of Secretary Hillary Clinton, the 2016 presidential campaign of Governor Jeb Bush, the 2020 presidential campaign of Mayor Bill de Blasio, and the 2020 and 2024 presidential campaigns of President Trump.[1]

As CLC will argue here, the Order conflicts with FECA and Congress's clear intent to structure the FEC to be independent and "inherently bipartisan," *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37 (1981). The nation relies on the FEC to operate as an independent arbiter that interprets and implements federal law in a neutral and nonpartisan manner. The independence of the FEC is particularly crucial when it operates in a quasi-judicial role, such as when commissioners review and decide on administrative complaints. Indeed, the Order has already impacted CLC's regulatory practice, casting doubt on whether the FEC will independently adjudicate an administrative complaint that CLC recently filed against New York City Mayor Eric Adams relating to illegal foreign contributions—or whether it will follow the lead of the Administration, which has dismissed related criminal charges against Adams and questioned the legitimacy of his prosecution.[2] *See infra* at 18-19. In order to impartially handle these complaints

---

[1]    *See, e.g.*, *CLC v. FEC*, 106 F.4th 1175 (D.C. Cir. 2024) (affirming district court's judgment that FEC's dismissal of CLC complaint against Clinton campaign was contrary to law); *CLC v. FEC, Dismissal Suit—Jeb Bush super PAC*, CLC (Sept. 25, 2024), https://campaignlegal.org /cases-actions/opposing-use-super-pacs-slush-funds-presidential-candidates-clc-v-fec-dismissal-suit; *Closing Letter - CLC Complaint to FEC Against de Blasio 2020, Fairness PAC, and NY Fairness PAC*, CLC (Apr. 19, 2023), https://campaignlegal.org/document/closing-letter-clc-complaint-fec-against-de-blasio-2020-fairness-pac-and-ny-fairness-pac. *See also infra* n.5.

[2]    *See* Compl., MUR 8366 (Adams), https://campaignlegal.org/document/clc-files-fec-complaint-against-mayor-eric-adams-violations-ban-soliciting-and-accepting?utm_source=cision&utm_medium=press&utm_campaign=february_2025_mayor_adams_fec_complaint. *See also* Devlin Barrett, *The U.S. attorney general derides the merits of the Adams case in New York*, N.Y. Times (Feb. 20, 2025), https://www.nytimes.com/2025/02/20/us/

and, more broadly, to fulfill its statutory responsibility to faithfully interpret and enforce FECA, the FEC cannot surrender its independence to President Trump—or any President.

## SUMMARY OF ARGUMENT

"[A]n executive order cannot supersede a statute," *Marks v. Cent. Intelligence Agency*, 590 F.2d 997, 1003 (D.C. Cir. 1978), and yet that is precisely what the Order attempts to do with respect to FECA and its creation of an independent FEC. Specifically, Section 7 of the Order states that "[n]o employee of the executive branch acting in their official capacity may advance an interpretation of the law . . . that contravenes the President or the Attorney General's opinion on a matter of law . . . unless authorized to do so by the President or in writing by the Attorney General." Order § 7.

But, as FECA makes clear, Congress intended to establish "an independent nonpartisan agency to supervise the enforcement of the laws relating to the conduct of elections." Final Report of the Select Committee on Presidential Campaign Activities, S. Rep. No. 93-981, at 564 (1974) (hereinafter, "Watergate Report"). To this end, Congress structured the FEC to be impartial, with an even number of commissioners balanced between the political parties, thus "ensur[ing] that every important action it takes is bipartisan." *Combat Veterans for Cong. PAC v. FEC*, 795 F.3d 151, 153 (D.C. Cir. 2015). Cognizant of the Watergate scandal in the backdrop, Congress insulated the Commission from presidential control, concerned that otherwise an enforcement body directed by "a Presidential appointee," like the Department of Justice, "might choose to ignore infractions committed by members of the President's own political party." *FEC v. NRA Pol. Victory Fund*, 513 U.S. 88, 95-96 (1994).

---

politics/trump-eric-adams-pam-bondi.html (noting that Attorney General Bondi described Adams indictment as "incredibly weak" and the "weaponization of government").

The Order attempts to bar FEC commissioners from advancing interpretations of law that are contrary with those of the Administration and thus violates FECA and runs counter to Congress's plain intent. The Order has had an immediate effect on political actors like the DNC, as well as groups like CLC who practice before the FEC, all of whom are entitled under the Act to rely on the Commission's ability to act as an unbiased adjudicator on the questions and cases brought before the agency.

These concerns are also exacerbated by the vagueness of the Order's directives and the lack of transparency about how the Order has been and will be implemented with respect to the Commission. The Administration's filings in this action do little to clarify how they intend to proceed. At this point, there is no way to ascertain whether the Administration has or will communicate its legal opinions and policy priorities to the FEC in a non-public manner—for instance, in connection with administrative complaints against President Trump's campaigns and other candidates.

Finally, the opaqueness of the Administration's plans to implement and enforce the Order poses a distinct and independent danger to open and accountable government. The lack of information about how the Order will be implemented will impede efforts to understand and monitor its effects on the FEC and the agency's decision-making. The threat the Order poses to the integrity of government is thus two-fold: first, it undermines the independence of an agency whose impartiality is required by law and necessary to ensure fair and nonpartisan administration of FECA; second, the lack of transparency about the Order's implementation will generate confusion about its effects on the FEC's operations, permit selective enforcement and biased decision-making, and ultimately undermine public confidence in the Commission and its administration of federal elections.

4

**ARGUMENT**

I.    **Section 7 of the Order Conflicts with FECA's Creation of an Independent and Bipartisan FEC.**

As plaintiffs correctly argue, Section 7 of the Order cannot legally be applied to FECA and the FEC. Although many questions surround precisely how the Administration plans to implement the Order, *see infra* Part II, Section 7 is fundamentally at odds with Congress's creation of the FEC as an independent and bipartisan agency charged with administering the campaign finance laws.

A.    **Congress intended for the FEC to be independent and bipartisan.**

The President's exertion of control over the FEC cannot be reconciled with the reason Congress created the FEC in the first place: the need for a bipartisan campaign-finance enforcement body insulated from presidential influence.

Congress created the FEC in direct response to Watergate. *See* Charles N. Steele and Jeffrey H. Bowman, *The Constitutionality of Independent Regulatory Agencies Under the Necessary and Proper Clause: The Case of the Federal Election Commission*, 4 Yale J. on Reg. 363, 371-72 (1987). The Senate Watergate Committee's lengthy hearings exposed the Nixon administration's widespread politicization of the Executive Branch—including the Department of Justice—to further the re-election efforts of President Nixon. *See* Watergate Report, S. Rep. No. 93-981, at 127-29, 145-47, 699-729, 980-98, 1184-87. As a result, Congress recognized that the Department of Justice could not always be trusted to robustly or evenhandedly enforce campaign finance laws. As one Representative observed, "[t]he failure of the Justice Department to prosecute in 1972 is widely known," and consistent with the fact that "[n]o administration or enforcement agency that is an any manner politically encumbered has ever done an adequate, consistent job in administering and enforcing election law." *See* H.R. Rep. No. 93-1239, at 140 (1974) (supp. views of Rep. Frenzel).

Congress thus came to the "belief that campaign finance laws could not regulate the activities of the President's own reelection committee unless the execution of those laws was free from his direct control." Steele, 4 Yale J. on Reg. at 371, 372 n.51. That view is reflected in the Senate Watergate Committee's final report, which recommended that "Congress enact legislation to establish an independent, nonpartisan Federal Election Commission." Watergate Report, S. Rep. No. 93-981, at 564. The Committee detailed the necessity of independence, stating:

> Probably the most significant reform that could emerge from the Watergate scandal is the creation of an independent nonpartisan agency to supervise the enforcement of the laws relating to the conduct of elections. Such a body—given substantial investigatory and enforcement powers—could not only help insure that misconduct would be prevented in the future, but that investigations of alleged wrongdoing would be vigorous and conducted with the confidence of the public.

*Id.*

While Congress debated the precise form that the FEC would take, all agreed that the agency's essential features would be its independence and bipartisan structure. For example, Senator Hubert H. Humphrey, among the earliest advocates for an independent FEC, argued that "an independent body is necessary to properly execute the election laws in an impartial and nonpartisan manner," given that the "temptation to politicize the Department of Justice, which currently has jurisdiction over such matters, is or has been apparently too great to resist." 119 Cong. Rec. 21,677 (1973). Representative Bill Frenzel, who also played a key role in advocating for a bipartisan independent commission, proposed a six-member FEC appointed by the President from lists submitted by congressional leaders "to assure the Commission's independence." H.R. Rep. No. 1239, at 183 (1974). Similarly, Representative Dante Fascell stressed the need for an "independent enforcement Commission," which he characterized as the "heart and crux of campaign reform." 120 Cong. Rec. 27,472 (1974). Indeed, Rep. Fascell emphasized that "the elections commission besides having the primary supervisory and enforcement authority, is given

full independent authority to seek enforcement through civil action in court by way of injunction or other appropriate relief without the necessity of submitting the matter to the Attorney General first." *Id.*

Describing the final bill creating the FEC, members of both Houses of Congress indicated that "legislators believed the bill met their goal of establishing an independent body." Steele, 4 Yale J. on Reg. at 367. As Representative Frenzel summarized, "The establishment of an independent Commission is the key provision in the bill. It will assure judicious, expeditious enforcement of the law, while reversing the long history of nonenforcement." 120 Cong. Rec. 35,135 (1974). Representative Armstrong reinforced this consensus, describing the final bill as establishing a "strong independent commission to enforce provisions of this act." *Id.* In the Senate, Minority Leader Hugh Scott echoed this sentiment, stating that the legislation had successfully produced "an independent Federal Election Commission." *Id.* at 34,373.

These statements are merely a sampling of Congress's pronouncements but they collectively demonstrate that Congress viewed the FEC's independence as essential to its function. To the extent it purports to apply to the FEC, Section 7 of the Order is thus "incompatible with the expressed . . . will of Congress," and the President's power to issue the Order is at its "lowest ebb." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

**B.      FECA creates an independent and bipartisan FEC.**

Consistent with Congress's intent, FECA creates a commission whose independence and bipartisanship are inherent in its structure, powers, and enforcement mechanism. The FEC is an independent agency of the United States government with exclusive jurisdiction over the administration, interpretation, and civil enforcement of FECA. 52 U.S.C. §§ 30106(b)(1), 30107(a), 30109. Among the agency's powers, FECA includes the ability to "formulate policy,"

7

pursue civil enforcement, promulgate regulations, "render advisory opinions," and to "initiate" and "defend" lawsuits "through its general counsel," and not the Attorney General. 52 U.S.C. §§ 30106(b)(1), (f), 30107(a)(6), (7), (8), (9). The FEC consists of six commissioners, no more than three of whom "may be affiliated with the same political party." 52 U.S.C. § 30106(a)(1). The Commissioners serve staggered six-year terms, longer than the four-year term of any President, and they choose from among their members a chairman and vice chairman who "shall not be affiliated with the same political party." *Id.* § 30106(a)(2), (5). For the agency to exercise any of its core functions affecting the rights of regulated parties, FECA specifically requires a bipartisan "affirmative vote of 4 members of the Commission." *Id.* § 30106(c) (citing 52 U.S.C. § 30107(a)(6), (7), (8), (9)). The Act prevents commissioners from side stepping these requirements by prohibiting them from "delegat[ing] to any person his or her vote or any decisionmaking authority or duty." *Id.*

Consistent with these provisions, FECA provides no role for the President or Attorney General in the exercise of the agency's powers and duties. *see* 52 U.S.C. §§ 30106(c), 30107(a); *cf.* 52 U.S.C. § 30106(b)(2) (specifying that the FEC's powers shall not be "construed to limit" certain of *Congress's* powers with respect to "elections for Federal office"). FECA authorizes the President to appoint commissioners, 52 U.S.C. § 30106(a)(1), but otherwise distances the FEC from the President. Congress gave the FEC "independent litigating authority," *NRA Political Victory Fund*, 513 U.S. at 91-92 & 101 n.2 (citing 52 U.S.C. § 30107(a)(6)), provided for congressional, rather than presidential, review of the Commission's proposed regulations, 52 U.S.C. § 30111(d), gave the Commission authority to submit its own budget to Congress without presidential approval, 52 U.S.C. § 30107(d)(1), and precluded the President from controlling the Commission's submissions to Congress, 52 U.S.C. § 30107(d)(2). Indeed, Congress even

exempted FEC employees from the senior executive service program, *see* Federal Election Campaign Act Amendments of 1979, Pub. L. No. 96-187, § 203, 93 Stat. 1339, 1368 (1980) (codified at 5 U.S.C. § 3132(a)(1)(C)), because the Commission "is a bipartisan agency, and should have a personnel policy free of involvement by the executive branch," 125 Cong. Rec. 36,754 (1979) (statement of Sen. Pell).

FECA requires commissioners to use their own independent legal judgment in exercising the FEC's powers. FECA states that commissioners must be chosen "on the basis of their experience, integrity, impartiality, and good judgment" and may not otherwise be government officials or employees. 52 U.S.C. § 30106(a)(3). When exercising the agency's powers, FEC commissioners regularly advance their own independent views interpreting FECA to attempt to persuade their colleagues and build the bipartisan consensus FECA requires. *See* DNC PI Mot., ECF No. 12, at 6. As one FEC commissioner has explained, "nothing in the Act instructs commissioners to obediently vote one way or the other on *any* motion. Each commissioner exercises their judgment and discretion in every vote they cast." Statement of FEC Commissioner Ellen L. Weintraub, *On the Voting Decisions of FEC Commissioners* at 11 (Oct. 4, 2022), https://perma.cc/9LRY-3Z5E.

Further reinforcing that FECA requires FEC commissioners to exercise independent legal judgment, FECA and FEC regulations restrict commissioners from communicating with others outside the agency about open matters pending before the Commission. FECA authorizes civil fines and, in some cases, criminal penalties, against any "member or employee of the Commission" who makes public the existence of any FECA enforcement matter absent waiver by the respondent. 52 U.S.C. § 30109(a)(12)(A). FECA's confidentiality protections are particularly important given that the FEC routinely obtains "extraordinarily sensitive political information that would not be

9

available in the absence of an investigation of complaints filed with the FEC," such as "plans and strategies for winning elections, materials detailing political and associational activities, and personal information concerning . . . employees, volunteers, and members of … organizations." *Am. Fed'n of Lab. & Cong. of Indus. Organizations v. FEC*, 177 F. Supp. 2d 48, 51 (D.D.C. 2001), *aff'd*, 333 F.3d 168 (D.C. Cir. 2003). FECA's confidentiality rules prevent the disclosure of such sensitive materials "to the public—and to political opponents." *Id.* Similarly, FEC regulations also prohibit *ex parte* communications with "any person outside the agency" regarding open enforcement matters and litigation, *see* 11 C.F.R. §§ 7.2, 7.8, 201.3, while requiring disclosure of such communications regarding regulations and advisory opinions, *see id.* §§ 201.2, 201.4.

In sum, FECA's text is consistent with Congress's intent to create a bipartisan and independent agency that is not "under the thumb of those who are to be regulated." FEC, Legislative History of Federal Election Campaign Act Amendments of 1976 at 72 (1977), https://perma.cc/G23G-SQ7T.

### C.    Section 7 undermines the FEC's independence and bipartisan structure.

In direct conflict with Congress's intent and FECA's text, Section 7 of the Order aims to place the FEC squarely under the President's thumb by giving the President and Attorney General veto power over the Commission's interpretations of FECA. Section 7 conflicts with the Act in at least three critical ways.

First, Section 7 nullifies FECA's provisions establishing the FEC's bipartisanship and independence by allowing the President and his party to control the Commission's official interpretations of FECA. Indeed, Section 7 conflicts with *the FEC's very existence*: the entire reason Congress created the FEC was to prevent the partisan, presidential control Section 7 imposes. *See supra* Part I.A. The Order thus renders FECA's prescriptions for the Commission's

structure, powers, and processes effectively pointless. Even if the FEC otherwise continues to operate as it has before, "[b]y obligating Commissioners to vote consistently with diktats from the President, Executive Order 14215 reduces the Commission's entire operations to mere theater." Pls.' PI Mot. at 15-16. Section 7 denies commissioners the ability to make legal decisions "on the basis of their experience, integrity, impartiality, and good judgment." 52 U.S.C. § 30106(a)(3). In doing so, Section 7 achieves the functional equivalent of replacing all six commissioners with a single administrator answerable directly to the President.

Indeed, the FEC itself acknowledges that Section 7 is inconsistent with its "'exclusive jurisdiction' to administer, interpret, and civilly enforce the Act" and bipartisan structure. *See* FEC Mot. to Dismiss ("MTD"), ECF No. 26, at 25-26. The agency argues that the Court should "limit[]" the scope of Section 7 as applied to the Commission because a different part of the Order (Section 8) requires implementation "'consistent with applicable law.'" *Id.* (quoting Order § 8(c)). But Section 7's fundamental conflict with FECA cannot be reconciled by any mere limiting construction (tellingly, the FEC recommends none), and, in any event, the agency's co-defendants, who are responsible for issuing and implementing the Order, do not agree that Section 7 conflicts with FECA.[3]

The President and Attorney General incorrectly claim that Section 7 does not conflict with FECA because "none of the provisions . . . [in] the FECA preclude a role of the President or Attorney General in administering the election laws." Administration Mot. to Dismiss ("Admin. MTD"), ECF No. 17, at 12. But FECA grants the President the power to appoint Commissioners,

---

[3]    The White House's "Fact Sheet" for the Order, upon which the FEC relies, *see* FEC MTD at 26, only reinforces the Administration's intent to apply the Order to "*all* executive branch officials" and "all agencies," including the FEC, *see* Fact Sheet: President Donald J. Trump Reins in Independent Agencies to Restore a Government that Answers to the American People, THE WHITE HOUSE, (Feb. 18, 2025), https://perma.cc/NY82-QNWT.

*see* 52 U.S.C. § 30106(a)(1), and that is all. FECA precludes any role for the President or Attorney General in those commissioners' administration of the Act by granting them no such role. For example, Congress precluded any role for the President and Attorney General in conducting FECA litigation before federal district and circuit courts by granting that authority only to the FEC's general counsel. *NRA Pol. Victory Fund*, 513 U.S. at 91-92 & n.1. More broadly, Congress granted the Commission the power to interpret FECA with the vote of at least four commissioners— without requiring additional approvals. FECA thus "explicitly vests discretion to make . . . decisions in the [Commission] and does not contemplate that the President or the White House will become involved in [Commission] deliberations." *Portland Audubon Soc. v. Endangered Species Comm.*, 984 F.2d 1534, 1545 (9th Cir. 1993); *see also United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266-67 (1954) (rejecting claim that Attorney General could dictate a decision of the Board of Immigration Appeals because by law the decision had been delegated to the Board "to exercise its own judgment"). At the very least, therefore, Section 7 conflicts with FECA's grant of discretion to the Commission to exercise its powers with the vote of at least four commissioners. *Cf. Am. Hist. Ass'n v. Nat'l Archives & Recs. Admin.*, 516 F. Supp. 2d 90, 109-10 (D.D.C. 2007) (holding that an Executive Order illegally conflicted with the Presidential Records Act (PRA) by "effectively eliminat[ing] the Archivist's discretion [granted by the PRA] to release a former president's documents") (citing *Accardi*, 347 U.S. at 266-67).[4]

---

[4]    The Administration attempts to minimize the impact of the Order by claiming that it does not "affect the Commission's factfinding authorities." Admin. MTD at 12. Notably, the Administration does not disclaim the power to issue an order affecting the Commission's factfinding authority in the future. But in any event, FECA's legislative history clearly indicates that Congress intended for the FEC to be independent *in every facet*, including in its critical role interpreting FECA. *See supra* Part I.A. The Administration cites no law indicating otherwise.

Second, the Order conflicts with FECA insofar as the Act's four-vote requirement guarantees parties appearing before the agency—seeking rulemakings, requesting advisory opinions, or in enforcement proceedings—the right to a politically impartial adjudicator. The Commission "must decide issues charged with the dynamics of party politics, often under the pressure of an impending election." *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37 (1981). For this reason, "Congress uniquely structured the FEC toward maintaining the status quo," as "[t]he voting and membership requirements mean that, unlike other agencies—where deadlocks are rather atypical—FEC will regularly deadlock as part of its *modus operandi*." *Pub. Citizen, Inc. v. FERC*, 839 F.3d 1165, 1171 (D.C. Cir. 2016). "To ignore [FECA's four-vote] requirement would be to undermine the carefully balanced bipartisan structure which Congress has erected." *Common Cause v. FEC*, 842 F.2d 436, 449 n.32 (D.C. Cir. 1988). Yet the Order effectively nullifies the four-vote requirement by decreeing that the vote of just one person from one party—the President—can control the outcome of a Commission decision. By doing so, the Order undermines FECA's primary protection against the "possibility that similarly situated parties may not be treated evenhandedly." *Common Cause*, 842 F.2d at 449.

Third and finally, Section 7 also conflicts with current law because it requires the FEC to violate prohibitions on communicating about pending matters to those outside the Commission. *See supra* at 9-10. Under Section 7, commissioners must obtain authorization from the President or Attorney General—who are outside the agency—before advancing a FECA interpretation that "contravenes" the administration's "opinion." *Cf. Portland Audubon*, 984 F.2d at 1545 ("The President and his aides are not a part of the Committee decision-making process. They are 'outside the agency' for purposes of the ex parte communications ban."). The conversations required to

obtain authorization in such cases risk disclosing "extraordinarily sensitive political information . . . to the public—and to political opponents." *AFL-CIO*, 177 F. Supp. 2d at 51.

This risk is significant even assuming the Order "does not bind the President or Attorney General to stake a position on any or every legal issue that will appear before the Commission," as the Administration claims. Admin. MTD at 12. Section 7 may require the Commission to clear many of the legal interpretations it wishes to advance with the President and Attorney General *before* doing so, to determine if those interpretations would contravene the Administration's "opinion." Whether the Administration has an opinion on the myriad of legal issues that come before the FEC will likely not be public or obvious in the vast majority of cases. The authorization requirement may thus require commissioners to regularly seek permission from the administration before advancing legal opinions. *See infra* Part II.A.

## II. Concerns About Presidential Overreach Are Exacerbated by the Lack of Transparency About How the Order Will Be Implemented.

Intensifying the risks posed by the Administration's unlawful attempt to exert control over the independent FEC is the lack of transparency about how the Order has been and will be implemented. Although the Administration states broadly that the "President and Attorney General have not issued any interpretation of the FECA to date," Admin. MTD at 7, it is still unclear how the Administration's legal interpretations have been or will be communicated to agencies, and whether such communications will be public. Defendants challenge plaintiffs' standing and the ripeness of their claims based on the Administration's unsupported allegation that it has not yet "implemented" the Order, but any non-public communications between the Administration and the FEC are uniquely and exclusively within the knowledge of defendants.

Indeed, the lack of transparency around the Order's application and implementation is *itself* a problem, and further undermines the integrity of the FEC's administration of the Act, and more

14

broadly, FECA's goal of accountable, open government. Before crediting the unsworn factual assertions on which the Administration's motion to dismiss relies, CLC urges this Court, at a minimum, to require defendants to disclose any steps, public or non-public, they have taken to implement the Order, including any communications from the Administration to the FEC concerning interpretations of FECA or FEC regulations.

### A. Defendants should not be permitted to leverage the lack of transparency around their implementation of the Order to challenge plaintiffs' standing.

Defendants challenge plaintiffs' standing to bring this suit based on the Administration's claims that it has taken no public steps to implement the Order. These claims are not substantiated by any declarations or other support. Both plaintiffs and this Court lack information about how the Administration has implemented or will implement the Order, and whether this implementation will occur in a public or non-public manner. But assessing defendants' challenge to plaintiffs' standing and the ripeness of their claims requires the disclosure of all communications between the Administration and the FEC pursuant to the Order, both past and planned.

Even as they assert that plaintiffs "cannot point to any injury, let alone an injury traceable to Defendants," Admin. MTD at 11, the Administration defendants make no attempt to explain how plaintiffs would identify such an injury, past or future, given the lack of transparency around the Order. The Administration should not be permitted to strategically leverage the vagueness of the Order's text—vagueness for which the defendant President is himself responsible—and the lack of information about its implementation to question plaintiffs' standing.

And even if the Administration's claims regarding the implementation of the Order are credited, this would not obviate all harm caused by the Order. Plaintiffs have already been impacted by the Order because it renders an agency that is statutorily mandated to serve as an

independent and non-partisan arbiter of the law into an arm of plaintiffs' political opponents. *See* DNC PI Mot. at 17, 19-21.

It is no answer to claim that the Administration has not yet taken public action to implement this executive order. *See* Admin. MTD at 10. Even if this is true, the impartiality of the FEC has already been undermined, especially insofar as commissioners operate in a quasi-judicial role, as they do when reviewing and deciding on citizen complaints under section 30109(a)(8). *See Schweiker v. McClure*, 456 U.S. 188, 195–96, (1982) ("[D]ue process demands impartiality on the part of those who function in judicial or quasi-judicial capacities."). As the Supreme Court has recognized, "there may be duties of a quasi-judicial character imposed on executive [tribunals] . . . whose decisions after hearing affect the interests of individuals, the discharge of which the President cannot in a particular case properly influence or control." *Myers v. United States*, 272 U.S. 52, 135 (1926); *see also Sierra Club v. Costle*, 657 F.2d 298, 406-07 (D.C. Cir. 1981) (recognizing that there "is no inherent executive power to control the rights of individuals" in "adjudications or quasi-adjudicatory proceedings"); *Professional Air Traffic Controllers Org. v. Federal Labor Relations Auth.*, 685 F.2d 547, 570 (D.C. Cir. 1982) ("We think it a mockery of justice to even suggest that judges or other decisionmakers may be properly approached on the merits of a case during the pendency of an adjudication.").

That harm to the FEC's impartiality—and thus to plaintiffs and others in the regulated community—is real and immediate, regardless of if or when the Administration in fact overrules the FEC's views on the law in any particular case. *Cf. Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 877 (2009) (explaining that there "are circumstances in which experience teaches that the *probability* of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable" (emphasis added)). The due process risks are clear where, as here, the rights of a party

appearing before the Commission rest on whether the leader of the rival political party directs the agency to adopt a legal interpretation adverse to those rights. And recent events indicate that plaintiffs' concerns about political retaliation are not illusory. The President has issued multiple executive orders against individual law firms based on the clients they have represented in the past, seeking to bar them from government business and strip lawyers of security clearances; one such law firm was Perkin Coie, targeted in part due to its representation of Trump's 2016 opponent, "failed Presidential candidate Hillary Clinton." *See* Exec. Order No. 14,230, *Addressing Risks From Perkins Coie LLP* (Mar. 6, 2025), https://www.federalregister.gov/documents/2025/03/11/ 2025-03989/addressing-risks-from-perkins-coie-llp.

The Order also impermissibly allows the Administration to direct the agency to adopt legal interpretations that are friendly to the President's rights as a respondent before the agency. President Trump and his electoral campaigns have been accused of violating the campaign-finance laws in dozens of FEC complaints, including some filed by CLC.[5] *See* Statement of Reasons of Commissioners Shana M. Broussard and Ellen L. Weintraub at 1, *In re Matter of Make America Great Again PAC, et al.* (MUR 7784) (June 15, 2022) ("Since the 2016 election cycle, the FEC has received more than 40 complaints involving Donald Trump or his committee."). It is untenable for

---

[5]    CLC has filed multiple complaints against Trump's presidential campaigns and those of his electoral opponents. *See also supra* n.1. For instance, pending before the FEC is a complaint CLC filed against the 2024 Trump campaign and several Trump-affiliated committees for failing to fully disclose their payments to reimburse a vendor for legal expenses. *CLC Alleges that Donald Trump's Committees Illegally Obscured Legal Services Payments* (Apr. 24, 2024), https://campaignlegal.org/document/clc-alleges-donald-trumps-committees-illegally-obscured-legal-services-payments. CLC is also litigating a challenge under 52 U.S.C. § 30109(a)(8) to the FEC's dismissal of a complaint it filed against Trump's 2020 campaign committee, alleging that the committee had failed to disclose the final recipients of millions of dollars in expenditures it funneled through intermediaries. *CLC Sues FEC Over Dismissal of Complaint Alleging Violations by Trump Campaign* (Jul. 8, 2022), https://campaignlegal.org/update/clc-sues-fec-over-dismissal-complaint-alleging-violations-trump-campaign.

defendants to suggest that there is no harm posed by an executive order that authorizes plaintiffs' political opponents to dictate the FEC's interpretations of law in enforcement actions pending against plaintiffs—and against Trump himself.

Finally, the Order also impacts organizations, like CLC, that practice before the FEC and who rely on the FEC to interpret, administer, and enforce the law free of political or partisan influence, as FECA requires. For example, after DOJ moved to dismiss criminal charges brought against New York City Mayor Eric Adams, CLC filed a complaint on February 18, 2025 with the FEC, alleging that the criminal indictment had gathered evidence indicating that Adams had violated FECA's provisions prohibiting the solicitation or acceptance of foreign national contributions. *See CLC Files FEC Complaint Against Mayor Eric Adams for Violations of the Ban on Soliciting and Accepting Donations from Foreign Nationals* (Feb. 18, 2025), https://campaignlegal.org/document/clc-files-fec-complaint-against-mayor-eric-adams-violations-ban-soliciting-and-accepting. That same day, the Trump Administration released the Order, raising questions about whether the FEC even held the authority to take enforcement action in the matter that would run counter to the Administration's decision to drop the Adams prosecution.

CLC then submitted an advisory opinion request asking the FEC whether CLC retained the right under section 30109(a)(1) to submit its complaint and any future complaints against Adams given that the Attorney General had expressed opposition to the enforcement of the federal foreign money prohibitions with respect to Adams.[6] The FEC responded by stating that this letter did not

---

[6]    CLC has made other efforts to obtain information about how the Administration and FEC will implement the executive order. On February 28, 2025, CLC sent the FEC a public letter expressing its view that Order was contrary to FECA and urging the FEC to reject the President's attempt to control its decision-making—or at least to clarify its position on the Order. *CLC Letter*

qualify as advisory opinion request and declined to answer the questions asked. *See* FEC Response

to CLC's March 10 AOR (Mar. 20, 2025), https://campaignlegal.org/document/fec-denies-clcs-

request-clarify-enforcement-rights-after-trumps-executive-order.[7]

**B.    The lack of disclosure about the Order's implementation harms CLC's regulatory practice and its interest in transparent government.**

Section 7 of the Order prevents FEC commissioners from fulfilling their statutory

responsibility to administer FECA in the neutral, nonpartisan manner that the statute requires. And

the lack of transparency about the application and implementation of the Order hinders CLC's

efforts both to understand and counteract the impact of the Order on the FEC's independence and

to advance the goal of transparent and accountable government.

"In a republic where the people are sovereign, the ability of the citizenry to make informed

choices . . . is essential." *Buckley v. Valeo*, 424 U.S. 1, 14-15 (1976) (per curiam). Citizens need

disclosure about public officials and their activities in office, as well as information about the

operations of government, if they are to meaningfully engage in democratic self-governance and

debate. Transparency in government enables citizens to understand governmental actions and

policy decisions, evaluate the performance and integrity of public officials, guard against political

corruption and abuse of office, and reinforce checks and balances in governmental operations.

---

*Re: Executive Order "Ensuring Accountability for All Agencies"* (Feb. 28, 2025), https://campaignlegal.org/sites/default/files/2025-02/2025-02-28_CLC%20Letter%20re%20Indep%20Agency%20EO_FINAL.pdf. To date, the FEC has not responded to this letter.

[7]    CLC amended its advisory opinion request and filed again on March 25, specifying that it was planning to submit a supplemental complaint against Mayor Adams and asking whether Section 30109(a)(1) permits CLC to file given that the "legal assertions in that filing would be inconsistent with the President's and the Attorney General's opinions on matters of law." Amend. AOR at 2 (Mar. 25, 2025), https://campaignlegal.org/document/clc-revises-request-asking-fec-clarify-enforcement-rights-after-trumps-executive-order. No response has yet been forthcoming from the FEC.

Indeed, the recognition that transparency fosters democratic accountability is the impetus for laws like the Freedom of Information Act (FOIA), 5 U.S.C. § 552, the Federal Advisory Committee Act (FACA), 5 U.S.C. Appendix, FACA, 86 Stat. 770, the Sunshine Act, 5 U.S.C. § 552b—and of course, FECA itself. As the Supreme Court has noted, "[t]he right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. FEC*, 558 U.S. 310, 339 (2010).

The threats posed by the Order to transparent and accountable government—and more specifically, to the FEC's independent and impartial administration of federal election and disclosure laws—are multiple and compounding. The Order makes the FEC answerable to the President, undermining the agency's ability to administer and enforce FECA impartially and effectively—including the Act's comprehensive campaign finance disclosure requirements, which the Trump campaign has been charged with violating in successive elections. *See supra* n.5. But there is little transparency about whether and how this Order will be implemented with respect to the Commission, which deprives the regulated community, advocacy groups like CLC, and the general public of the information they need to monitor and evaluate the Order's effects on the FEC and federal elections. This lack of transparency around the Order and the Administration's actions is also a broader problem, discouraging citizens from participating in the political process, evaluating the actions of public officeholders and employees, and checking Executive overreach and abuse.

**CONCLUSION**

The Order is contrary to FECA and damages the independence and impartiality of the FEC; the lack of disclosure around the Order's implementation inhibits the transparency needed both to

facilitate public oversight over the Commission and to sustain public confidence in American elections. This Court should deny defendants' motions to dismiss.

**Dated: April 3, 2025**

Respectfully submitted,

/s/ *Tara Malloy*

Adav Noti (D.C. Bar No. 490714)
Tara Malloy (D.C. Bar No. 988280)
Erin Chlopak (D.C. Bar No. 496370)
Kevin P. Hancock (D.C. Bar No. 90000011)
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Ste. 400
Washington, DC 20005
(202) 736-2200
anoti@campaignlegalcenter.org
tmalloy@campaignlegalcenter.org
echlopak@campaignlegalcenter.org
khancock@campaignlegalcenter.org

*Counsel for Amicus Curiae*